**JAN STIGLITZ (SBN 103815)**
**LAW OFFICE OF JAN STIGLITZ**
225 Cedar St.
San Diego, CA 92101
Tel.: (619) 525-1697
Fax: (619) 615-1497

**BRETT A. BOON (SBN 283225)**
**CRAIG S. BENNER (SBN 283913)**
**BENNER & BOON, LLP**
542 12th Street
San Diego, CA 92101
Tel.: (619) 358-9779
Fax: (619) 365-4926

Attorneys for Plaintiff
**WILLIAM J. RICHARDS**

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| WILLIAM J. RICHARDS, <br> Plaintiff, <br> v. <br><br> COUNTY OF SAN BERNARDINO; OFFICE OF THE SAN BERNARDINO COUNTY DISTRICT ATTORNEY; SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT; DISTRICT ATTORNEY MICHAEL RAMOS; DEPUTY DISTRICT ATTORNEY MICHAEL RISLEY; MARK NOURSE; NORMAN PARENT; CRAIG OGINO; DANIEL GREGONIS; NORMAN SPERBER, & DOES 1-10 INCLUSIVE, <br> Defendants. | **PLAINTIFF'S COMPLAINT FOR DAMAGES** <br> **Deprivation of Civil Rights** <br><br> **DEMAND FOR JURY TRIAL** |

**JURISDICTION AND VENUE**

1.  This action is brought by Plaintiff WILLIAM J. RICHARDS (hereinafter "Mr. Richards" or "Plaintiff") pursuant to 42 U.S.C. §§ 1983 and 1985.

2.  This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including, 42 U.S.C. §§ 1983 & 1985

3.  The acts and/or omissions complained of herein commenced on or about August, 1993 and continued until approximately May, 2016 within the Central District of California, Eastern Division.  Thus, venue lies in this District pursuant to 28 U.S.C. § 1391.

**SUMMARY OF CLAIMS**

4.  Mr. Richards spent more than 23 years imprisoned for a crime he did not commit: the August 10, 1993 murder of his wife, Pamela Richards (hereinafter "Mrs. Richards").

5.  From the moment he was first arrested, Mr. Richards has consistently maintained his innocence, that he had nothing to do with the murder, and he did not know anything about the true perpetrator.

6.  After three full trials, the prosecution obtained a conviction against Mr. Richards, and the court sentenced him to 25 years to life. Mr. Richards's wrongful conviction was the result of intentional and/or deliberately indifferent misconduct by all named Defendants, who cared more about a conviction than finding the true perpetrator.  Defendants used unconstitutional means to wrongfully convict Mr. Richards.

7.  After working to uncover the false evidence used against him and obtaining new scientific evidence further proving his innocence, Mr. Richards obtained his freedom in May, 2016 after a ruling from the Supreme Court of California finding that he was convicted based on false evidence.

PLAINTIFF'S COMPLAINT FOR DAMAGES

## PARTIES

8.   At all times mentioned herein, Mr. Richards was a resident of the State of California.

9.   The Defendant **County of San Bernardino** was a public entity, organized and existing under the laws of the State of California.

10.  Defendant **San Bernardino County Sheriff's Department is** a public entity, organized and existing under the laws of the State of California.  The San Bernardino County Sheriff's Department is an agency of the County of San Bernardino.

11.  Defendant **San Bernardino County District Attorney's Office** was a public entity, organized and existing under the laws of the State of California.  The San Bernardino County District Attorney's Office is an agency of the County of San Bernardino.

12.     At all times mentioned herein, Defendant San Bernardino County District Attorney **Michael Ramos** was employed by and working on behalf of Defendant San Bernardino County District Attorney's Office, and resided within the jurisdiction of the State of California.  Defendant Michael Ramos is sued in his individual capacity.

13.  At all times mentioned herein, Defendant San Bernardino County Deputy District Attorney **Michael Risley** was employed by and working on behalf of Defendant San Bernardino County District Attorney's Office, and resided within the jurisdiction of the State of California.  Defendant Michael Risley is sued in his individual capacity.

14.  At all times mentioned herein, Defendant **Frank Sheridan**, M.D. was employed by and working on behalf of Defendant San Bernardino County, serving as its Chief Medical Examiner, and resided within the jurisdiction of the State of California.  Defendant Frank Sheridan is sued in his individual capacity.

15.    At all times mentioned herein, Defendant Sergeant **Tom Bradford** was employed by and working on behalf of Defendant San Bernardino County Sheriff's Department, serving as a Sergeant, and resided within the jurisdiction of the State of California.  Defendant Tom Bradford is sued in his individual capacity.

16.    At all times mentioned herein, Defendant Deputy **Mark Nourse** was employed by and working on behalf of Defendant San Bernardino County Sheriff's Department, serving as a Sheriff's Deputy, and resided within the jurisdiction of the State of California.  Defendant Mark Nourse is sued in his individual capacity.

17.    At all times mentioned herein, Defendant Deputy **John Navarro** was employed by and working on behalf of Defendant San Bernardino County Sheriff's Department, serving as a Sheriff's Deputy, and resided within the jurisdiction of the State of California.  Defendant John Navarro is sued in his individual capacity.

18.    At all times mentioned herein, Defendant Detective **Norman Parent** was employed by and working on behalf of Defendant San Bernardino County Sheriff's Department, serving as a Sheriff's Detective, and resided within the jurisdiction of the State of California.  Defendant Norman Parent is sued in his individual capacity.

19.    At all times mentioned herein, Defendant **David Stockwell** was employed by and working on behalf of Defendant San Bernardino County, serving as a Criminalist, and resided within the jurisdiction of the State of California. Defendant David Stockwell is sued in his individual capacity.

20.    At all times mentioned herein, Defendant **Daniel Gregonis** was employed by and working on behalf of Defendant San Bernardino County, serving as a Criminalist, and resided within the jurisdiction of the State of California. Defendant Daniel Gregonis is sued in his individual capacity.

21. At all times mentioned herein, Defendant **Craig Ogino** was employed by and working on behalf of Defendant San Bernardino County, serving as a Criminalist, and resided within the jurisdiction of the State of California. Defendant Craig Ogino is sued in his individual capacity.

