BARRETT S. LITT (No. 45527)
E-mail: blitt@kmbllaw.com
MARILYN E. BEDNARSKI (No. 105322)
E-mail: mbednarski@kmbllaw.com
DAVID S. McLANE (No.124952)
E-mail: dmclane@kmbllaw.com
CAITLIN S. WEISBERG (No. 262779)
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE & BEDNARSKI
975 East Green Street
Pasadena CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Wendy J. Koen (No. 255759)
E-mail:  wkoen.defender@gmail.com
LAW OFFICE OF WENDY J. KOEN
32818 Mira Street
Menifee, California 92584
Telephone: (858) 500-2300

Attorneys for Plaintiff WILLIAM J. RICHARDS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| WILLIAM J. RICHARDS,<br><br>         Plaintiff,<br><br>    v.<br><br>COUNTY OF SAN BERNARDINO, MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10, inclusive,<br><br>         Defendants. | CASE NO. 17-cv-00497-SJO-SP<br>[Honorable S. James Otero]<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br>(1)  Violation of Civil Rights – Individual Defendants (42 U.S.C. § 1983)<br>(2)  *Monell* Claim for Violation of Civil Rights (42 U.S.C. § 1983)<br><br>**[DEMAND FOR JURY TRIAL]** |

## I.     INTRODUCTION

1.     This civil rights action pursuant to 42 U.S.C. § 1983 seeks compensatory and punitive damages from Defendants for causing Plaintiff to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States.

2.     On August 10, 1993, Mr. Richards returned home from work to discover that his wife had been brutally murdered. He called 911 to report it and waited for the police to arrive. When the police did arrive, they immediately treated Mr. Richards as a suspect. Evidently caring more about charging someone rather than finding the true perpetrator, the police focused their investigation exclusively on Mr. Richards, despite the absence of evidence of guilt and the existence of strong alibi evidence. After two full trials resulting in hung juries and a mistrial during jury selection, Mr. Richards was retried for a fourth time, resulting in his wrongful conviction and a sentence of twenty-five (25) years to life.

3.     Mr. Richards' wrongful conviction was the result of intentional and/or deliberately indifferent misconduct by all of the named Defendants who conducted a recklessly deficient investigation of the murder, fabricated forensic evidence, wrote false police reports, suppressed exculpatory evidence, and destroyed exculpatory and potentially exculpatory evidence. Plainly speaking, the misconduct of Defendants led to an innocent man being convicted of murdering his wife. There can be no worse conduct of a police agency and its officers when it engages in such misconduct leading to an innocent man not only being wrongfully imprisoned but stigmatized with the false and defamatory label that he killed his wife.

4.     Plaintiff William J. Richards spent over twenty-two years in jails and prisons for the murder of his wife; a crime he did not commit. He has always maintained his innocence and worked tirelessly to prove that he had nothing to do with the murder. Ultimately, with the assistance of the California Innocence Project, Mr. Richards vacated his conviction and secured his freedom.

## II.    JURISDICTION AND VENUE

5.    The Court has jurisdiction over the federal civil rights claims alleged herein pursuant to 28 U.S.C. §§ 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

6.    Pursuant to 28 U.S.C. § 1391, venue lies in the Central District of California because all incidents, events, and occurrences giving rise to this action occurred in the County of San Bernardino, California.

## III.   PARTIES

7.    Plaintiff William J. Richards ("Plaintiff") is an adult competent to bring this suit in this Court. Prior to his arrest, and at the time of the events described herein, he was a resident of the County of San Bernardino. Following his wrongful arrest, Plaintiff was detained and ultimately incarcerated. During such times, he was in the custody of the San Bernardino Sheriff's Department and the California Department of Corrections and Rehabilitation.

8.    Defendant COUNTY OF SAN BERNARDINO ("COUNTY") is, and at all times relevant hereto was, a duly authorized public entity or political subdivision, organized and existing under the laws of the State of California. The San Bernardino Sheriff's Department (hereinafter "SBSD") is, and at all relevant times was, an agency and subdivision of Defendant COUNTY. The COUNTY and SBSD are located within the State of California. At all relevant times, Defendant COUNTY and SBSD possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the SBSD and the actions of employees of the SBSD, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention. Defendant COUNTY is sued as a local government entity under 42 U.S.C. § 1983 because its customs, policies and/or practices with regard to the operation of the SBSD were a moving force behind the

constitutional violations claimed by Plaintiff herein.

9.     Upon information and belief, at all relevant times, Defendants MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10 were police officers, detectives, sergeants, captains, commanders, chiefs of police, civilian employees, agents, policy makers, and/or representatives of the SBSD, as well as employees, agents, policy makers and representatives of Defendant COUNTY. At all relevant times, said Defendants were acting under color of law and within the course and scope of their employment with the COUNTY and/or the SBSD. These Defendants are natural persons and are sued both individually and in their official capacity. Upon information and belief, at all relevant times these Defendants were residents of the State of California.

10.     Defendant SPERBER was retained by the COUNTY to provide forensic examination, analysis, and testimony with respect to alleged bite mark evidence. At all times material herein, he was an agent of the COUNTY and was acting under the color of law within the course and scope of his agency and employment relationship with the COUNTY.

11.     At present time, the true names and capacities of Defendants sued herein as DOES 1 through 10 are unknown to Plaintiff. Upon information and belief, the true names and capacities of DOE Defendants are contained in records, documents, and other discovery that is unavailable to Plaintiff and can only be ascertained through the discovery process. Upon information and belief, each of the DOE Defendants was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.   GENERAL ALLEGATIONS

12.     At all relevant times, each and every Defendant was the agent and/or employee and/or co-conspirator of each and every other Defendant, and was acting

1   within the scope of such agency, employment and/or conspiracy and/or with the

2   permission, consent, and/or direction and/or adoption of the other co-Defendants.

