BARRETT S. LITT (No. 45527)
E-mail: blitt@kmbllaw.com
MARILYN E. BEDNARSKI (No. 105322)
E-mail: mbednarski@kmbllaw.com
DAVID S. McLANE (No.124952)
E-mail: dmclane@kmbllaw.com
CAITLIN S. WEISBERG (No. 262779)
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Wendy J. Koen (No. 255759)
E-mail:  wkoen.defender@gmail.com
Law Office of Wendy J. Koen
32818 Mira Street
Menifee, California 92584
Telephone: (858) 500-2300

Attorneys for Plaintiff WILLIAM J. RICHARDS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| WILLIAM J. RICHARDS,<br><br>       Plaintiff,<br>  v.<br><br>COUNTY OF SAN BERNARDINO, MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10, inclusive,<br><br>       Defendants. | CASE NO. 17-cv-00497-SJO-SP<br><br>[Honorable S. James Otero]<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT COUNTY OF SAN BERNARDINO'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:   June 10, 2019<br>Time:  10:00 a.m.<br>Ctrm:  10C |

TO THE COURT, DEFENDANTS, AND THEIR ATTORNEYS OF RECORD:

Plaintiff William J. Richards, by and through counsel of record, respectfully submits this Opposition to Defendant County of San Bernardino's Motion for Summary Judgment, or in the Alternative Partial Summary Judgment (Dkt. No. 94).

Plaintiff's Opposition is based on the attached Memorandum of Points and Authorities, the Separate Statement of Genuine Issues and Separate Statement of Additional Material Facts submitted concurrently herewith, all declarations and evidence cited by Plaintiff in opposition to Defendant's motions, all pleadings and papers on file in this action, and such other evidence and argument as may be presented on behalf of Plaintiff at the hearing on Defendant's motion.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: May 20, 2019        By:  */s/ David S. McLane*
                                DAVID S. McLANE
                                Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND .........................................................................3

    A.    Facts concerning destruction of exculpatory time of death
       evidence and William Richards' alibi.........................................3

    B.    Facts concerning reckless investigation that deprived Mr.
       Richards of due process ...........................................................8

    C.    Facts concerning *Brady* violations that were material to Mr.
       Richards conviction................................................................10

III.    LEGAL STANDARD SUMMARY JUDGMENT.........................................12

IV.    ARGUMENT ...............................................................................................14

    A.    There is more than sufficient evidence to establish SBC had a
       custom or practice to destroy exculpatory time of death evidence
       that destroyed Mr. Richards's alibi.; that SBC had a failure to
       have a policy to ensure critical time of death evidence was
       preserved; and there was a complete failure of training to prevent
       the destruction of this evidence................................................14

    B.  There is More than Sufficient Evidence that SBC Was the Moving
       Force Behind Reckless Investigation Violations .................................18

    C.    There is More than Sufficient Evidence that SBC's lack of Brady
       policies led to the concealment of material evidence ..........................19

V.    CONCLUSION ...........................................................................................21

1

<u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.,*
5     477 U.S. 242 (1986)......................................................................................13
6
*Arizona v. Youngblood,*
      488 U.S. 51 (1988)........................................................................................15
7
*Berry v. Baca,*
8     379 F.3d 764 (9th Cir. 2004) ......................................................................19
9
*Blair v. City of Pomona,*
      223 F.3d 1074 (9th Cir. 2000) .....................................................................19
10
*Bos. v. Suffolk Cty., New York,*
11    326 F. Supp. 3d 1, 24–25 (E.D.N.Y. 2018) .............................................8, 19
12
*Brady v. Maryland,*
      373 U.S. 84 (1963).................................................................................18, 19
13
*Castro v. County of Los Angeles,*
14    833 F.3d 1060 (9th Cir. 2016) .....................................................................15
15
*City of Canton v. Harris,*
16    489 U.S. 378 ..........................................................................................17, 20

*City of Saint Louis v. Praprotnik,*
17    485 U.S. 112 (1988)......................................................................................14
18
*Cleveland v. Policy Management Systems Corp.,*
      526 U.S. 795 (1999).................................................................................13, 19
19
*Coffin v. United States,*
20    156 U.S. 432 (1895)........................................................................................3
21
*Conn v. City of Reno,*
      591 F.3d 1081 (9th Cir. 2009) ................................................................13, 14
22
*Fraser v. Goodale,*
23    342 F.3d 1032 (9th Cir. 2003) .....................................................................13

*Gravelet-Blondin v. Shelton,*
24    728 F.3d 1086 (9th Cir. 2013) .....................................................................14
25
*In re Lawley,*
      42 Cal. 4th 1231 (2008) .................................................................................2
26
*In re Richards,*
27    No. S223651, 63 Cal. 4th 291 .......................................................................1

*Jackson v. Barnes,*
28    749 F.3d 755, 764 (9th Cir. 2014) ...............................................................15

*Johnson v. Mississippi,*
      486 U.S. 578 ....................................................................................................3

*Monell v. Dept. of Social Services,*
  436 U.S. 658 (1978)........................................................................3, 14

*Napue v. Illinois,*
  360 U.S. 264 (1959)...............................................................................18

*National Steel Corp. v. Golden Eagle Ins. Co.,*
  121 F.3d 496 (9th Cir. 1997) ................................................................19

*Nelson v. Colorado,*
  137 S.Ct. 1249 (2017)..............................................................................3

*Oviatt By & Through Waugh v. Pearce,*
  954 F.2d 1470 (9th Cir. 1992) ...........................................................8, 19

*Owen v. Independence,*
  445 U.S. 622 (1980)...............................................................................18

*Oyenik v. Corizon Health Inc.,*
  696 F. App'x 792 (9th Cir. 2017)........................................................8, 19