## PARTICIPATION, STATE OF MIND, and DAMAGES

22. All Defendants acted without authorization of law and acted under color of law.

23. Each Defendant participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew of the violations alleged herein and failed to act to prevent them.  Each defendant ratified, approved, and/or acquiesced in the violations alleged herein.

24. As joint actors with joint obligations, each defendant was and/or is responsible for the failures and omissions of the other.

25. Each Defendant acted individually and/or in concert with the other Defendants and others not named in violating Mr. Richards's rights.

26. Each Defendant acted with a deliberate indifference to and/or reckless disregard for an accused's rights for the truth by withholding evidence from the defense, and/or for preventing Mr. Richards's right to a trial free from constitutional defect, and free of active concealment of material facts, and/or for the Plaintiff's right to due process of law.

27. As a direct and proximate result of the aforementioned acts, omissions, customs, practices, policies, and decisions of the Defendants, Mr. Richards has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Mr. Richards to sustain damages in a sum to be determined at trial.

28. Due to the acts of the Defendants, Mr. Richards has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental

anguish as well as mental and physical pain and injury.  For such injury, Mr. Richards will incur significant damages based on psychological and medical care.

29.   As a further result of the conduct of each of these Defendants, Mr. Richards has lost past and future earnings in an amount to be determined according to proof at trial.

30.   As a further result of the conduct of each of these Defendants, Mr. Richards has been deprived of a lifetime of friendships and familial relationships.

31.   The aforementioned acts of the Defendants, each of them, was willful, wanton, malicious, oppressive, in bad faith, and done with reckless disregard or with deliberate indifference to the constitutional rights of Mr. Richards entitling him to exemplary and punitive damages from each Defendant in an amount to be proven at trial.

32.   By reason of the above described acts and omissions of Defendants, Mr. Richards was required to retain attorneys to institute and prosecute this action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

33.   Mr. Richards is informed, believes, and alleges that at all times mentioned herein, each of the Defendants was the agent for and/or employee of the remaining DOE Defendants, and in doing the things hereafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and/or with the permission, consent, and/or direction and/or adoption of the other co-Defendants.

34. Each and every paragraph of this Complaint for Damages is expressly incorporated into each cause of action alleged herein as if stated fully therein.

35. The acts and/or omissions of all Defendants, named and un-named were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Mr. Richards.

**FACTUAL ALLEGATIONS**

36. This claim arises from the wrongful and unconstitutional investigation, prosecution, conviction, and incarceration of Mr. Richards for the murder of his wife, Pamela Richards.  Mrs. Richards was murdered on August 10, 1993.

37. Due to the wrongful and unconstitutional acts of the Defendants, Mr. Richards, an innocent widower, was convicted and incarcerated, serving more than 23 years in prison, for the murder of Mrs. Richards.

38. Mr. Richards experienced fear, anxiety, stress, and severe mental anguish during the time of his incarceration, and continues to suffer these psychological harms due to the wrongful conduct of the Defendants.

39. From the date of his arrest throughout his 23 years in custody, Mr. Richards maintained his complete innocence of the murder of his wife.  On June 21, 2016, Mr. Richards was released from custody.

*THE CRIME*

40. On August 10, 1993, Mrs. Richards was severely beaten outside of her home with fist-sized rocks, manually strangled, and a cinder block and stepping stone were used to crush her skull.  The killer dropped a cinder block on her head, crushing her skull, and creating blood spatter for a radius of fifteen feet.

41. The murder of Mrs. Richards occurred sometime while Mr. Richards was working at his regular place of employment as a mechanical engineer.

42. That evening, Mr. Richards clocked out of work at his normal time, 11:03 p.m. and drove home.

43. Mr. Richards and Mrs. Richards lived in a remote location of San Bernardino County.

44. Upon arriving home, Mr. Richards initially noted all the lights were off, but this was not particularly unusual considering the property's electricity was run entirely by a generator.

45. Mr. Richards went to the shed and had a glass of iced tea. He then walked toward the home and saw his wife lying face down by the porch. He turned her over to see what was wrong and his fingers went into a hole in her head. Mr. Richards, cradled his wife in disbelief and horror, and then heard the phone ring.

46. Eugene Price (Mrs. Richards's former lover) called and spoke with Mr. Richards at 11:55 p.m. Mr. Price testified Mr. Richards's told him (Mr. Price) that Mrs. Richards was dead. Mr. Price told him to call 911. Mr. Richards called 911 at 11:58 p.m.

47. The timeline was critical to highlighting the failures of the investigators in the investigation of Mr. Richards's case and the problems with the prosecution's accusations at trial.

48. It was undisputed and thoroughly verified that Mr. Richards clocked out of work at 11:03 p.m. and drove home. San Bernardino Deputy Sheriff John Navarro recreated that drive, and determined that it would have taken forty-one minutes to do so—suggesting that Mr. Richards arrived home no earlier than 11:47 p.m. Since Mr. Price spoke with Richards at 11:55 p.m., by the prosecution's time line, Mr. Richards had only eight minutes in which to kill his wife.

49. When officers responded to the 911 call, they immediately focus their limited investigation on Mr. Richards. In fact, at the first criminal trial, Mr.

Richards's attorney overheard the Sheriff's Deputies make a comment to the effect that they had made up their mind about Mr. Richards's guilt before even arriving on the crime scene.

50. Deputy Mark Nourse (hereinafter "Nourse") arrived on the scene at approximately 12:32 a.m.  Nourse testified that it was very dark when he reached the scene.   However, historical data proves this statement to be false, as the skies above Mr. Richards' homestead that night were clear with a bright full moon illuminating the night ski.

51. Mr. Richards directed Nourse to the body and told Nourse Mrs. Richards was dead.  Mr. Richards told Nourse he found the victim face down and he turned her over.

52. Nourse put on surgical gloves and checked the body, but otherwise failed to investigate the murder scene.

53. Homicide detectives did not arrive on the scene until 3:15 a.m. Because it was nighttime and the lighting was poor—and, most importantly, because they had already concluded Mr. Richards was the culprit—the detectives decided to abandon the crime scene entirely.  They did not process the scene until 6:00 a.m., more than six hours after the body was found.  In the interim, Mr. Richards's dogs entered the crime scene, partially burying Pamela's body while Deputy Nourse and other law enforcement were on the scene.