3       13.    Each of the Defendants caused and is responsible for the unlawful

4   conduct and resulting injury herein alleged by, *inter alia*, personally participating in

5   the conduct, or acting jointly and in concert with others who did so by authorizing,

6   acquiescing in or failing to take action to prevent the unlawful conduct by

7   intervention, or promulgating policies and procedures or practices pursuant to which

8   the unlawful conduct occurred; by failing and refusing to initiate and maintain

9   adequate training, supervision, policies, procedures and protocols; by failing to

10  implement and ensure compliance with policies and procedures to ensure the safety

11  and reasonable security of individuals, such as Plaintiff; and by ratifying the

12  unlawful conduct performed by agents, employees, counselors, staff, and officers

13  under their direction and control.

14      14.    Whenever and wherever reference is made in this Complaint to any act

15  by a Defendant, such allegation and reference will also be deemed to mean the acts

16  and failures to act of each Defendant individually, jointly, and/or severally.

17      15.    The acts and/or omissions of all Defendants, named and un-named

18  were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with

19  deliberate indifference to or reckless disregard for Plaintiff's rights and the truth.

20      16.    Each and every paragraph of this complaint is expressly incorporated

21  into each cause of action alleged herein as if fully stated therein.

22  **V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

23      17.    Plaintiff married Pamela Richards on November 13, 1971. In August

24  1993, after more than twenty years of marriage, the couple lived together in

25  Hesperia, California, on property that they owned in a remote area of San

26  Bernardino County. With plans of building a house, they were living out of a

27  motorhome and storage building on the property, which were powered by a

28  generator. Plaintiff was employed as a mechanical engineer at the Schuller

Manufacturing Company in Corona, California. Mrs. Richards was working as a server at an Olive Garden.

18.     On August 10, 1993, Plaintiff left for work at approximately 2:00 p.m. and worked the 3:00 p.m. to 11:00 p.m. shift. He clocked out at 11:03 p.m., filled his ice chest with ice from Schuller's ice making machine, and drove home, arriving home shortly before midnight. When Plaintiff arrived home shortly before midnight, there were no lights on in the motorhome or elsewhere on the property. Plaintiff went to the storage shed and got himself a glass of iced tea.

19.     As he was walking towards the motorhome, by the light of the moon, Plaintiff saw his wife lying on the ground near the porch. Plaintiff turned her over to see what was wrong and his fingers went into a hole in her head. Her body was cold. It was immediately obvious that she was dead and had been dead for some time. Plaintiff cradled his wife in disbelief and horror. While holding her, he heard the phone ring. The caller was Eugene Price, who was in a romantic relationship with Mrs. Richards that was known to Plaintiff. Plaintiff told Mr. Price that Mrs. Richards was dead, and Mr. Price told Plaintiff to call 911. At 11:58 p.m., after hanging up with Mr. Price, Plaintiff called 911 and reported the murder.

20.     Mrs. Richards was attacked, severely beaten, and strangled. Her skull was crushed with a cinder block and paving stone. Blood, Mrs. Richards's clothing, and Mrs. Richards's broken fingernails were found in multiple locations around the property, and defensive wounds were found on Mrs. Richards's body, all suggesting that Mrs. Richards struggled with her attacker and was killed during the struggle. When Plaintiff found her, she was naked from the waist down, and Plaintiff covered her with a sleeping bag. Mr. Richards had no wounds consistent with a purported struggle with his wife.

21.     Mrs. Richards was home after Plaintiff left for work at approximately 2:00 p.m. Telephone records and witnesses reflect that she made several phone calls that afternoon. Mrs. Richards called several numbers trying to reach Eugene Price

between 3:00 and 3:15 p.m. She called her employer, Olive Garden, at approximately 3:30 or 4:00 p.m. about possibly working that afternoon and evening. She called the bank at around 4:00 p.m. At approximately 6:22 p.m., she called Plaintiff's mother's residence and spoke with Cathy Shaw for approximately forty minutes. Finally, at approximately 7:04 p.m., Mrs. Richards called her brother and spoke with him briefly. In that call, she told her brother that she was about to vacuum the house and go to the laundromat. Mrs. Richards did not speak on the phone with anyone after that point. When the police arrived, the vacuum was plugged in as if it was about to be used, and Mrs. Richards's purse, sunglasses, and a basket full of laundry were in her Suzuki Samurai. This evidence, which was consistent with the attack and murder occurring much earlier in the evening than shortly before the midnight hour when Plaintiff arrived home, was deliberately ignored by the Defendants.

22. Starting between 9:30 and 10:00 p.m., Eugene Price began calling the Richards's residence to try to reach Mrs. Richards. He called multiple times, and no one answered the phone until close to midnight, when Plaintiff picked up the phone. This evidence, which was consistent with the attack and murder occurring much earlier in the evening than shortly before the midnight hour when Plaintiff arrived home, was deliberately ignored by the Defendants.

23. In an effort to prove that it was possible for Plaintiff to commit the murder and show that he arrived home as far as possible in advance of his 911 call, Defendant John Navarro, one of the SBSD Detectives investigating the murder, purportedly conducted a test drive of the distance between Schuller Manufacturing and Plaintiff's residence, which was approximately forty-five (45) miles including a stretch on the 15 freeway. Defendant Navarro started at 11:03 p.m. from the clocking-out location and left the Schuller Manufacturing premises at 11:06 p.m. He reported that it took forty-one (41) minutes to drive the distance between Plaintiff's employment and residence and claimed to have driven at the speed of traffic on the

15, between sixty (60) and seventy (70) miles per hour, arriving at 11:47 p.m. The speed limit on the 15 freeway at that time was fifteen (55) miles per hour.