*Soto v. City of Sacramento,*
  567 F. Supp. 662 (E.D. Cal. 1983) .......................................................13

*Trevino v. Gates,*
  99 F.3d 911 (9th Cir. 1996) ..................................................................15

*Tsao v. Desert Place, Inc.,*
  698 F.3d 1128 (9th Cir. 2012) ..........................................................17, 20

*Vucinich v. Payne, Webber, Jackson & Curtis, Inc.,*
  739 F.2d 1434 (9th Cir. 1984) ..............................................................13

*Wereb v. Maui County,*
  727 F. Supp. 2d 898 (D. Haw. 2010).....................................................13

*Wilson v. Lawrence Cnty.,*
  260 F.3d 946 (8th Cir. 2001) ................................................................18

*Winslow v. Smith,*
  696 F.3d 716 (8th Cir. 2012) ................................................................18

**Statutes**

CA. Gov. Code § 27491.2(a) .....................................................................7

PC § 4900.................................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff William Richards sued the County of San Bernardino ("SBC") for violating his civil rights.  Mr. Richards deserves his day in Court to show that SBC was a moving force behind his constitutional violations.

Defendant SBC's introduction has nothing to do with the merits of its motion but is an obvious and misleading attempt to sway this Court that somehow Mr. Richards is guilty and thus not deserving of pursing his civil remedies.  This patent attempt to slander Mr. Richards speaks more to the weakness of their arguments. They call Mr. Richards exoneration the result of a "technical" change in the definition of false evidence.  [SBC motion for summary judgement ("MSJ"), p. 2, ll. 3-4].  SBC then misleads this Court by citing to alleged domestic abuse that was rejected by the trial court and excluded at trial. [MSJ, pp. 6-8, SAMF 375]. The California Supreme Court not only granted Mr. Richards' petition for writ of habeas corpus, a rare and unique event, by holding that Defendant Sperber's testimony was false because he recanted his testimony, but also held that "the defense had a substantial response to much of the prosecution's evidence against petitioner. Under these unique circumstances, it is reasonably probable that the false evidence presented by Dr. Sperber at petitioner's 1997 jury trial affected the outcome of that proceeding."  [SAMF 327; Exhibit CCC, *In re Richards,* No. S223651, 63 Cal. 4th 291]

Also omitted in the SBC's moving papers is that SBC had an opportunity to re-try him but chose not to and dismissed the charges. [SAMF 377].  Also, misleadingly, SBC claims that Mr. Richards has not applied for a "petition of factual innocence . . .." [MSJ, p. 2, ll. 6-7]. Plaintiff has filed a petition for innocence, a PC § 4900 claim, which is pending with the California Victim's Compensation and Claims Board, and the hearing has been stayed because Plaintiff plans to file a

motion for innocence before Judge McCarville, who granted the original habeas petition by Mr. Richards. [SAMF 378].

Further, SBC falsely states in the motion that no finding of innocence "has been made." [MSJ, p. 2, l. 7]. SBC conveniently omits that Judge McCarville, who conducted the habeas hearing, made a finding of actual innocence - - the evidence presented at the habeas evidentiary hearing unerringly pointed to innocence, a very high standard of proof which requires that the Petitioner prove his actual innocence. *In re Lawley*, 42 Cal. 4th 1231, 1239-41(2008) (The "heavy burden" on habeas petitioners asserting actual innocence is to prove that "newly discovered evidence completely undermines the prosecution's entire case and points unerringly to innocence." This standard is much higher than preponderance of evidence standard in civil cases. Judge McCarville of the San Bernardino County Superior Court ruled that:

> "The Court finds that the evidence with respect to the bite mark analysis and the DNA analysis and the hair analysis has established, taken together that there . . . did exist and does exist a fundamental doubt in my mind as to the accuracy and reliability of the evidence presented at the trial proceeding.
> "This finding is based upon the Court's review of the trial transcript as well as assessing the credibility of the witnesses that have testified before me.
> "Taking the evidence as to the tuft fiber – and when I say tuft, I'm talking about the blue fiber under the finger, - and the DNA and the bite mark evidence, the Court finds that the **entire** prosecution case has been undermined, and that the petitioner has established his burden of proof to show that the evidence before me presents or **points unerringly to innocence**.
> "Not only does the bite mark evidence appear to be now questionable, it puts the petitioner has [*sic*] being excluded. And while I agree with [the prosecution's] statements with respect to the flat stone versus the cinderblock, the DNA evidence establishes that someone other than petitioner and the victim was present at the crime scene. . . .
> "Based upon all the evidence presented, the Court grants petitioner's application.  The petition for writ of habeas corpus is granted." [SAMF 326, emphasis added].

Judge McCarville, who heard much of the evidence that will be presented at this trial, found that Mr. Richards met the very high burden of actual innocence.

Defendant SBC still insists he is guilty, which is a sham, and the height of legal arrogance. SBC cannot admit it is wrong despite the trial court and California Supreme Court telling them they are wrong. Mr. Richards is not only legally innocent; he is presumed innocent since he has no criminal conviction. At least that is the way it is in this country, to imply otherwise, as SBC does, is an injustice to our system and Mr. Richards. In *Nelson v. Colorado*, 137 S.Ct. 1249, 1255 (2017), the Supreme Court stated, "once [a defendant's] convictions were erased, the presumption of innocence was restored," 137 S.Ct. at 1255, citing *Johnson v. Mississippi*, 486 U.S. 578, 585 (After a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge."); *Coffin v. United States*, 156 U.S. 432 (1895) ("[A]xiomatic and elementary," the presumption of innocence "lies at the foundation of our criminal law.")