54. San Bernardino County Sheriff's Homicide Detective Norman Parent (hereinafter "Parent") and his team found the victim covered by a sleeping bag; she was naked from the waist down except for a pair of socks. A 12x12x2-inch stepping stone was found north of the victim.

55. The horrific details of the crime spread quickly throughout the local neighborhood and the State of California.  Desperate for the appearance of positive action and the naming of a villain, the San Bernardino County

Sheriffs' Department, District Attorney's Office, and San Bernardino County charged Mr. Richards with one count of first degree murder.

*THE INVESTIGATION, PROSECUTION, AND WRONGFUL CONVICTION*

56. From the beginning, investigators sought to find evidence of Mr. Richards's guilt, and the investigation as well as ultimate prosecution focused solely on Mr. Richards without consideration of glaring inconsistencies in the case they presented.

57. Inexplicably, neither Nourse, Parent, nor any other officer, performed the most basic and common sense investigatory functions upon arriving at the murder scene.

58. Officers failed to feel the hood or engine of Mr. Richards's car to determine whether they could prove—or disprove—his statements about when he arrived home.

59. Mr. Richards had informed the police there was *no power at all* in the RV, and that even the interior lights would not turn on. Because of the size of the RV's battery, it would have been impossible for the battery to have run down and died completely to the point that the lights would not work. This meant the battery was not dead, *but that it had been removed*, likely by the true perpetrator or perpetrators. A dead battery in the RV would have been consistent with the prosecution's theory—or, at the very least, it was not inconsistent with Mr. Richards having committed the crime. A missing battery, however, provided powerful evidence indicating someone other than Mr. Richards was on the property and had stolen the battery in connection with the murder.

60. After Mr. Richards's arrest and before he was put on trial, the Defendants destroyed the entire crime scene by removing the trailer and all other structures, materials, and items from the property, preventing Mr. Richards

- 9 -

from developing evidence of his innocence and solidified the false evidence used against him.

61. Other failings of law enforcement meant key pieces of exculpatory evidence were ignored or never collected, to Mr. Richards's detriment. Officers failed to feel the generator to determine if it had been in use notwithstanding that Officers knew this was the only source of power on the property.

62. Officers failed to fingerprint the vehicles, anywhere inside or outside the home, the shed, or two smooth fist sized rocks that had clearly been used to strike the victim.

63. Officers failed to swab the purported "bite-mark" found on Mrs. Richards in order to test for DNA from the biter's saliva.

64. Also, detectives and officers refused to allow the coroner's medical team to properly investigate. This caused questions like time of death and other crime scene investigatory questions to go permanently unanswered.

65. Within 24 hours of the murder, Sergeant Tom Bradford and Sheriff's investigators took pictures of Mr. Richards and collected all the clothes he was wearing the night his wife was killed. They also took pictures of Mr. Richards's hands. The authorities did not find any cuts, abrasions, or wounds on Mr. Richards.

66. On September 03, 1993, Mr. Richards was arrested. However, a complaint and charges for the murder of Mrs. Richards were not brought against him for another eight days.

*THE PROSECUTION'S CASE*

67. It took four attempts to wrongfully convict Mr. Richards of the crime. Mr. Richards's first trial resulted in a hung jury. In his second trial, the court recused itself, and declared a mistrial. The third trial resulted in a second hung jury. Desperate for a conviction, in the fourth trial, Defendants

1    introduced—for the first time—false and fabricated bite mark evidence,
2    which directly resulted in the wrongful conviction.

68.  In addition, San Bernardino county employees—specifically, officers and
     agents from the San Bernardino County Sheriff''s Department—
     intentionally and deliberately misrepresented their background and
     investigation credentials when testifying against Richards.  Sheriff's Deputy
     Mark Nourse stated he had experience dealing with trauma victims in the
     Air Force, stating: "I had an airliner go down in Alaska with numerous well,
     victims in all stages of care.  I mean, from walking and become fine to
     deceased."  Nourse also stated he had been certified as an Emergency
     Medical Technician while in the Air Force:

> Q.  What is an EMT?
> A.  It stands for Emergency Medical Technician.  It's — you
>     receive considerable more training, advanced first aid,
>     and it's one step below a paramedic.
> Q.  Were you or are you an EMT?
> A.  Yes, sir, I was.  The basic EMT was approximately a
>     semester-long course, which you went through classroom
>     study for the full semester and you did field studies the
>     whole time.

69.  The prosecution used both of these statements to show to the jury that
     Nourse was uniquely qualified to determine that Richards's reactions to his
     wife's death were suspicious.

70.  Both of these statements Nourse made—that he dealt with trauma victims
     after an airplane crash in the Air Force, and that he was an EMT—are lies.
     Nourse never worked with trauma victims of a plane crash while he was in
     the Air Force, and he was never certified as an EMT.  Nourse and others used
     this false testimony against Richards at his trial, in violation of his
     constitutional rights.

71.  Further, the prosecution repeatedly elicited fabricated testimony and
     argued that no one other than Mr. Richards could have committed the

1    murder because there was no evidence of anyone other than Mr. Richards
2    and Mrs. Richards at the murder scene.

3    72.    The prosecution tried to argue that despite his employment records proving
4          he was at work until 11:03 p.m., Mr. Richards somehow managed to drive
5          home, kill his wife, and answer Mr. Price's phone call, all by 11:55 p.m.  Since
6          San Bernardino Sheriff's Deputy John Navarro testified he made the drive in
7          forty-one minutes, this left Mr. Richards only 8 minutes—an incredibly short
8          time span—to commit the murder.

9    73.    Dr. Frank Sheridan, Chief Medical Examiner, performed an autopsy of Mrs.
10         Richards's body.  Dr. Sheridan gave no opinion as to time of death, however
11         he found pronounced marks on Mrs. Richards's buttocks area from pebbles,
12         indicating she had been lying on her back for *some time* after she had died.
13         He could not say she had died in that position. He did not find similar marks
14         on her breasts.   Dr. Sheridan also found evidence of lividity on Mrs.
15         Richards's back. According to Dr. Sheridan, it usually takes at least two hours
16         for lividity to become obvious and it becomes fixed at six to ten hours. These
17         findings were consistent with Mr. Richards's explanation of finding Pamela
18         on her stomach and then rolling her over.