24.    Thereafter, Defense investigator Christian Filipiak drove the same route three times, at different freeway speeds on cruise control. At sixty (60) miles per hour, the drive took fifty-two (52) minutes; at sixty-five (65) miles per hour, it took forty-eight (48) minutes; at seventy (70) miles per hour, it took forty-four (44) minutes. Defendant Navarro's purported test drive, at sixty to seventy miles per hour, was therefore three minutes shorter than the amount of time it took Mr. Filipiak to make the drive going seventy miles per hour. In fact, Defendant Navarro was driving as fast as possible in an attempt to manufacture false evidence that Plaintiff was home for a greater window of time prior to calling 911 and therefore had a larger window of opportunity to commit the murder. Defendant Navarro's intentional speeding, fundamentally altering the nature of his "test" was not disclosed in his report. In addition, Defendant Navarro falsely reported that he drove to Plaintiff's residence, when he in fact drove to the bottom of the rough, unimproved dirt road that led to Plaintiff's residence. Even using Navarro's time-distance test based on speeding and false reporting of the end point, Plaintiff would have arrived home no more than eleven (11) minutes before calling 911, and he likely arrived home even later, within a few minutes of calling 911 – just enough time to discover his murdered wife and pick up the phone when it rang.

25.    SBSD officers did not respond to the first 911 call for over 30 minutes, leaving Plaintiff alone with his dead wife. Plaintiff called 911 two more times after the first call, at 12:06 a.m. and 12:33 a.m. When Defendant Nourse, a SBSD Deputy, eventually arrived, he was the only police officer on the scene for several hours. The homicide investigators, SBSD Detectives Norman Parent, Tom Bradford, and John Navarro ("Defendant Detectives"), did not arrive until approximately 3:00 a.m., and they, along with Defendant criminalist Daniel Gregonis who also reported to the crime scene, decided not to process the crime scene or conduct any crime

scene investigation until after 6:00 a.m., despite the manifest importance of processing any crime scene as quickly as possible and despite the known significance of the time of death in this case, as Plaintiff had reported both in the 911 call and to Defendant Nourse that he arrived home within minutes of finding Mrs. Richards's body and calling 911. This information was relayed to Defendant Detectives and Defendant Gregonis when they arrived at the crime scene.

26.     Although the coroner was notified at approximately 1:30 a.m., a deliberate decision was made by Defendant Detectives and Defendant Gregonis not to call him to the scene. Ultimately, he did not arrive to the scene until after 10:30 a.m., at which point it was too late to conduct critical time-of-death investigation. Although Defendant Nourse later claimed, falsely, to have examined the body and made certain observations, *e.g.*, regarding temperature and rigor mortis, Defendant Detectives made a deliberate decision to forgo confirmation of Defendant Nourse's observations when they arrived to the crime scene. None of the Defendant Detectives personally touched or examined the victim, and none of them called the coroner to the scene or took any steps to call the coroner to the scene. As a result, no liver temperature was taken and no qualified person conducted an examination of the victim. Defendant Detectives have claimed that their decision was the result of a policy and/or practice of the SBSD and San Bernardino County Coroner's Office and that it was standard SBSD practice to prohibit the coroner from examining a body for hours until after the conclusion crime scene investigation.

27.     Detectives Parent, Bradford, and Navarro investigated the murder as a team, meaning that each one was assigned to investigate the murder, was integrally involved in the murder investigation, and was responsible for ensuring that the investigation was conducted in such a way as to not violate the constitutional rights of the accused. At that time, SBSD homicide division had three "teams" of homicide investigators and used a team system for homicide investigations, rather than a partner system. The Defendant Detectives had adjoining desks in the homicide

division office, shared information, and closely collaborated on investigations. The team held daily "Round Pound" meetings in the morning to discuss and analyze cases, report on the investigation activities that had been performed by each team member, and plan and assign further investigation activities. Investigation decisions were made collectively by the team.

28.    Defendant Detectives, Defendant Nourse, and Defendant Gregonis immediately focused their suspicion on Plaintiff without any basis for doing so aside from the absence of any other immediate suspects. Defendant Detectives made up their minds about Plaintiff's guilt on the first night of the investigation and considered him their prime suspect. This unjustified focus on Plaintiff caused these Defendants to draw unfounded conclusions, falsify evidence, taint the investigation, and otherwise recklessly conduct the investigation in a way that destroyed and suppressed exculpatory evidence.

29.    When Deputy Nourse arrived at the property, he spoke with Plaintiff, recording a portion of their conversation. He also observed Mrs. Richards's body and the crime scene. As a result of his observations, Deputy Nourse radioed dispatch, notifying the watch commander and homicide. Deputy Nourse remained at the scene until the following morning. Thereafter, he wrote several reports regarding the homicide. The reports written by Deputy Nourse regarding his involvement in the investigation contain false statements, including, *inter alia*, that the sky was very cloudy and overcast such that there was very little if any moonlight; that Mrs. Richards "did not appear to have been dead for very long;" that Mrs. Richards's body was neither warm nor cold; that there were "no signs of lividity;" that there were "no signs of any rigor mortis;" that the "body was still very soft and pliable;" and that "a lot of blood was still very damp and even wet in spots." In fact, Deputy Nourse was not qualified to make the referenced observations about Mrs. Richards's body and knew he was not so qualified. Further, Deputy Nourse did not conduct a sufficient examination of Mrs. Richards's body to reach those conclusions, even if

1   he were qualified.

2       30.     Although Deputy Nourse was the only officer on the scene and

3   homicide detectives did not arrive for several hours, Deputy Nourse did not conduct

4   time-sensitive investigation either of his own initiative or at the request of homicide

5   detectives.

6       31.     When Deputy Nourse ultimately testified, he repeated the false

7   statements in his police report and bolstered them with false testimony regarding his

8   background and experience. Deputy Nourse claimed that he was trained as an

9   Emergency Medical Technician (EMT) in the Air Force and that he had responded

10  to a plane crash in Alaska that involved numerous victims. This testimony was

11  essential to Deputy Nourse's claims regarding the state of Mrs. Richards's body

12  when he saw it and opinion that she had died recently. Thus, Deputy Nourse

13  fabricated his experience to make himself seem more credible when delivering the

14  prosecution's key false evidence regarding time of death.