In this Opposition, Plaintiff will establish that there are genuine issues of material fact that preclude a finding that SBC is entitled to summary judgement. Pursuant to *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978), SBC was a moving force through its customs, practices and lack of training and supervision that caused these constitutional violations.

## II.    FACTUAL BACKGROUND

### A.    Facts concerning destruction of exculpatory time of death evidence and William Richards' alibi

Pamela Richards last phone call was at approximately 7:00 p.m.  [SAMF 369]. Her car was parked outside at that time, with her laundry basket inside, and her purse, indicating she was about to leave to do laundry.  Mr. Richards clocked out of work at 11:06 p.m. He did not get home until 11:50 p.m., and discovered his wife was murdered. [SAMF 158]. He rolled her over, held her, and cradled her in his arms. [SAMF 139]. As an engineer, he was in a state of shock and walked around

1  the scene trying to figure out what happened. He answered all the detectives'
2  questions, and consented to being photographed, inspected for defensive wounds, he
3  had none, consented to blood draws and searches of his property, and anything else
4  the detectives asked of him.

5      He received a call from Eugene Price at around 11:55 p.m. that night., and
6  then called 911 at 11:58 p.m. [SAMF 140]. He called 911 two more times since the
7  police had not arrived, and then Officer Nourse arrived at 00:38 a.m. [SAMF 141].
8  Mr. Nourse knew that Mr. Richards stated that he did not kill his wife. [SAMF 189].
9  Mr. Nourse knew that Mr. Richards told him that he had just came from work and
10  found her dead. [SAMF 158]. Mr. Nourse briefed detectives Parent, Navarro and
11  Bradford of these facts. [SAMF 158]. Thus, the defendant detectives knew time of
12  death was a critical issue in this case. [SAMF 372]. They knew also that a coroner
13  could assess lividity, body temperature and rigor mortis to determine when Mrs.
14  Richards died. [See SAMF 170].

15      Mr. Nourse fabricated his police reports and stated that there were no signs of
16  lividity or rigor morits, even though he admitted in his deposition that he had not
17  assessed lividity or rigor mortis. [SAMF 142, 164]. He wrote a supplementary
18  report, which one could reasonably infer was at the instigation of his co-defendant
19  detectives, that the blood was fresh. [SAMF 143]. He then went on to testify at trial
20  without any factual basis that it was as if Mrs. Richards had just died in his arms.
21  [SAMF 173]. To the contrary, Dr. Sheridan, the forensic pathologist, testified that
22  time of death could not be determined. [SAMF 171]. This was critical to the
23  conviction, because Nourse's fabricated reports and concealment of *Brady* evidence
24  concerning time of death defeated Mr. Richards' alibi since he had just come from
25  work at least by 11:50 p.m. Not only was his alibi defense harmed, his credibility
26  was impugned because the prosecution asserted that Mr. Richards lied about
27  discovering his wife's body, and that he had the opportunity to kill Mrs. Richards
28  because she had just died.

1    Despite knowledge of these facts, and that it was critical to not only their

2  case, but Mr. Richards' due process rights and the search for the truth, they

3  destroyed critical time of death evidence and Mr. Richards's alibi. At the fourth

4  trial, Deputy Coroner Randolph, who did not get to the scene until approximately

5  10:43 a.m. the next day, stated that the delay made it impossible to determine time

6  of death. [SAMF 170]. PMK coroner testified in deposition that one could not

7  determine time of death at all 12 hours after the death of the victim. [SGI 16].

8  Detective Parent, who was the case agent, lead detective and sat through the trial,

9  failed to correct Nourse's testimony even though it was his obligation to correct

10  false testimony. [SAMF 177].

11    Time of death analysis, including assessment of body temperature, rigor

12  mortis and lividity, should be analyzed as close as possible to the time the police

13  arrive at the scene. [SAMF 346, 347]. At trial, Dr. Sheridan compared liver testing,

14  where a small incision is made in the abdomen and a probe is inserted to measure

15  body temperature through the liver, to conducting surgery.  SBC's person most

16  knowledgeable ("PMK") witness on coroner practices, Mr. Morales, who was a

17  deputy coroner in the SBC at the time of the incident in 1993, testified that with a

18  little training, anyone could do liver testing. [SGI 18]. He indicated that deputy

19  coroners were trained to assess time of death, but there would be no value to

20  assessing the body ten or more hours after the body was deceased. [SAMF 347, SGI

21  16]. He also testified that Dr. Sheridan set the policies for coroners and how to

22  investigate deaths. [SGI 8]. SBC's custom and practice was to not allow the deputy

23  coroner approach the body to assess time of death. [SAMF 170]. This practice and

24  custom is followed despite SBC's awareness that it destroys critical information to

25  determine time of death. [SGI 16].  The SBC coroner's office, which was separate

26  from the sheriff's department in 1993, and the SBC sheriff, customs and practice to

27  deny timely coroner exams of the body, destroyed critical time of death evidence in

28  this case.

1    Defendant detectives, PMK Coroner witness Morales and PMK Detective

2  witness Davenport all testified that it was the policy and practice of the SBC

3  homicide detail not to let in the deputy coroner to examine the body until the crime

4  scene was cleared, no matter how long it took, even where time of death was an

5  issue.  [SGI 16]. The PMK Coroner witness specifically stated that it resulted in

6  losing critical evidence to asses time of death, and delays caused by their policies

7  rendered time of death analysis worthless. [SGI 16].