19   74.    At the autopsy, before Mrs. Richards's right index and middle fingertips
20         were severed and delivered to criminalist Daniel Gregonis (hereinafter
21         "Gregonis"), criminalist Craig Ogino (hereinafter "Ogino") received
22         scrapings from Mrs. Richards's fingernails.  Ogino looked at the fingernails
23         under a stereo microscope and *never* reported that a tuft of blue fibers was
24         lodged in a crack in Mrs. Richards's right middle fingernail.  The material
25         that was recovered from under the fingernails of the victim's right hand
26         included a large amount of soil and blood, one tri-lobule synthetic fiber, one
27         dark-blue wool fiber, one dark hair, and one blond hair.  At the first trial,

28

Gregonis testified that there is no hair that was consistent with anyone but Pamela Richards on Pamela Richards.

75. A key piece of evidence against Mr. Richards was a tuft of blue fibers that Gregonis—and Gregonis alone—noticed after the fingertips were severed from the body at autopsy.  Gregonis classified this tuft of blue cotton fibers as relevant to the investigation, because he found it "jammed" in a crack in the victim's right middle fingernail.  At Mr. Richards's fourth trial (resulting in the guilty verdict), Gregonis testified this tuft of blue cotton fibers was indistinguishable from fibers in the blue cotton shirt Mr. Richards was wearing the night Mrs. Richards was murdered.  The prosecution argued the fact this tuft of fibers was "jammed" in into Mrs. Richards's fingernail meant Mrs. Richards had been fighting off Mr. Richards when she was murdered, cracking her fingernail and pulling some of the fibers from Mr. Richards's shirt in the process.

76. Again, neither Craig Ogino nor any other law enforcement agent noticed this tuft of blue fibers before the fingers were severed and before Gregonis began examining the severed fingers.  Gregonis only "discovered" the fibers after being left alone with the severed fingers *and after obtaining* a small sample of Mr. Richards's shirt.  Tellingly, Gregonis discarded the shirt sample before trial, thus making it impossible to prove whether the tuft of blue fibers had been pulled from the sample and inserted into the fingernail.

77. Of course, the fact that no other law enforcement investigator discovered the fibers at any point before the fingers were severed and delivered to Gregonis—even after a thorough and complete autopsy of the body, and after the fingernails were completely scraped for DNA evidence—shows Gregonis planted these fibers, intentionally fabricating evidence against Mr. Richards in a successful attempt to obtain a conviction against him.

78. Portions of Gregonis's investigation and subsequent testimony were so devoid of forensic and scientific foundation that they would be laughable if they did not lead to the tragic conviction of an innocent man. For example, investigators found no blood spatter on Mrs. Richards's legs, but did find 30 to 40 blood stains on her pants. Gregonis believed twelve of those stains were from medium energy spatter. Gregonis also four small spots of blood on Mr. Richards's shoelaces. To determine whether this blood evidence was forensically relevant, Gregonis conducted a bizarre series of tests with a papier mâché doll filled with paint, dropping a rock on the doll's head and seeing whether any paint got on his clothing. There was no scientific basis or grounding for these "forensic" tests, yet Gregonis ultimately testified the blood spatter found at the crime scene and on Mr. Richards's clothing was consistent with Richards committing the murder.

79. Dr. Norman Sperber, the chief forensic dentist for San Diego and Imperial Counties, also testified for the prosecution. Dr. Sperber testified that he examined a single autopsy photograph of the victim's right hand and identified a lesion which he concluded was a human bite-mark made by the lower teeth. Dr. Sperber testified that the lesion had "a roundness only seen in bite-marks."

80. Dr. Sperber opined that whoever left the mark had a distinctive abnormality relative to their lower right canine tooth and that Mr. Richards had the same distinctive abnormality, shared by "one or two or less" out of one hundred people.

### THE DEFENSE CASE

81. Testifying as a witness for Mr. Richards, Dr. David Thomas concluded it was difficult to estimate a precise time of death because tests routinely conducted to aid in that determination were never conducted by investigators.

82.  Mr. Richards's appointed attorney tried to highlight the lack of obvious investigative procedures.

83.  Mr. Richards hired a private investigator who made three trips recreating the route Mr. Richards would have used when returning home from work. According to the investigator, if Mr. Richards had driven home at 65 mph, he would have arrived home at 11:54 p.m., just moments before Mr. Price's telephone call.

84.  Dr. Golden (hereinafter "Golden"), who served as the chief odonatologist for San Bernardino County, testified for the defense that he received a single photograph of the injury on the victim's right hand.  He assumed it was a bite-mark and could not rule out Mr. Richards as the biter.

85.  Dean Gialamas (hereinafter "Gialamas"), Senior Criminalist with the Los Angeles County Sheriff's Department, testified regarding the blood spatter evidence and disagreed with the conclusion reached by Gregonis.  Looking at the blood stains on Mr. Richards's shoelaces, Gialamas could not say whether they were the result of transfer or splatter; the stains were consistent with either possibility.

86.  Moreover, Gialamas testified he found the presence of only four spots found on Mr. Richards, all lined up, to be "curious . . . [t]ypically, from beating events, very severe beating events, there typically is a lot of exchange of blood spatter from a bleeding source to a perpetrator."  In addition, there was no blood spatter on the shoe itself.  Ultimately, Gialamas concluded that all the blood stains on Richards appeared to be transfer stains and the stains on Richards's clothing were not consistent with his being Mrs. Richards's killer.

87.  As stated herein, after the fourth attempt of trying the case, the jury found Mr. Richards guilty and he was wrongfully sentenced to 25 years to life in prison for a crime he did not commit.

*MR. RICHARDS FIGHTS FOR HIS FREEDOM*

88.   On December 05, 2007, the California Innocence Project filed a Petition for a Writ of Habeas Corpus on Mr. Richards's behalf, and the San Bernardino Superior Court granted him an evidentiary hearing.  At the hearing, Mr. Richards presented exculpatory DNA evidence, and refuted the false and fabricated evidence encompassing the bite-mark and "blue fiber" evidence used against him.