15      32.     When they arrived at the crime scene, Defendant Detectives and

16  Defendant Gregonis made the decision to defer any investigation or crime scene

17  processing until daylight, after 6:00 a.m. Defendants Parent and Gregonis led the

18  crime scene investigation, while Defendants Bradford and Navarro took Plaintiff to

19  a local station for interrogation. As a result of the decision to defer crime scene

20  processing, these Defendants failed to collect and/or document exculpatory evidence

21  that was instead destroyed due to the passage of time, including: photographs

22  documenting the crime scene as it appeared when Deputy Nourse arrived;

23  processing of Mrs. Richards's body to determine time of death, including taking her

24  temperature and conducting a physical examination; feeling the engine of Plaintiff's

25  vehicle to corroborate his time of arrival; feeling the generator to determine if it had

26  been in use that evening (it would have been unlikely for Mrs. Richards to be at the

27  property without lighting until the time Plaintiff returned home from work); etc.

28  These Defendants also failed to secure the crime scene, allowing cars, people, and

dogs to disturb the evidence. For example, cars obliterated tire tracks on the road leading to the Richards residence, investigators walked all over the crime scene area, and dogs partially buried Mrs. Richards's head with dirt. As a result, Defendant Parent admitted that he had no idea what happened up there at the crime scene. Defendants Parent, Bradford, Navarro, and Gregonis were all personally involved in purportedly searching the area around the crime scene for evidence, including footprints and tire tracks. Despite the obvious disturbance of the crime scene, Defendant Detectives falsely claimed that they thoroughly searched the area and that there was an absence of footprints and tire tracks indicating that there were no third-parties on the property on the night of the murder.

33.     From the beginning, Defendant Detectives, Defendant Nourse, and Defendant Gregonis sought evidence of Plaintiff's guilt, and the investigation and ultimate prosecution focused solely on Plaintiff without consideration of glaring inconsistencies in the evidence they presented. This tunnel vision resulted in a reckless investigation and failure to investigate the murder and identify the true perpetrator.

34.     Plaintiff had informed the Defendants that there was no power at all in the motorhome and that even the interior lights would not turn on. Because of the size of the motorhome's battery, it would have been impossible for the battery to have run down and died completely to the point that the interior lights would not work. This indicates that the battery was not dead, but that it had been removed / stolen, presumably by the real perpetrators. Yet Defendant Detectives, Defendant Nourse, and Defendant Gregonis did not investigate or document the whereabouts of the battery and disposed of the motorhome before the defense had an opportunity to examine it.

35.     Other evidence was never collected, despite its obvious exculpatory value. Defendant Detectives and Defendant Gregonis failed to fingerprint the vehicles, anywhere inside or outside the home, the shed, or two smooth fist sized

rocks that had clearly been used to strike the victim. Defendant Detectives (Parent and Navarro who attended the autopsy and Bradford who was informed of the autopsy) failed to direct that the purported "bite mark" found on Mrs. Richards be swabbed in order to test for DNA from the biter's saliva. Defendants Bradford and Navarro failed to collect scrapings from underneath Plaintiff's fingernails on the morning of August 11, 1993, which would have confirmed that he did not have any tissue, fibers, or hair from the victim. Defendant Detectives claimed that there was no evidence of any other person at the crime scene based on footprints and tire tracks, yet disregarded evidence that third parties had, in fact, been on the property without leaving such evidence or without Defendants having documented the evidence. When confronted with this information, Defendants were forced to change their testimony regarding the scope of their search for prints and tracks.

36.     Defendant Detectives also failed to pursue possible alternative suspect evidence, including evidence that an unknown person in a red vehicle drove towards the property at approximately 7:00 p.m., which evidence was lost or destroyed. In addition, Defendant Detectives interviewed Eugene Price, a key alternative suspect, on the morning after the murder, but failed to conduct any investigation of his alibi until almost a year later. Even then, the investigation was limited to brief interviews with two family members and did not include interviews of uninvolved third parties who could have corroborated or refuted Mr. Price's alibi or the collection of documents that would have corroborated or refuted the alibi. In the original interview of Eugene Price, Defendant Detectives did not photograph or document Mr. Price's appearance or a bandaged injury on his hand. Defendant Detectives did not investigate inconsistencies in Mr. Price's statements or his efforts to implicate Plaintiff in the murder.

37.     Detectives Parent, Bradford, and Navarro, individually and collectively, interviewed a number of witnesses during the investigation. Defendant Detectives discussed these interviews and made collective decisions regarding what leads to

pursue. Although Defendant Detectives had access to recording devices, including portable recording devices and telephone recording devices, and used these devices to record interviews with witnesses who provided negative information about Plaintiff, many interviews that contained exculpatory information or potentially exculpatory information were not recorded. Defendant Detectives failed to ask questions to elicit exculpatory information, failed to record exculpatory information provided during interviews, and failed to follow up on leads that might result in the discovery and preservation of exculpatory information.

38.     These acts and failures to act demonstrate that Defendant Detectives, Defendant Nourse, and Defendant Gregonis, with deliberate indifference to and reckless disregard for Plaintiff's rights and the truth, failed to investigate the murder and failed to collect and preserve significant evidence that could have exculpated Plaintiff.

39.     During their interrogation of Plaintiff on the morning after the murder, Defendants Bradford and Navarro took pictures of Plaintiff, including his hands, and collected all the clothes that he was wearing on the night his wife was killed. There were no cuts, abrasions, or wounds on Plaintiff that would have been consistent with the obvious struggle between Mrs. Richards and her attacker. Defendant Detectives ignored this exculpatory evidence and failed to take finger scrapings which would have further demonstrated that Plaintiff was not involved in any violent struggle.