8    Mr. Davenport justified the still current policy despite the enormous dangers

9  it entails on the grounds that the crime scene could be disturbed if the deputy

10  coroner was let in to examine the body. [SGI 16]. However, experts for plaintiff,

11  both police practices expert Russ Fischer, and Forensic Pathologist expert Terri

12  Haddix, state that it was common practice in 1993 to let the coroner or pathologist in

13  the crime scene to assess time of death, and that it can be accomplished without

14  disturbing the body or the crime scene. Russ Fischer stated:

15  "Likewise, the coroner's investigation of post-mortem changes, which must
16  be done as early as possible upon discovery of the victim, is a standard and
   necessary part of a death investigation, unless time of death is already established or
17  otherwise uncontested. Homicide detectives and coroner's investigators are trained
   to conduct such investigations so as to minimize the risk of disturbing evidence."
18  [SAMF 370]

19  Dr. Haddix stated,

20   "Furthermore, when a body is assessed at the scene, the people responding
   from coroner or medical examiner offices exercise caution when approaching a
21  body to minimize disruption of the scene. In Dr. Sheridan's deposition, he indicated
   that only a 'narrow little passageway' would be required for the coroner'
22  investigators to approach a body to assess the postmortem changes and would
   "disturbed the scene as little as possible.'  Many times, when attending scenes, I
23  have been directed along a specific path to gain access to the body but to not disturb
24  the scene." [SGI 32; SAMF 371]

25  Even Dr. Sheridan, the chief forensic pathologist for SBC in 1993, testified at

26  his deposition that the detectives can create a narrow path for the deputy coroner to

27  assess the body without destroying or interfering with the investigation. [SAMF

28

370; SGI 2, 32]. The excuses offered by the SBC are a red-herring and defy common sense.

Further, SBC was aware of a California law giving coroners the ability to immediately inspect a deceased body: CA. Gov. Code § 27491.2(a), effective in 1961, states:

> "The coroner of the coroner's appointed deputy, on being informed of a death and finding it to fall into the classification of death requiring his or her inquiring, may immediately proceed to where the body lies, examine the body, make identification, make inquiring into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition or release the body to the next of kin."

[SGI 5]. Indeed, the homicide department has a policy, which was and is apparently never followed, to allow the coroner to come in assess the body where time of death is an issue. [*See* SGI 5].

According to Mr. Fischer, the impact of the SBC policy, destroyed critical evidence concerning time of death:

> The County's practice of delaying any time of death investigation by the coroner's office until after the processing of the crime scene is contrary to established police practices and customs in 1993. . . .
> - The actions of Deputy Nourse and the detectives, in conformance with County practice, resulted in the destruction of time of death evidence and the presentation of unreliable evidence by Deputy Nourse at trial. [SGI 16; SAMF 372].

Dr. Haddix also opines that the loss of this evidence was prejudicial:

> "I believe the failure to have the coroner's office response to this scene very early in the investigation and the apparent practice of not performing core body temperatures by the coroner's office (although Dr. Sheridan indicated that the coroner's investigators were qualified to do so in 1993) deprived this investigation of additional information that would have assisted in estimating the postmortem interval and assessing if Mr. Richards could have even been present at the scene at the time of death." [SAMF 373].

This prejudiced Mr. Richards because the jury was left with the fabricated testimony of Defendant Nourse that Mrs. Richards had died recently and precluded his alibi defense that he was not even there. Subsequent evaluation by Dr. Haddix concluded that,

> "Ms. Richards d[ied] well before the arrival of Mr. Richards at the scene, reasonably in the realm of two hours (or possibly more) prior to Deputy Nourse's evaluation of the body." [SAMF 374].

Additionally, due to the practice, there was a failure to train and supervise concerning time of death as the SBC did not train or supervise the homicide detail and its detectives to assess time of death when an issue in the case. In fact, their training and supervision was never to assess time of death until the crime scene was cleared.

**B.    Facts concerning reckless investigation that deprived Mr. Richards of due process**

The facts in this case concerning the reckless SBC investigation are so pervasive in this case they demonstrate a custom and practice of reckless investigations by the SBC. *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)); *Bos. v. Suffolk Cty., New York*, 326 F. Supp. 3d 1, 24–25 (E.D.N.Y. 2018) (courts have found that single-incident *Monell* claims survive motions for summary judgment or motions to dismiss). In its Opposition to Defendants' MSJ with respect to the Defendant detectives and Officer Nourse, (Dkt. 93), Plaintiff details the facts establishing a reckless investigation. The evidentiary support for these facts is detailed in the Statement of Disputed Facts, and Statement of Additional Undisputed Facts [*See e.g.*, SAMF 181-185, 376].

The Defendants conducted a reckless investigation at the crime scene including but not limited to: (1) failing to collect fingerprints; (2) failing to isolate the body of Pamela Richards as dirt was piled on her by dogs roaming the crime

scene which prevented an assessment whether Mrs. Richards was in a prone (face down on stomach) or supine (face down on back)  position when Mr. Richards came home and informed Nourse that he turned her over from a prone position to supine position which the defendants disputed and attributed all of the dirt on her head to the dogs; (3) failing to preserve and document foot prints and tire tracks which allowed them to claim only William Richards and Pamela Richards were at the scene during the incident; (4) failing to keep a crime log to document the police and others who entered the crime scene to determine the number of police at the scene, and to document their tire tracks and foot prints so that their tire tracks and shoes could be photographed and excluded as sources of the multiple foot and tire tracks at the scene; (5) failing to document their search for tire tracks and foot prints so we only had the detectives word as to what search they conducted and where, (6) allowing the officers and detectives to destroy foot and tire tracks; (7) allowing dogs to roam the crime scene and destroy foot and tier tracks which allowed the SBC to argue at trial only William and Pamela Richards were there during the incident; (8) failing to call in a coroner to asses time of death (see IIA.); (8) failing to investigate third-party culpability including Eugene Price and driver of the red car with blonde hair, [a blonde hair later turned out through DNA belonged to a third person was under Pam's fingernails] going up to the Richards' place at 7:00 p.m., the last time anyone heard from Pamela Richards was about 7:00 pm; (9) failing to fingerprint obvious suspect objects including the murder weapon paving stone that has a print on it; (10), fabricating the driving test by Navarro; (12) fabricating the blood spatter analysis and tests, and planting a fiber by Gregonis;  (13) failing to provide Dr. Sperber with all the photographs (including photos of the fencing which may have been the source for the lesion on Mrs. Richards hands, [] which impacted his ability to conduct his bite mark analysis; and (14) failing to submit the paving stone and hairs for DNA analysis which showed a third-party was at the scene at the time of

the murder.