89.   At the criminal trial, the Prosecution repeatedly took the position that the 12 x 12 x 2-inch stepping stone found north of the victim was one of the murder weapons.  Gregonis had previously identified three areas on the stepping stone that were the most likely places to find the killer's DNA.  In 2006, those areas were tested by the Department of Justice and STR DNA testing conclusively established that two of these three areas contained a mixture of the victim's DNA and male DNA, *not belonging to Mr. Richards*.

90.   Mitochondrial DNA testing of a hair, which had been recovered from amongst blood and debris under one of Mrs. Richards's fingernails, determined that this hair did not belong to Mrs. Richards or Mr. Richards.  Instead, the hair belonged to an unknown third party.

91.   At the only trial resulting in a conviction, Sperber testified to the rarity of Mr. Richards's dentition: "[s]o if it was a hundred people that we took in here, I doubt that we would see in a hundred people one tooth lower, submerged like this.  It might be one or two, or less."  However, at the evidentiary hearing, Sperber recanted and testified he never should have provided an estimate regarding the percentage of the population that had Mr. Richards's dentition abnormality, and stated the statistic he provided was scientifically inaccurate and flatly wrong.

92.   When Sperber testified at Mr. Richards's trial, he did so without any basis in science or statistics to do so.  At the evidentiary hearing, Sperber also

testified that the American Board of Forensic Odontology found such testimony to be inappropriate in the absence of any scientific studies.

93.　At the evidentiary hearing, Sperber testified to a conclusion directly opposite of the conclusion he gave at trial and "ruled out" Mr. Richards as the person who caused the bite-mark on Mrs. Richards's hand: "My opinion today is that [Mr. Richards's] teeth, as we have seen, are not consistent with the lesion on the hand."  "Non-consistent means you don't see similar patterns.  I have essentially ruled [Mr. Richards] out."

94.　In 2007, Dr. Golden digitally scanned a 35-mm slide to generate a high-resolution photo of the bite-mark, and then re-analyzed the bite-mark injury.  Dr. Golden testified that since Mr. Richards's trial, he and other forensic odontologists have used Adobe Photoshop to correct the angular distortion that is visible in some photographs.  Unlike at trial, where he testified that he could not rule out Mr. Richards as the source of the bite-mark, based on a new digital analysis of the photograph, at the hearing, Dr. Golden ruled Mr. Richards out as the source of the bite-mark.

95.　Another expert at the evidentiary hearing, Dr. Bowers, testified that the photograph of Mrs. Richards's hand, used at Mr. Richards's trial, was distorted.  Dr. Bowers testified that he created a corrected version of the photograph and demonstrated numerous areas of discrepancy between Mr. Richards's lower arch teeth and the bite-mark.  The digital analysis Dr. Bowers used captured the outlines of the indentations (from the mold of Mr. Richards lower arch that was originally created by Sperber) to create a digital exemplar to be superimposed onto the corrected bite-mark image.

96.　Dr. Bowers performed various measurements of the bruise and of Mr. Richards's dentition and found that the bruise was too small to have been made by Mr. Richards.  Additionally, when superimposing the exemplar of Mr. Richards's teeth onto the enhanced photograph of the bite-mark, Dr.

Bowers found three of Mr. Richards's teeth matched and three did not, i.e., were, in fact, complete mismatches. Thus, he eliminated Mr. Richards as a possible biter.

97. At the original autopsy of Mrs. Richards, investigators took several photos of her right hand. After the autopsy, the tips of Mrs. Richards's index and middle fingers were severed and delivered to the Sheriff's Department for a forensic examination. Notably, the lab received Mr. Richards's blue cotton shirt the same day.

98. There were *no blue fibers* in or on the nails of the victim's fingers in the initial photographs taken by investigators. The absence of the blue fibers in these initial photographs was verified during Mr. Richards's evidentiary hearing for post-conviction relief. Photographs of the victim's fingers at autopsy and after they were severed were enlarged, enhanced, and compared to each other. An expert used computer software to perform color saturation on the photographs and analyze the colors in each photograph; this technique established categorically that there were no blue fibers in or on the victim's fingers or fingernails before Gregonis "discovered" them.

99. As noted above, the blue fibers were only present after the autopsy had been completed, after Gregonis had control of the victim's severed fingers, and after Gregonis asked for a sample of the blue shirt Mr. Richards wore the night of the murder. Suspiciously, Gregonis created a video of the removal of the blue fibers from the fingertip as a means to document this alleged discovery – yet did not film any other part of the investigative procedures for the case.

100. The only explanation accounting for the appearance of the blue fibers is that they were planted by one or more of the named Defendants—*post-autopsy*—in order to fabricate enough evidence to wrongfully convict Mr. Richards.

101.  Gregonis's history makes his actions concerning the blue fibers even more suspicious, as before Mr. Richards's trial, Gregonis's credibility had been called into doubt.  In a death penalty case, Gregonis examined test results of a drop of blood.  (*People v. Cooper*, 53 Cal.3d 771, 779 (1991).)  The results were inconclusive as to whether the blood's EAP type was B or RB.  (*Id.*)  In direct contradiction to those test results, and with direct knowledge to the contrary, Gregonis testified falsely that the blood appeared to have the same EAP type as the defendant's blood.  (*Id.*)

102.  Additionally, Gregonis lied on the stand in yet another death penalty case.  In 1989, Gregonis testified before a jury that test results could not exclude the defendant as the donor.  (*See People v. Coffman and Marlow*, 34 Cal.4th 1, 126-127 (2004).)  In his own case notes from the *Coffman* case, Gregonis unambiguously recorded that the urine from both stains could not have come from the defendant.  Despite this, Gregonis later testified the results were inconclusive—a direct contradiction of his own findings, advanced for the sake of obtaining a conviction.