40.     Defendants Parent and Navarro attended the autopsy of Mrs. Richards. During the autopsy, scrapings were done of Mrs. Richards's fingernails and no observations were made regarding any fiber located under any nail. The scrapings included a large amount of soil and blood, one tri-lobule synthetic fiber, one dark-blue wool fiber, one dark hair, and one blond hair. The scrapings included a light blond hair that was approximately two centimeters long with a round tip telogen root. Subsequent DNA testing established that this was a human hair belonging to someone other than Plaintiff or Mrs. Richards.

41.    Two of Mrs. Richards's fingernails were broken. The fingers with the broken fingernails were severed at the end of the autopsy and delivered to Defendant Gregonis, who matched the fingers to broken fingernails found at the scene. Several weeks after the autopsy, after Defendants had failed to find any meaningful evidence of Plaintiff's guilt, and after Plaintiff's blue shirt was in his custody, Defendant Gregonis purportedly discovered a tuft of blue fibers lodged in one of Mrs. Richards's broken fingernails. This tuft of blue fibers was not observed by Dr. Sheridan, the medical examiner who conducted the autopsy, either during the course of the autopsy or when he scraped the fingernails for trace evidence. It also was not observed by Defendants Bradford and Navarro who attended the autopsy. A comparison of photographs taken during the autopsy with stills from video recorded by Mr. Gregonis to document the blue fiber show that there were no blue fibers lodged in Mrs. Richards's fingernail and no visible crack in the fingernail before the fingers were severed and delivered to Mr. Gregonis. In addition, at around the same time that Defendant Gregonis purportedly found the tuft of fibers, he cut a sample of Plaintiff's shirt, which was later discarded, contrary to standard protocol for the handling of evidence.

42.    Defendant Gregonis reported, and later testified, that the blue fibers that he claimed to have found under Mrs. Richards's fingernail were indistinguishable from the fabric of Mr. Richards's shirt. The only explanation for the post-autopsy appearance of the blue fibers is that they were planted by one or more of the named Defendants who intentionally fabricated the evidence in a successful attempt to secure Plaintiff's conviction.

43.    Defendant Gregonis also provided blood splatter analysis to the prosecution, in which he claimed both that the minimal blood stains on Plaintiff's clothing were consistent with medium energy splatter that would have occurred when Mrs. Richards was killed and that the general absence of blood on Plaintiff's clothing was not inconsistent with the theory that he was the murderer despite the

blunt-force injuries to Mrs. Richards and the extensive bleeding that occurred from those injuries. Defendant Gregonis further asserted that the minimal blood on Plaintiff's clothing was inconsistent with Plaintiff's statement that he had cradled the victim. Defendant Gregonis based his testimony, in part, on an amateur and unreliable demonstration involving a homemade dummy filled with paint in which Defendant Bradford participated. In rendering his blood splatter analysis, Defendant Gregonis lacked any scientific or forensic basis for his conclusions, which were made with deliberate indifference to or reckless disregard for Plaintiff's rights and the truth and which were fabricated for the purpose of securing a conviction of Plaintiff regardless of the truth.

44.     This is not the first case where Mr. Gregonis gave false testimony. In at least two prior cases, Mr. Gregonis gave testimony regarding forensic evidence that was directly contradicted by his own notes and reports. In each instance, the effect of Mr. Gregonis's testimony was to make the evidence seem more inculpatory than was supported by his own forensic analysis. No instances of prior false or incorrect testimony by Mr. Gregonis were disclosed to Plaintiff during his criminal prosecution, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

45.     Plaintiff was arrested on September 3, 1993 and taken into custody. He was held in custody pending trial and therefore remained in custody from September 3, 1993 until the California Supreme Court ultimately granted his petition for writ of habeas corpus in 2016.

46.     After Plaintiff was arrested and before trial, the Defendants authorized and/or carried out the destruction of the crime scene, by removing the motorhome and all other structures, materials, and items from the property. The motorhome and other crime scene property contained evidence of the murder that was material and exculpatory and potentially material and exculpatory, including possible fingerprints, blood, DNA evidence, circumstantial evidence, evidence of missing property, etc. The destruction/disposal of the motorhome and other crime scene

property prevented Plaintiff's defense attorneys from examining the evidence, for the purpose of both contesting the purported inculpatory evidence presented by the prosecution and developing exculpatory evidence. Defendants destroyed this evidence with full knowledge of its relevance to Plaintiff's defense with deliberate indifference to and reckless disregard for Plaintiff's rights and the truth.

47.     Dr. Norman Sperber, a forensic odontologist, was retained by the County of San Bernardino in advance of Plaintiff's final trial to conduct a forensic examination and analysis of a lesion on the victim that was suspected to be a bitemark. Although not permanently employed by the County of San Bernardino, Defendant Sperber was the chief forensic dentist for the Counties of Imperial and San Diego and was retained by the County of San Bernardino to perform forensic examination in *People v. Richards*, because no one on staff in the County of San Bernardino was available to perform the forensic examination and analysis. Dr. Sperber had worked for San Bernardino County agencies on several prior cases. In this capacity, he was acting under the color of law as an agent of the County of San Bernardino.

48.     Dr. Sperber worked with other SBSD defendants in an investigatory capacity in conducting his forensic examination and analysis. He initially consulted with Detective Parent, after which, Detective Parent provided photographs of the lesion and assisted Defendant Sperber in making arrangements for him to examine and perform a molding of Plaintiff's teeth.

49.     Based on the photograph he was given and the mold of Plaintiff's teeth, Dr. Sperber prepared a written report stating his forensic analysis and conclusions. In the report, Dr. Sperber stated that the lesion was a human bite mark; that despite distortions in the photographs, they were susceptible to odontological analysis; that Plaintiff had "unique" dentition with respect to an under-erupted tooth; that the under-erupted tooth matched up with a gap in the purported bitemark on the victim; and that Plaintiff's other teeth were "consistent with" the purported bitemark.