This is not a complete listing of all the ways in which Defendants conducted a reckless investigation. But all of the critical evidence leading to a conviction in this trial, was compromised and deprived Mr. Richards of due process of law. This was done for one reason and one reason only - - these officers were interested in convicting William Richards, and not conducting an impartial investigation or search for the truth. As Russ Fischer, the police practices expert, has stated:

"While no criminal investigation is perfect and without unintentional errors and omissions, significant basic investigative deficiencies in the Richards murder investigation leads this writer to conclude that the investigation was inconsistent with minimally accepted police standards and practices. . . ."

"As testified to by Detective Bradford during the third trial, he told Richards the first night that he was 95% certain that Richards was the culprit (TT 03942-03943). Actions and inactions by investigators lend itself to the conclusion that there was an overriding impetus to prove that William Richards killed his wife, and it was therefore unnecessary to investigate matters that did not support that belief. . . .

"Given the absence of admissions by William Richards, lack of witnesses, questionable physical evidence, strong alibi evidence, lack of a strong motive and leads pointing to alternate suspects, the failure to consider alternate theories and suspects indicates that the officers focused on Richards to the exclusion of other information that they were in possession of and had an obligation to pursue. To do so is contrary to generally accepted police practices." [SAMF 376].

The reckless investigation resulted in the destruction of critical evidence, the suppression of *Brady* evidence, independently violated Mr. Richards' rights, and is the basis of a *Monell* violation.

## C.    Facts concerning *Brady* violations that were material to Mr. Richards conviction

SBC had no policies concerning turning over exculpatory evidence to the district attorney to turn over to the defense. [SAMF 325]. SBC also had no training or supervision concerning making sure *Brady* materials were turned over to the defense. [SGI 25-27]. Neither the SBC 1993 Sheriff's manual, nor the Homicide detail manual, which according to their PMK witness, Mr. Davenport, was in effect in 1993, mention *Brady* or exculpatory evidence, let alone define it, and the duty to

turn over all such evidence to the defense. [SGI 25-27]. The County's so-called evidence concerning training on *Brady* should be rejected out of hand since Davenport's and the defendant's declarations are self-serving, without any documents and evidentiary back-up to support their claims. [SGI 25-27].

In this case, Defendant Nourse suppressed critical *Brady* evidence in his reports that he did not conduct lividity, and rigor mortis examinations, even though he claimed in his reports that there were no signs of lividity and rigor mortis.  He also failed to disclose when he touched Mrs. Richards' body he did not check the body, but only the wrist and carotid artery to determine if she had a pulse, and did not check the body for temperature. [SAMF 166, 167].  He also concealed that he had no training or expertise necessary to make such an examination.  [SAMF 169]. This evidence was material because it allowed DA Risley to argue in closing that Mrs. Richards had only recently passed away, thus obliterating Mr. Richards alibi that he was at work, and his credibility that he did not kill his wife.

Further, Defendant Detective Navarro reported that it only took 41 minutes to drive from Mr. Richard's work to his home, leaving at 11:06 p.m. when Mr. Richards left work, to get home by 11:47 pm.  [SAMF 207]. Mr. Richards received a call from Eugene Price, at approximately 11:55 pm, and called 911 to report his wife's murder at 11:58 pm.  [SAMF 140, 141]. Thus, it was important for the Defendants to increase the amount of time he was at home so he would have the opportunity to commit this violent murder, where Mrs. Richards fought and struggled for her life, and there were multiple places at the crime scene where the murder occurred.  Indeed, Tim Palmbach, the defense expert concerning the crime scene, opines that there could very well have been two assailants.  [Ex. 23., Decl. Palmbach & Report].  Defendant Navarro fabricated and concealed *Brady* evidence in his report on the driving test.  He did not drive all the way to the residence, even though he maintained it was a test from Mr. Richards work to his residence, he only

drove to the gate of the house. [SAMF 204]. There was a long way up the dirt road to the mobile home where the Richards lived, which would be further delayed because it was dark, the road was difficult to navigate - -even police officers car got stuck going up the drive past the gate evidencing the difficulty of the drive. [SAMF 146]. He also concealed in his report the speed he drove, as he admitted in his deposition that he drove as fast as he could. [SAMF 204].

Additionally, Craig Oguino, a criminalist with the SBC, concealed notes that revealed that a hair underneath Pamela Richards fingernail was not her hair, where he reported that it was consistent with her hair.  [SAMF 363-364]. He testified in his deposition that he did not turn over his notes concerning his hair fiber analysis showing the hair was not consistent with Pam Richards. [SAMF 366]. He did turn over a report indicating that the hair was consistent with Pam Richards, thus, minimizing the evidence that a third party was at the incident because his hair was under the victim's fingernails. [SAMF 362]. This was critical - - if there was a hair of a third-party underneath her fingernail that hair was likely deposited during the struggle and fight for her life that night. [SAMF 368].  His notes indicated that the hair was blonde, where Pamela Richards had died blonde hair with brown roots. [SAMF 363]. This was material because DA Risley argued in closing that there was no evidence of third parties at the scene, where in fact, there was evidence of a third party through the hair underneath Mrs. Richards' fingernail, and the paving stone murder weapon, which Defendant Gregonis suspected had third party DNA, but he failed to test it for DNA. [SAMF 367]. It turned out the bloody paving stone also had third party DNA, [SAMF 638], which meant that "someone other than [Mr. Richards] and the victim was present at the crime scene." [SAMF 326]. The defense was deprived of this third-party exculpatory material.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Because "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge, "when reviewing a grant of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). The evidence used to defeat summary judgment need not be in an admissible form, where it reflects admissible content. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (holding that the district court properly considered a diary that defendants moved to strike as hearsay because at summary judgment "we do not focus on the admissibility of the evidence's form [; w]e focus instead on the admissibility of its contents").

"Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim." *Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (citation omitted); *see also Soto v. City of Sacramento*, 567 F. Supp. 662, 668 (E.D. Cal. 1983) ("[R]elevant issues relating to the mental state of a person, since always a matter of inferences, are peculiarly decisions for the jury and are rarely, if ever, susceptible to resolution on summary judgment."); *accord Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2009), *vacated on other grounds* 658. F.3d 897 (2011). If the nonmoving plaintiff presents evidence regarding the culpable mental state of a defendant, that defendant "cannot succeed on summary judgment based simply on his own assertions of his mental state." *Wereb v. Maui County*, 727 F. Supp. 2d 898, 916 (D. Haw. 2010). Thus, the declarations of defendants, replete with their thoughts and motivations, 25 years after the fact, and contradicted by the record (*see* objections to declarations filed concurrently herewith) should be heavily discounted as "sham declarations". *See, Cleveland v. Policy Management Systems Corp.* 526 U.S. 795, 906 (1999). Further, summary judgment is unwarranted and impermissible if based simply on Defendants' declarations as to their own state of mind. *Conn v. City of Reno*, 91 F. 3d 1081 (9th Cir. 2010). "Proof of 'subjective

1  awareness' is not limited to their purported recollections of the individuals

2  involved." *Id.*

3  **IV.   ARGUMENT**

4       **A.   There is more than sufficient evidence to establish SBC had a**

5          **custom or practice to destroy exculpatory time of death evidence**

6          **that destroyed Mr. Richards's alibi.; that SBC had a failure to**

        **have a policy to ensure critical time of death evidence was**

7          **preserved; and there was a complete failure of training to prevent**

        **the destruction of this evidence.**

8       As established by the Statement of Facts, there is more than sufficient

9  evidence to create a genuine issue of fact that SBC violated Mr. Richards rights by

10  destroying critical time of death evidence at the crime scene, which negatively

11  impacted his alibi. This theory should go to the jury because the SBC sheriff's

12  department had an (1) affirmative practice and custom not to assess time of death

13  until the crime scene was cleared no matter how important; (2) along with the SBC

14  coroner's office, they failed to enact policies to prevent such a constitutional

15  violation; and (3), they failed to train or supervise to ensure time of death evidence,

16  potentially exculpatory and indeed exculpatory in this case, was preserved for the

17  defense.

18       A plaintiff seeking to establish municipal liability must demonstrate that the

19  government "had a deliberate policy, custom, or practice that was the 'moving

20  force' behind constitutional violation he suffered." *Monell v. Dep't of Soc. Servs. Of*

21  *N.Y.,* 436 U.S. 658(1978);  *Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1096 (9th

22  Cir. 2013).  Ninth Cir. Civ. Instruc. 9.5 [Section 1983 Claim Against Local

23  Governing Body Defendants Based on Unlawful Official Policy, Practice, Or

24  Custom -Elements and Burden of Proof]. As held by the Supreme Court in *City of*

25  *Saint Louis v. Praprotnik,* 485 U.S. 112, 127 (1988), liability attaches when an

26  employee commits a constitutional violation pursuant to a widespread practice or

27  custom.  Normally the question of whether such a custom exists is a jury question.

28

1   *Trevino v. Gates,* 99 F.3d 911, 920 (9th Cir. 1996), and, thus, not appropriate for

2   summary judgement. Further, a widespread "custom or practice" must be so

3   "persistent" that it constitutes a "permanent and well settled city policy," and

4   constitutes the standard operating procedure of the local governmental entity." *Id. at*

5   918, quoting *Monell*, 496 U.S. at 691.

6         Contrary to the SBC's position that deliberate indifference must be shown,

7   SBC MSJ, p. 9, ll. 10-11, p. 10-12, the Ninth Circuit instruction comments to 9.5,

8   specifically state deliberate indifference need not be shown where the violation was

9   based on an actual practice, not a failure to act, "The claim in *Castro*, [*Castro v.*

10   *County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)(*en banc*)], however, was that

11   the entity failed to enact policies that would have protected a pretrial detainee's right

12   to be free from violence from other inmates. *See id.* at 1075-76. The *en banc* court

13   did not suggest that it was overruling cases stating that the deliberate indifference

14   standard only applies to 'failure to act' cases. *See*, *e.g., Jackson,* 749 F.3d *at* 763."

15   [Citing *Jackson v. Barnes, 749 F.3d 755, 764 (9th Cir. 2014)*].  SBC simply

16   misapprehends Plaintiff's theory - - SBC had an affirmative practice, not a failure of

17   policy, that violated Mr. Richard's rights.  Moreover, SBC gets it wrong again when

18   it claims there is no violation of an underlying right, SBC MSJ, p.p. 10-11.

19   Contrary to SBC's contention that Plaintiff's claim is based on the failure to take

20   liver temperatures, SBC MSJ, p. 12, ll. 14-28, p. 13, 1-8, the underlying violation is

21   the destruction of exculpatory evidence pursuant to *Arizona v. Youngblood*,

22   488 U.S. 51 (1988). The *Youngblood* Court noted that the bad-faith analysis turns

23   on "the police's knowledge of the exculpatory value of the evidence at the time it

24   was lost or destroyed." *Id.* at 56. SBC knows that time of death evidence is crucial.