103.  At the conclusion of the *habeas* evidentiary hearing, Superior Court Judge Brian McCarville granted the writ in favor of Mr. Richards.  The Court concluded that the evidence presented created a "fundamental doubt . . . as to the accuracy and reliability of the evidence present at trial."  The Court went on to say the following:

> *"The Court has considered the evidence with respect to the bite mark and the DNA as well as the hair evidence and the allegations with respect to Mr. Gregonis . . . I have not taken those portions of evidence individually, but I have taken them collectively in light of each of the witnesses that testified.*
> *. . .*

PLAINTIFF'S COMPLAINT FOR DAMAGES

*The Court finds that the evidence with respect to the bite mark analysis and the DNA analysis and hair analysis has established, taken together, that there was a -- that there did exist and does exist a fundamental doubt in my mind as to the accuracy and reliability of the evidence presented at the trial proceeding. Taking the evidence as to the tuft fiber -- and when I say tuft, I'm talking about the blue fiber under the finger, and the DNA and the bite mark evidence, the Court finds that the entire prosecution case had been undermined, and that petitioner has established his burden of proof to show that the evidence before me presents or points unerringly to innocence.*

*Not only does the bite mark evidence appear to be questionable, it puts the petitioner as being excluded.  And . . . the DNA evidence establishes that someone other than petitioner and the victim was at the crime scene."*

104. In his opinion, Hon. McCarville opined: "Taking the evidence…the blue fiber under the finger, — and the DNA and bite-mark evidence, the Court finds the entire prosecution case has been undermined, and that petitioner has established his burden of proof to show that the evidence before me presents or points unerringly to innocence."

105. However, despite the clear indication of fabricated evidence, the San Bernardino County District Attorney's Office perpetuated the wrongful conviction by appealing the results of the Court's ruling.  On November 19, 2010, the Court of Appeal reversed.

106. Richards filed a Petition for Review with the California Supreme Court on December 28, 2010.  The California Supreme Court granted review, and on December 3, 2012, it affirmed the judgment by a 4 – 3 vote.

107. On January 7, 2015, after a change in applicable *habeas* law, Richards petitioned the California Supreme Court for relief from his conviction a second time.  On May 26, 2016, the California Supreme Court—in a vote of 7-0—reversed Richards's conviction on the basis that the People had presented false evidence at Richards's fourth trial.

108. In November of that same year, Mr. Richards filed his Notice of Claim against the County of San Bernardino and the various Defendant County actors named herein responsible for his 23 years spent wrongfully in custody.  Mr. Richards's life has been permanently ruined because of the wrongful and unconstitutional acts of the Defendants.

**FIRST CAUSE OF ACTION**

**DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983**

***Deprivation of Liberty without Due Process of Law and Violations of Right to a Fair Trial, under the Fifth and Fourteenth Amendments***

**(Against All Defendants)**

109. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

110. Defendants fabricated false evidence of Mr. Richards's guilt, thereby violating Mr. Richards's right to a fair trial and causing him to be deprived of his liberty without due process of law.

111. Defendants failed to provide exculpatory and/or impeachment evidence to Mr. Richards during his criminal trial, and thereby violated Mr. Richards's right to a fair trial and causing him to be deprived of his liberty without due process of law.

112. Rather than conduct an adequate investigation, Defendants, individually and in concert, acted in a manner that shocks the conscience and followed through with the unlawful prosecution of Mr. Richards, thereby depriving

Mr. Richards of his right not to be deprived of liberty without due process of law.

113. Defendants fabricated evidence prior to trial, including using planted blue fibers and concocted bite-mark evidence, and did so knowingly or in reckless disregard for the truth.  The evidence was actually false; Mr. Richards never murdered his wife as proven by the evidence used to overturn his unjust and unlawful conviction.  The use of this evidence was demonstrated to have affected the jury's verdict in convicting Mr. Richards; as the prosecution was unable to obtain a conviction without the evidence as stated herein.

114. Defendants used and/or allowed to be used, completely false evidence regarding the bite-marks found on the victim.

115. Defendants used and/or allowed to be used, completely fabricated evidence concerning the planting of the blue fibers allegedly found on the victim's finger.

116. Defendants failed to perform proper investigative techniques from the outset and throughout the murder investigation which would have excluded Mr. Richards as the murderer, and instead blindly and unwaveringly pursued Plaintiff as the only suspect in their pursuits to obtain a conviction for the crime by any means necessary.

117. Defendants failed to provide exculpatory evidence and impeachment evidence at Mr. Richards's criminal trial including impeachment evidence of the Prosecution's witness, Gregonis and the Prosecution's failure to turn over photographs of Mrs. Richards's fingers showing the lack of blue tuft of fibers used to convict Mr. Richards.

118. Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Mr. Richards's defense and right to a fair trial.  Had the fabricated, false evidence

been excluded and the evidence from a complete and properly obtained investigation been fully obtained, there is little doubt Mr. Richards would never have been wrongfully convicted.  Had the exculpatory evidence, the pictures of Mrs. Richards's fingers, been turned over to Mr. Richards, he would never have been wrongfully convicted.   Had the impeachment evidence showing a lack of credibility of Prosecution expert Gregonis been turned over to Mr. Richards, he would never have been wrongfully convicted.  Due to the actions and/or inactions of Defendants, Mr. Richards was convicted of a crime he did not commit.

119. The foregoing actions and/or omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Richards's federally protected rights.  These acts were perpetrated while Defendants were acting in their official capacities and under color of state law.

120. As a direct and proximate result of Defendant's actions, Mr. Richards was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced, and incarcerated for over 23 years, and suffered all other grievous injuries and damages as set forth herein and as to be proven at trial.

///
///
///

## SECOND CAUSE OF ACTION

### DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983

#### *Brady Violations*

**(Against Defendants San Bernardino District Attorney's Office, Deputy District Attorney Risley, San Bernardino County Sheriff's Department, DOES 1-10)**

121. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein

122. Defendants, while acting under color of state law, deprived Plaintiff of his civil rights by violating his right to have material exculpatory and impeachment evidence and information as required under *Brady v. Maryland*, 373 U.S. 83 (1963) (hereinafter "*Brady*") turned over to Mr. Richards for his defense.

123. The actions of each Defendant in withholding evidence from the defense were done with deliberate indifference to or the reckless disregard for Mr. Richards's constitutional rights or for the truth.

124. The *Brady* violations asserted herein encompass, but are not limited to:

    a. Failing to disclose pictures taken of Mrs. Richards's hand/fingers showing a lack of blue tuft of fibers.

    b. Failing to disclose an investigative report concerning the same undisclosed pictures of Mrs. Richards hand/fingers.

    c. Failing to disclose impeachment and credibility evidence and/or information concerning the Prosecution's key witness, Gregonis, and his lacking of credibility and/or truthfulness.

    d. Failing to disclose Nourse's lack of credibility and/or lack of truthfulness.