1   Absent this report, and the analysis and conclusions stated in the report, Defendant
2   Sperber would not have been called to testify for the prosecution.

3       50.     Defendant Sperber testified during the prosecution's case in chief,
4   repeating the false forensic conclusions that were stated in his earlier report: he
5   stated that the photograph provided a sufficient basis for comparative analysis, that
6   the lesion in the photograph of the victim was a human bite mark, that it reflected a
7   distinctive abnormality that was consistent with Plaintiff's dental anatomy, and that
8   the abnormality was shared by "one or two or [fewer]" persons out of a hundred
9   people. As the California Supreme Court later ruled, based in part on Dr. Sperber's
10  recantation, this evidence that was in both the report and in his testimony was false.
11  If the lesion was even a bite mark, it did not match Plaintiff's teeth. The false
12  evidence generated by Dr. Sperber in both his report and repeated in his testimony
13  contributed to Plaintiff's wrongful conviction and was the basis for the California
14  Supreme Court's decision to vacate the conviction.

15      51.     During Plaintiff's habeas proceedings, Plaintiff presented evidence that,
16  with the angular distortion corrected, the image showed clear and unambiguous
17  discrepancies between the lesion and Plaintiff's dentition.  At the habeas
18  proceedings, Dr. Sperber recanted his previous testimony regarding the lesion on
19  Mrs. Richards's hand. Contrary to his report and trial testimony, he testified that
20  Plaintiff's teeth were not consistent with the lesion and that Plaintiff was essentially
21  "ruled out." Dr. Sperber further acknowledged that the statistics he gave in his trial
22  testimony were not based on science or supported by any data and that it was
23  inappropriate for him to have given such testimony. He admitted that he had just
24  been "guessing" about the rarity of Plaintiff's undererupted tooth.

25      52.     At the time that Defendant Sperber submitted his forensic report, he
26  was aware that his analysis and conclusions were unsupported by reliable scientific
27  principles and that his methodology fell below the relevant scientific standards at the
28  time for forensic odontology. In particular, in his report, Dr. Sperber acknowledged

1  that he was aware of the visual distortion in the photograph.  Dr. Sperber, who had

2  taught classes and written articles regarding the proper photographing of bite marks,

3  knew from his research, training, and experience that the angular distortion in the

4  photograph of Mrs. Richards rendered any direct comparison with a mold of

5  Plaintiff's teeth impossible, and made any match between the mold of Plaintiff's

6  teeth and the distorted photograph meaningless. Dr. Sperber was aware that his

7  conclusions were based on nothing more than "eyeballing" the evidence and not

8  based on any testing, measurement, or other reliable criteria. He knew that he was

9  presenting his unfounded "guesses" under the guise of expert opinion. In addition,

10  Dr. Sperber knew that another respected odontologist had reached the conclusion

11  that the photograph was not of sufficient quality to make a comparison; the same

12  conclusion ultimately admitted by Dr. Sperber under oath during the habeas

13  proceedings but denied in his report and original trial testimony.  Dr. Sperber,

14  despite this knowledge, stated in his report (and later testified) that a comparison

15  could be made and that the lesion was consistent with Plaintiff's dentition. Dr.

16  Sperber's false conclusions regarding the bite mark evidence in his report were

17  tendered to the prosecution with the knowledge that they were scientifically baseless

18  and false and with deliberate indifference to and reckless disregard for Plaintiff's

19  rights and the truth.

20        53.    At the time he was retained to provide forensic examination and

21  analysis, Dr. Sperber was aware that there had been two mistrials, *i.e.*, that the

22  available evidence was insufficient to convict Mr. Richards, and that the police and

23  prosecution were searching for additional evidence that would convict him. As part

24  of the law enforcement team, he accepted the assertion that Plaintiff was guilty and

25  thought of himself as the hero who would save the prosecution and get the long-

26  sought after conviction, not as an impartial expert. Dr. Sperber admitted as much

27  after the habeas proceedings: "I said, well, gee, they tried this guy three times and

28  I'm going to be the hero in this case and show that it is his mouth."  Dr. Sperber's

1    desire to "be the hero" caused him to falsely and recklessly implicate Mr. Richards
2    in a crime for which he was innocent. Dr. Sperber's false report and false testimony
3    were deliberately intended to mislead the jury and secure a conviction regardless of
4    the otherwise insufficient evidence of guilt.

5           54.    Upon information and belief, Defendants failed to disclose various
6    items of material exculpatory evidence to the prosecution and the defense including,
7    but not limited to, photographs, forensic analysis, and impeachment information in
8    violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

9           55.    It took four attempts to wrongfully convict Plaintiff. Plaintiff's first
10   trial resulted in a hung jury. In his second trial, the court recused itself and declared
11   a mistrial. The third trial ended in a second hung jury. At the end of the fourth trial,
12   the jury deliberated, announced that they were deadlocked, asked for a further
13   instruction to clarify the meaning of reasonable doubt, were not given a clarification,
14   and ultimately convicted Plaintiff. Judging by this case history, the prosecution's
15   evidence (which included false evidence and excluded exculpatory evidence) was
16   the bare minimum necessary to obtain a conviction. Had any of the false evidence
17   presented to the juries been revealed as false, or omitted, or had additional
18   exculpatory evidence been presented, it likely would have changed the outcome of
19   the trials.

20          56.    Plaintiff was sentenced to twenty-five years to life in prison.

21          57.    While incarcerated, Plaintiff sought and obtained post-conviction DNA
22   testing of the evidence from the crime scene. The testing revealed conclusive
23   evidence of third-party DNA at the crime scene.