25         Further, under Ninth Circuit Manual of Model Civil Jury Instructions (Apr.

26   2019), 9.8, Mr. Richards also can proceed with a failure to have policies to prevent

27   the destruction of time of death analysis, and a  failure to  train and supervise claim

28   based on the failure of the policy maker, the SBC Sheriff's office, to have training

1   policies concerning time of death which were deliberately indifferent to Mr.

2   Richards' due process rights..  Under Ninth Cir. Model Rule 9.8, the Plaintiff must

3   show the failure to act deprived Mr. Richards of due process of law, in this case the

4   destruction of potentially exculpatory evidence under *Youngblood.*

5       Here, as set forth in Section IIA., with respect to a practice that destroyed

6   exculpatory alibi and time of death evidence, it is clear that Defendant SBC through

7   both the Sheriff's office and the Coroner's office had a practice that no matter how

8   important it was to assess time of death evidence, even if it could establish an alibi,

9   SBC homicide detectives would not have a coroner assess time of death until the

10  crime scene was cleared. The practices of the coroner's office were the same. To

11  this day the practice is the same. It defies common sense when the coroner is a

12  public official who would follow the direction of the detectives to not disturb the

13  scene. They can go in, take their measurements, and leave, and return when the

14  scene is processed to attend the victim. The defendants violated *Youngblood,*

15  because even though time of death was critical in this case and they knew it, they

16  were willing to risk destruction of exculpatory evidence in derogation of Mr.

17  Richards due process rights – they destroyed his alibi.

18      The claim is not based on the failure to take liver temperatures, but the failure

19  to preserve exculpatory time of death evidence. Indeed, SBC relies on Dr. Sheridan,

20  but he testified and the PMK Coroner witness testified that they always assess time

21  of death factors rigor mortis, body temperature and lividity, and they are required to

22  make that assessment. But they also concede one cannot make that assessment if one

23  does not timely examine the body. Thus, they are acting in deliberate indifference to

24  their knowledge that time of death assessments are critical, but they cannot do it

25  pursuant to their practices. As set forth in the declarations of Russ Fischer, the

26  Plaintiff police practices expert, and Terri Haddix, the forensic pathologist, their

27  justification to not allow the coroner in, contrary to State law, based on preservation

28  of evidence, is false at worst, and misleading at best, especially in this case where

1   the SBC allowed dogs to roam through the crime scene, and the police as well, and

2   they knew time of death was the critical issue in the case.  Thus, the evidence is

3   sufficient to go to the jury on this *Monell* claim.

4        Second, even if deliberate indifference is necessary based on a failure to enact

5   a policy, Plaintiff has more than presented sufficient evidence of the SBC sheriff

6   and coroner's deliberate indifference. Here, the SBC PMK homicide witness knew

7   that there was a government code section stating that the coroner's office may

8   examine the body immediately, but they thumbed their noses at that law. [SGI 5].

9   They knew that other counties did immediately attend the crime scene and have

10  coroner's inspect the body; they knew other counties were conducting liver testing

11  which are used to assess body temperature, but they chose to follow a choice in all

12  cases that risked the destruction of critical time of death evidence.  *See, e.g. Tsao v.*

13  *Desert Place, Inc.* 698 F.3d 1128, 1145 (9th Cir. 2012) ("[P]olicies of omission

14  regarding the supervision of employees . . .  can be 'policies' or 'customs' that

15  create municipal liability . . . only if the omission 'reflects a deliberate or conscious

16  chose' to countenance the possibility of a constitutional violation." (Quoting *City of*

17  *Canton v. Harris*, 489 U.S. 378, 389-90). Third, they knew that the coroner could

18  come in without disturbing the crime scene - - they present a false choice, preserve

19  the crime scene or determine time of death, when it is not a choice that needed to be

20  made, counties across the country demonstrate they can chew gum and walk at the

21  same time.

22       Third, there clearly was a failure to train or supervise. The PMK homicide

23  witness Davenport testified that 1993 homicide detail practices were consistent with

24  the 2017 homicide detail manual. That manual specifically states that the homicide

25  detective can have the coroner come in to assess time of death. [SGI 2, 5]. However,

26  that was never followed, even where time of death was relevant. There is no training

27  in the importance of assessing when a person died, it can make all the difference, as

28  did in this case, in convicting an innocent man and letting a murderer go free. In

1  fact, there training violates due process and the search for truth - - never let the

2  coroner in to inspect the body.  Thus, there was insufficient training and supervision

3  that even though the clear practice was never to allow the coroner in to examine the

4  body to assess time of death in a timely matter, the policy did give discretion and

5  recommended it when time of death was important. They knew it was important, but

6  they did not care because it was more important to process the crime scene no

7  matter how important time of death analysis was in a case.

### B.  There is More than Sufficient Evidence that SBC Was the Moving Force Behind Reckless Investigation Violations

10  SBC was the moving force behind the reckless investigation violations in this

11  case.  Federal courts recognize that reckless failure to investigate violates due

12  process and may support §1983 liability. *Winslow v. Smith*, 696 F.3d 716, 732 (8th

13  Cir. 2012); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 – 957 (8th Cir. 2001).  The

14  right to be free from reckless investigatory tactics implicates the liberty "interest in

15  obtaining fair criminal proceedings before being denied one's liberty…" *Wilson*,

16  260 F.3d 946, 956, n. 8, (citing, *Brady v. Maryland*, 373 U.S. 84, 87 (1963), *Napue

17  v. Illinois,* 360 U.S.  264, 269 (1959). Where the violations in an individual case are

18  pervasive, that is sufficient to establish a custom or practice. [cite]

19  Even if SBC is correct that qualified immunity precludes individual claims,

20  which they are not, (see opposition to MSJ 93), the SBC, as an institutional

21  defendant, is not entitled to qualified immunity. *See Owen v. Independence*, 445

22  U.S. 622, 638 (1980) (holding that "municipality may not assert the good faith of its

23  officers or agents as a defense to liability under § 1983").