125. The Constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Mr. Richards's due process rights were violated by the conduct alleged herein. Mr. Richards brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Mr. Richards's right to *Brady* information is a constitutional source other than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

126. Defendants were each jointly and severally responsible to provide *Brady* material and information to the defense. This responsibility includes the discovery of the *Brady* information learned before the prosecution of the case against Mr. Richards.

127. Each Defendant engaged in, knew, or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved, or acquiesced in it.

128. As a direct and proximate result of Defendant's actions, Mr. Richards was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced, and incarcerated for over 23 years, and suffered all other grievous injuries and damages as set forth herein and as to be proven at trial.

**THIRD CAUSE OF ACTION**

**DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983**

***Fifth and Fourteenth Amendments – Due Process Violation***

***False Evidence***

**(Against All Defendants)**

129. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

130. Defendants and other yet unknown deliberately fabricated evidence, including but not limited to false evidence of bite-mark information and the planting of blue fibers, that was used to criminally charge, prosecute, and convict Mr. Richards.

131. Defendants continued their investigation of Mr. Richards despite the fact they knew he was innocent, or were deliberately indifferent to Mr. Richards's innocence, and the results of the false evidence and investigation were used to criminally charge, prosecute, and convict Mr. Richards.

132. Additionally, Defendants used techniques that were so coercive and abusive that Defendant knew, or were deliberately indifferent to the fact, that those techniques would yield false information that was used to criminally charge, prosecute, and convict Mr. Richards.

133. As a direct and proximate result of Defendants' overt acts and/or omissions, Mr. Richards was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over 23 years, and subjected to other grievous injuries and damages as set forth herein and in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### 42. U.S.C. § 1985
### *Civil Rights Conspiracy Claim*
### (Against All Defendants)

134. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

135. Defendants and other yet unknown agreed among themselves and other to act in concert to deprive Mr. Richards of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth

Amendments, including his right not to be deprived of liberty without due process of law and to be free from illegal seizure.

136. In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

   a. Acting in concert to contrive, create, produce, and/or fabricate false evidence regarding a bite-mark on the victim and its relation to Mr. Richards; teeth;

   b. Acting in concert to contrive, create, produce and/or fabricate false evidence regarding the blue fibers purported found on the victim's finger;

   c. Prior to and subsequent to Mr. Richards's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate evidence and/or alternative potential suspects; and

   d. Prior to and subsequent to Mr. Richards's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate evidence of Mr. Richards's innocence.

137. As a direct and proximate result of Defendants' overt acts and/or omissions, Mr. Richards was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over 23 years, and subjected to other grievous injuries and damages as set forth herein and in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

### 42. U.S.C. § 1983

### *Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments*

### (Against Defendants Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber, and DOES 1-10)

138. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

139. Mr. Richards's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional actions and inaction of Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10, acting in their individual capacities and under color of law.

140. Upon information and belief, Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 directly participated in the misconduct that resulted in Mr. Richards's wrongful conviction, including but not limited to fabricating evidence and failing to perform the basic functions of their duties as public servants.

141. Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 knowingly refused to terminate the wrongful prosecution of Mr. Richards, which, upon information and belief, they knew or reasonably should have known had been initiated based on the fabricated and false evidence and lack of commonsense investigation procedures. As a result, Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 knew or reasonably should have known that Mr. Richards's constitutional rights to be free from unreasonable seizure and not be deprived of liberty without due process of law would be violated.

142. Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 culpably failed to adequately train, supervise, and/or control their subordinates, who failed to perform the functions of their job and/or fabricated false evidence.

143. Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 violated Mr. Richards's constitutional rights by acquiescing in the deprivation of Mr. Richards's constitutional rights by their subordinates, and by generally showing a reckless or callous indifference to Plaintiff's rights.

144. Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10 failure to train, supervise, and/or control their subordinates to fabricate evidence and fail to document, obtain, and disclose any further investigatory evidence.

145. The actions and/or omissions of Defendants Ramos, Bradford, Navarro, Stockwell, Risley, Nourse, Parent, Ogino, Gregonis, Sperber & DOES 1-10, in their individual capacities, caused Mr. Richards to suffer the constitutional deprivations and grievous personal injuries and damages described herein and in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

## DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983

### *MONELL VIOLATION - Unlawful Official Policy, Practice, or Custom*

**(Against Defendants County of San Bernardino, San Bernardino Sheriff's Department, Office of the San Bernardino District Attorney, & DOES 1-10)**

146. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

147. Municipal corporations or entities may be named in a lawsuit for deprivation of Constitutional rights, as this lawsuit claims. *Monell v. Dept. of Social Services*, 436 U.S. 658, 701 (1978).

148. Mr. Richards was wrongfully charged, prosecuted, and convicted for a crime he did not commit based on the unconstitutional conduct and acts of Defendants.

149. All actions and/or conduct of the Defendants was commenced under color of State law.

150. Mr. Richards is informed and believes, and on that basis alleges, at all time stated herein, Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney, & DOES 1-10 had unlawful official policy and/or widespread practice or custom which caused the deprivation of Mr. Richards's constitutional rights as committed by any of the named actors herein.

151. The Defendants official policy or widespread and/or longstanding custom or practice is closely related to the deprivation of Mr. Richards's constitutional rights so as to be the moving force that caused the ultimate harm and/or injury to Mr. Richards.

### SEVENTH CAUSE OF ACTION

### DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983

### *MONELL VIOLATION - Act(s) of Final Policymaker(s)*

**(Against Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney, & DOES 1-10)**

152. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

153. Municipal corporations or entities may be named in a lawsuit for deprivation of Constitutional rights, as this lawsuit claims.  *Monell v. Dept. of Social Services*, *supra*, 436 U.S. at 701.

154. Mr. Richards was wrongfully charged, prosecuted, and convicted for a crime he did not commit based on the unconstitutional conduct and acts of Defendants.

155. All actions and/or conduct of the Defendants was commenced under color of State law.

PLAINTIFF'S COMPLAINT FOR DAMAGES

156. The actions of Defendants' employee(s) deprived Mr. Richards of his constitutional rights as described herein.

157. The Defendants' employee(s) had final policymaking authority from Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney & DOES 1-10 concerning the actions taken against Mr. Richards.