24          58.    A 12 x 12 x 2 inch stepping stone with blood was collected from the
25   crime scene by the police. According to the prosecution's theory of the case, the
26   stepping stone was one of the blunt objects that was used to murder Mrs. Richards.
27   Mr. Gregonis opined that there were three areas on the stepping stone that would be
28   likely locations for the murderer's DNA. STR DNA testing by the Department of

Justice in 2006 established that two of the three areas identified by Mr. Gregonis contained a mixture of Mrs. Richard's DNA and third-party male DNA, not belonging to Plaintiff.

59.     Mitochondrial DNA testing of the blond hair recovered from amongst the blood and debris under Mrs. Richards's fingernails established that the hair belonged to neither Mrs. Richards nor Plaintiff but came from an unknown third-party.

60.     Based on the results of the DNA testing, as well as evidence that the bite mark and blue fiber evidence presented at trial was false, Plaintiff filed a petition for writ of habeas corpus on December 5, 2007. An evidentiary hearing was held in 2009, at the end of which, on August 10, 2009, the San Bernardino Superior Court, Judge Brian McCarville presiding, granted the petition on the basis of false evidence and actual innocence.

61.     The San Bernardino County District Attorney's Office appealed the Superior Court's ruling, which was reversed by the California Court of Appeal on November 19, 2010. On December 3, 2012, the Court of Appeal's ruling was affirmed by the California Supreme Court.

62.     In response to the California Supreme Court's ruling with respect to the bite mark evidence, the California legislature amended the statute regarding false evidence as a basis for habeas relief. The amended statute permits persons to obtain habeas relief where, as in Plaintiff's case, expert opinion testimony used to convict the person is later invalidated or repudiated. The amendment, which was intended "to keep innocent people out of prison," provided grounds for Plaintiff to refile his petition for writ of habeas corpus. On May 26, 2016, the California Supreme Court reversed Plaintiff's conviction on the ground that false evidence had been presented at Plaintiff's trial.

63.     After initially refiling charges, and following a vindictive prosecution motion by the defense, the San Bernardino District Attorney's Office declined to re-

1  prosecute Plaintiff. On June 21, 2016, Plaintiff was finally released from custody.

2  ## VI.   PARTICIPATION, STATE OF MIND, AND DAMAGES

3      64.   All Defendants acted illegally under color of law.

4      65.   Each individual Defendant participated in the violations alleged herein,

5  and/or directed the violations alleged herein, and/or knew or should have known of

6  the violations alleged herein and failed to act to prevent them. Each Defendant

7  ratified, approved or acquiesced in the violations alleged herein.

8      66.   As joint actors with joint obligations, each individual Defendant was

9  and is responsible for the failures and omissions of the other.

10      67.   Each individual Defendant acted individually and in concert with the

11  other Defendants and others not named in violating Plaintiff's rights.

12      68.   Each Defendant acted deliberately, purposefully, knowingly and/or

13  with deliberate indifference to, or reckless disregard for an accused's rights or the

14  truth in engaging in the conduct alleged herein.

15      69.   As a direct and proximate result of the described acts, omissions,

16  customs, practices, policies, and decisions of the Defendants, Plaintiff was

17  wrongfully arrested, convicted, and incarcerated for over twenty-two years.

18      70.   As a direct and proximate result of his wrongful arrest, conviction, and

19  incarceration, Plaintiff has lost his liberty and the quality and enjoyment of his life

20  both during his period of incarceration and thereafter.

21      71.   As a direct and proximate result of his wrongful arrest, conviction, and

22  incarceration, Plaintiff has suffered, continues to suffer, and is likely to suffer in the

23  future, extreme and severe mental anguish, mental and physical pain and injury,

24  fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to

25  reputation, and apprehension. For such injuries, he has incurred and will continue to

26  incur significant damages.

27      72.   As a direct and proximate result of his wrongful arrest, conviction, and

28  incarceration, Plaintiff has lost past and future earnings.

73.     As a direct and proximate result of his wrongful arrest, conviction, and incarceration, Plaintiff has been deprived of familial relationships as well as the society and companionship of friends and family.

74.     While wrongfully incarcerated, Plaintiff was diagnosed with prostate cancer, for which Plaintiff received deficient and inadequate medical care. The substandard medical care that Plaintiff received contributed to his pain, suffering, and mental anguish. It also was a direct and proximate cause of the deterioration of his physical and medical condition and the recurrence of his cancer. The mistreatment and non-treatment of Plaintiff's serious medical condition negatively impacted his prognosis and chances of survival from an otherwise treatable and curable form of cancer. That Plaintiff would be deprived of control over his medical care and that he would receive inadequate medical care were both reasonably foreseeable results of Plaintiff's wrongful conviction and Defendants' acts and failures to act that caused Plaintiff's wrongful conviction.

75.     The aforementioned acts and/or omissions of Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith, and done knowingly, purposefully, and/or with deliberate indifference to and/or reckless disregard for Plaintiff's constitutional rights or the truth.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF CIVIL RIGHTS — 42 U.S.C. § 1983**

### **(AGAINST ALL INDIVIDUAL DEFENDANTS)**

76.     Plaintiff re-alleges and incorporates by reference all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as though fully stated herein.

77.     Defendants NOURSE, PARENT, BRADFORD, NAVARRO, GREGONIS, SPERBER, and DOES 1 through 10, while acting under color of law, caused Plaintiff to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth, Fifth, Eighth, and

Fourteenth Amendments by, *inter alia*, fabricating evidence, failing to disclose material exculpatory evidence, destroying exculpatory and potentially exculpatory evidence, and conducting a reckless investigation into the murder of Pamela Richards. Defendants' acts and omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff's rights and the truth.

78.   The constitutional source of the violations and obligations asserted herein is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff asserts both procedural and substantive due process violations. To the extent that the source of Plaintiff's rights is any constitutional or statutory source other than due process, this claim is brought on those bases as well.