24  All the reckless investigation violations set forth above in Section IIB., and in

25  the Opposition to Summary Judgment motion for the Nourse and the defendant

26  detectives, establish the SBC's custom of reckless investigations because they are so

27  pervasive in this case they evidence a custom and practice.  *Oyenik v. Corizon

28  Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (citing *Oviatt By & Through*

1   *Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)); *Bos. v. Suffolk Cty., New*

2   *York*, 326 F. Supp. 3d 1, 24–25 (E.D.N.Y. 2018) (courts have found that single-

3   incident *Monell* claims survive motions for summary judgment or motions to

4   dismiss). The investigation had one goal – to convict William Richards- - no matter

5   the evidence and the truth.  Their reckless investigation deprived Mr. Richards of

6   due process and a fair trial.

## C.    There is More than Sufficient Evidence that SBC's lack of Brady policies led to the concealment of material evidence

9   SBC had no written *Brady* policies or written *Brady* training *materials*.

10  Defendants claim they were trained on *Brady*, but they have produced no written

11  documentation to support their *Brady* training. *Brady v. Maryland* 373 U.S. 83

12  (1963) was decided in 1963, and Defendant SBC cannot point to any training

13  materials or specific policies concerning *Brady* or even exculpatory evidence and

14  their duty to turn over such evidence. Their sham declarations should be discounted.

15  *See, e.g.  Cleveland*, 526 U.S. at 906, evidentiary facts are required to support or

16  oppose summary judgment, not conclusory statements without factual support,

17  *National Steel Corp. v. Golden Eagle Ins. Co.,* 121 F.3d 496, 502 (9th Cir. 1997)

18  (conclusory allegations without factual support are insufficient); and, self-serving

19  declarations do not establish a policy, *Berry v. Baca*, 379 F.3d 764, 770 (9th Cir.

20  2004) ("We cannot determine whether the County's implementation of its policies is

21  in fact reasonably efficient based solely on the defendants' self-serving declarations.

22  This would be an improper basis for summary judgment, as the County's

23  explanations and defenses 'depend on disputed facts and inferences' that are proper

24  for jury determination." (quoting *Blair v. City of Pomona*, 223 F.3d 1074, 1080 (9th

25  Cir. 2000)).

26  They claim that they turn over everything, but that proves too much since we

27  know they destroyed critical time of death evidence, and they have a policy of

28  destroying their notes, because they turn them into reports. [*See* SGI 27]. But what

1    is to be included in the report, and any requirement to ensure evidence that

2    exculpates the Defendant is to be included in the report, for example, is absent from

3    any policy or training material. Saying one turns over everything is meaningless

4    since that does not happen, and they get to define everything. The policies are

5    inconsistent with their self-serving declarations, so their declarations should be

6    rejected. Their so-called platitudes about integrity, completing reports, (SBC SJM,

7    p.p. 16-18), do not establish any training materials, classes or supervision or even

8    specific policies defining *Brady*, and what types of *Brady* evidence needs to be

9    turned over.

10        Their lack of policies and training on *Brady* are the basis of Plaintiff's *Monell*

11   claim based on *Brady* violations. *See, e.g. Tsao v. Desert Place, Inc.* 698 F.3d 1128,

12   1145 (9th Cir. 2012) ("[P]olicies of omission regarding the supervision of employees

13   . . . can be 'policies' or 'customs' that create municipal liability . . . only if the

14   omission 'reflects a deliberate or conscious chose' to countenance the possibility of

15   a constitutional violation." (Quoting *City of Canton v. Harris*, 489 U.S. 378, 389-

16   90). *See also* Ninth Circuit Model Jury Instruc. 9.8 [9.8 Section 1983 Claim Against

17   Local Governing Body Defendants Based on a Policy That Fails to Prevent

18   Violations of Law or A Policy of Failure to Train—Elements and Burden of Proof].

19        As established in Section II.C., the following *Brady* violations occurred:  (1)

20   Defendant Nourse concealed and fabricated critical facts in his reports concerning

21   time of death [that he did not analyze rigor mortis and lividity, and that he had no

22   medical training to make such assessments] that materially affected the outcome of

23   the trial since it impacted Mr. Richards' ability to mount an alibi defense by

24   showing Pam Richards died substantially earlier than the defendants claimed; (2)

25   Defendant Navarro concealed and fabricated critical facts concerning his driving test

26   that would have reduced substantially the window and opportunity for Mr. Richards

27   to come home and murder his wife; and,  (3), Criminalist Oguino suppressed critical

28   facts and fabricated his report that would have shown a third -party hair underneath

1  Pam Richards fingernail.  This was critical to rebut the claim that there was no

2  evidence of third parties on the property the night of the incident.

3        Thus, there is substantial evidence to show that the SBC was a moving force

4  in these *Brady* violations.

5  **V.  CONCLUSION**

6        For all of the foregoing reasons, Plaintiff respectfully requests that the Court

7  deny SBC's motion for summary judgment.

8                      Respectfully submitted,

9                      KAYE, McLANE, BEDNARSKI & LITT, LLP

10

11  DATED: May 20, 2019        By:  */s/ David S. McLane*
                                    _____

12                      DAVID S. McLANE
                           Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28