158. The Defendants' employee(s) engaged in the actions resulting in the deprivation of Mr. Richards's constitutional rights, they were acting as the final policymaker for Defendants.

159. As a direct and proximate result of Defendants' actions and the ratification thereof, Mr. Richards was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced, and incarcerated for over 23 years, and suffered all other grievous injuries and damages as set forth herein and as to be proven at trial.

**EIGHTH CAUSE OF ACTION**

**DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983**

***MONELL VIOLATION - Ratification Final Policymaker***

**(Against Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney, & DOES 1-10)**

160. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

161. Municipal corporations or entities may be named in a lawsuit for deprivation of Constitutional rights, as this lawsuit claims.  *Monell v. Dept. of Social Services*, *supra*, 436 U.S. at 701.

162. Mr. Richards was wrongfully charged, prosecuted, and convicted for a crime he did not commit based on the unconstitutional conduct and acts of Defendants.

163. All actions and/or conduct of the Defendants was commenced under color of State law.

164. The actions of Defendants' employee(s) deprived Mr. Richards of his constitutional rights as described herein.

165. The Defendants' employee(s) had final policymaking authority from Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney & DOES 1-10 concerning the actions taken against Mr. Richards and the final policymaker ratified Defendants' employee(s) actions, and/or knew of and specifically made deliberate choice to approve of the actions resulting in the deprivation of Mr. Richards constitutional rights.

166. As a direct and proximate result of Defendants' actions and the ratification thereof, Mr. Richards was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced, and incarcerated for over 23 years, and suffered all other grievous injuries and damages as set forth herein and as to be proven at trial.

**NINTH CAUSE OF ACTION**

**DEPRIVATION OF CIVIL RIGHTS – 42. U.S.C. § 1983**

***MONELL VIOLATION - Policy that Fails to Prevent Violations of Law and/or Policy of Failure to Train***

**(Against Defendants County of San Bernardino, San Bernardino Sherriff's Department, Office of the San Bernardino District Attorney, & DOES 1-10)**

167. Mr. Richards incorporates each and every allegation contained in paragraphs previously stated and the subsequent paragraphs stated inclusive as if fully stated herein.

168. Municipal corporations or entities may be named in a lawsuit for deprivation of Constitutional rights, as this lawsuit claims.   *Monell v. Dept. of Social Services*, supra, 436 U.S. at 701.

169. Mr. Richards was wrongfully charged, prosecuted, and convicted for a crime he did not commit based on the unconstitutional conduct and acts of Defendants.

170. All actions and/or conduct of the Defendants was commenced under color of State law.

171. Mr. Richards is informed and believes, and on that basis alleges, at all time stated herein, Defendants promoted or upheld policies that prevented violations of law by its employees.

172. Mr. Richards is informed and believes, and on that basis alleges, at all time stated herein, Defendants lacked any training policies or lacked adequate training procedures to prevent violations of law by its employees.

173. Defendants acted with deliberate indifference, and conscious and reckless disregard to the safety, security, constitutional, and statutory rights of Mr. Richards, and engaged in the unconstitutional conduct and/or omissions as described herein.

174. The Defendants, by and through its policymakers, created and maintained a custom, policy, and/or practice of failing to train, supervise, and/or discipline its employees and agents, including Defendants, regarding constitutionally adequate investigation techniques, evidence preservation, proper disclosure of exculpatory evidence, and proper evidence handling and oversight.

175. The acts of the Defendants' officials, agents, and/or employees deprived the Mr. Richards of his rights under the United States Constitution as alleged herein.

176. The acts of the Defendants' officials, agents, and/or employees were carried out pursuant to an adopted policy or a widespread or a longstanding practice, custom of the Defendants in obtaining a conviction above the rights of a potentially innocent criminal defendant.

177. As a direct and proximate result of Defendants' official policy or widespread or longstanding practice or custom actions, Mr. Richards was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced, and incarcerated for over 23 years, and suffered all other grievous injuries and damages as set forth herein and as to be proven at trial.

**TENTH CAUSE OF ACTION**

**CLAIM UNDER CALIFORNIA STATE LAW, CAL. GOV. CODE § 815.2, FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY**

**(Against Defendants San Bernardino County Sheriff's Department, Office of the San Bernardino County District Attorney, and County of San Bernardino)**

171. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

172. Mr. Richards suffered the aforementioned injuries as a proximate result of the misconduct of the individual Officer Defendants.

173. During all relevant times, Defendants were employees of the San Bernardino County Sheriff's Department, the Office of the San Bernardino County District Attorney, and the County of San Bernardino.

174. The acts and omissions of Defendants that proximately caused Mr. Richards's injuries were within the scope of Defendants' employment with the San Bernardino County Sheriff's Department, the Office of the San Bernardino County District Attorney, and the County of San Bernardino.

**JURY DEMAND**

Pursuant to the Seventh Amendment of the United States Constitution, Mr. Richards hereby requests a jury trial on all issues and claims set forth in this Complaint.

PLAINTIFF'S COMPLAINT FOR DAMAGES

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff William J. Richards respectfully requests:

- A trial by jury on each of Mr. Richards's claims;
- The Court award compensatory damages to Mr. Richards and against Defendants, jointly and severally, in an amount to be determined at trial;
- The Court award punitive damages to Mr. Richards, and against Defendants, in an amount to be determined at trial, in order to deter such conduct by the Defendants in the future;
- For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §§ 1983 claims and 1985 claims;
- For any and all other relief to which Mr. Richards may be entitled and award by the Court.

**DATED**:  March 15, 2017                    **LAW OFFICES OF JAN STIGLITZ**


                                             _Jan Stiglitz /s/_
                                             Jan Stiglitz, Esq.
                                             Attorneys for Plaintiff
                                             William Richards

**DATED**:  March 15, 2017                    **BENNER & BOON, LLP**


                                             _Craig Benner /s/_
                                             Brett A. Boon, Esq.
                                             Craig S. Benner, Esq.
                                             Attorneys for Plaintiff
                                             William Richards

PLAINTIFF'S COMPLAINT FOR DAMAGES