79.   Defendants, and each of them, conspired and agreed to commit the above-described unconstitutional deprivations of Plaintiff's rights and acted in concert to deprive Plaintiff of his rights to be free from unreasonable seizures, to due process, to a fair trial, and to be free from groundless criminal prosecutions based on false evidence.

80.   Defendants, and each of them, engaged in, knew about, or should have known about the acts and/or omissions that caused the constitutional deprivations alleged herein and failed to prevent it and/or ratified/approved it and/or acquiesced to it.

81.   Defendants, and each of them, committed the aforementioned acts and omissions in bad faith and with knowledge that their conduct violated well-established law.

82.   As a direct and proximate result of Defendants' aforementioned acts and/or omissions, Plaintiff was injured as set forth in earlier paragraphs of this complaint and is entitled to compensatory damages according to proof.

83.   The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless

1 | disregard of Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and
2 | exemplary damages from Defendants according to proof.

### SECOND CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS — 42 U.S.C. § 1983 (*MONELL*)

### (AGAINST DEFENDANT COUNTY)

84.    Plaintiff re-alleges and incorporates by reference all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as though fully stated herein.

85.    Defendant COUNTY and the SBSD, an agency and subdivision of Defendant COUNTY, possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the SBSD and the actions of employees of the SBSD, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests, evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention.

86.    At all relevant times, Defendants NOURSE, PARENT, BRADFORD, NAVARRO, GREGONIS, SPERBER, and DOES 1 through 10, and each of them, were employees and/or agents of SBSD and Defendant COUNTY and were under the direction and control of SBSD and Defendant COUNTY.

87.    Upon information and belief, at all relevant times, SBSD and Defendant COUNTY, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of Plaintiff and/or the truth, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied unconstitutional polices, practices and/or customs with respect to the investigation and prosecution of crimes.

88.    Upon information and belief, at all relevant times, SBSD and Defendant COUNTY, with deliberate indifference to and/or reckless disregard for the safety, security, and constitutional and statutory rights of Plaintiff and/or the

1   truth, failed to institute policies or provide training that would enable peace officers,

2   agents, and/or employees to handle the usual and recurring situations with which

3   they must deal and would prevent the kinds of constitutional violations alleged in

4   this complaint, where the need for such policies and/or training was obvious.

5          89.     Upon information and belief, Defendant COUNTY had knowledge,

6   prior to and since August 10, 1993, of repeated allegations and instances of

7   misconduct by officers, employees, and/or agents of the SBSD in relation to the

8   investigation and prosecution of criminal offenses, including fabrication of

9   evidence, suppression of exculpatory evidence, dishonesty, and abuse of authority.

10         90.     Upon information and belief, Defendant COUNTY maintained and

11  enforced SBSD customs, policies and/or practices of hiring, retaining, training,

12  assigning, supervising, and failing to discipline officers, supervisors, and other

13  employees and/or agents who have a propensity for violating the due process rights

14  of the accused, dishonesty, and abuse of authority, among other failures in their

15  duties.

16         91.     Upon information and belief, Defendant COUNTY knowingly

17  maintains and permits *sub-rosa* customs, policies and/or practices of tolerating,

18  condoning, and ratifying the occurrence of the kinds of constitutional violations and

19  wrongs alleged in the within action, by deliberate indifference to widespread police

20  abuses, failing and refusing to fairly and impartially investigate, discipline, or

21  prosecute peace officers, employees, and/or agents  who engage in due process

22  violations, dishonesty, and abuse of authority.

23         92.     Upon information and belief, the unconstitutional customs, policies,

24  and/or practices of Defendants COUNTY and SBSD include, but are not limited to:

25  (a) insufficient, incompetent, and biased investigation of allegations of misconduct

26  by employees; (b) inadequate supervision, evaluation, and discipline of employees

27  known to have committed misconduct or whose performance caused a risk of

28  constitutional violations; (c) ineffective and/or inadequate training of peace officers

1  with respect to the due process rights of the accused, when the need for such training
2  was obvious; and (d) the regular failure and refusal to enforce written procedures
3  with regard to administrative investigations, discipline, and use of force.

4          93.     The customs, policies, and/or practices of SBSD and Defendant
5  COUNTY were a moving force behind the constitutional violations alleged by
6  Plaintiff in the First Cause of Action and the resulting injuries to Plaintiff, entitling
7  Plaintiff to compensatory damages according to proof.

8                              **PRAYER FOR RELIEF**

9          WHEREFORE, Plaintiff prays for judgment against Defendants COUNTY,
10  NOURSE, PARENT, BRADFORD, NAVARRO, GREGONIS, SPERBER, and
11  DOES 1 through 10, and each of them, and award of damages jointly and severally,
12  as follows:

13      1.    General and compensatory damages according to proof;
14      2.    Special damages according to proof;
15      3.    Exemplary and punitive damages against each individual Defendant, in
16            amounts according to proof;
17      4.    Costs of litigation;
18      5.    Reasonable attorneys' fees and costs permitted by 42 U.S.C. § 1988;
19      6.    Such other and further relief as the Court may deem just and equitable.

20                              Respectfully submitted,

21                              KAYE, McLANE, BEDNARSKI & LITT, LLP
22
23  DATED: October 26, 2018      By:  */ s / Caitlin S. Weisberg*
                                      CAITLIN S. WEISBERG
24                                    Attorneys for Plaintiff

LAW OFFICES OF WENDY KOEN

DATED: October 26, 2018      By:  _/ s / Wendy Koen_
                                  WENDY KOEN
                                  Attorney for Plaintiff

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a trial by jury on all issues.


Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: October 26, 2018      By:  _/ s / Caitlin S. Weisberg_
                                  CAITLIN S. WEISBERG
                                  Attorneys for Plaintiff

LAW OFFICES OF WENDY KOEN

DATED: October 26, 2018      By:  _/ s / Wendy Koen_
                                  WENDY KOEN
                                  Attorney for Plaintiff