BARRETT S. LITT (No. 45527)
E-mail: blitt@kmbllaw.com
MARILYN E. BEDNARSKI (No. 105322)
E-mail: mbednarski@kmbllaw.com
DAVID S. McLANE (No.124952)
E-mail: dmclane@kmbllaw.com
CAITLIN S. WEISBERG (No. 262779)
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Wendy J. Koen (No. 255759)
E-mail:  wkoen.defender@gmail.com
Law Office of Wendy J. Koen
32818 Mira Street
Menifee, California 92584
Telephone: (858) 500-2300

Attorneys for Plaintiff WILLIAM J. RICHARDS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM J. RICHARDS,<br><br>        Plaintiff,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO, MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. 5:17-cv-00497-SJO-SP<br><br>[District Judge:  Hon. S. James Otero]<br><br>**PLAINTIFF'S STATEMENT OF GENUINE ISSUES AND ADDITIONAL MATERIAL FACTS IN RESPONSE TO DEFENDANT COUNTY OF SAN BERNARDINO'S MSJ**<br><br>Date:    June 10, 2019<br>Time:   10:00 a.m.<br>Ctrm: 10C |

## OBJECTIONS TO DEFEDANTS' EVIDENCE

The evidence cited in Defendants' Statement of Uncontroverted Facts are subject to the legal objections set forth below. The objections are supported by the following authority.

1)     Vague, conclusory, and/or self-serving declarations are insufficient to support summary judgment.  Rather, evidentiary facts are required to support or oppose a summary judgment motion. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990) ("The object of [Rule 56's affidavit requirement] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Berry v. Baca*, 379 F.3d 764, 770 (9th Cir. 2004) ("We cannot determine whether the County's implementation of its policies is in fact reasonably efficient based solely on the defendants' self-serving declarations. This would be an improper basis for summary judgment, as the County's explanations and defenses 'depend on disputed facts and inferences' that are proper for jury determination."); *National Steel Corp. v. Golden Eagle Ins. Co.,* 121 F.3d 496, 502 (9th Cir. 1997) (conclusory statements without factual support are insufficient); *Schneider v. TRW, Inc.*, 938 F.2d 986, 991  (9th Cir. 1991) (motions to support or oppose summary judgment must cite evidentiary facts, not bald or conclusory assertions of the ultimate fact at issue); *Marshall v. East Carroll Parish Hosp. Service Dist.,* 134 F.3d 319, 324 (5th Cir. 1998) (conclusory assertions are insufficient to support a motion for summary judgment);  *See also Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) (evidentiary facts are required to support or oppose summary judgment).

2)     Contradictory sworn statements. Defendants may not support summary judgment with sworn statements that are subject to impeachment with earlier sworn statements and other evidence. *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

3)    Foundation / personal knowledge. Pursuant to Federal Rule of Civil Procedure 56(c)(4), the supporting affidavits or declarations must be based upon personal knowledge, set out non-hearsay facts that would be admissible in evidence and show that the declarant is competent to testify on the matters stated. The testimony of any witness, other than an expert witness, must be based upon what the witness saw and heard or otherwise experienced through his own senses. Federal Rule of Evidence 602.

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| 1. | In 1993, it was the County's practice that the crime scene was processed before anyone from the Coroner's Department was permitted to enter the crime scene. [Exh. A, Morales Decl. ¶ 3.] | Undisputed |
| 2. | The purpose of the County's practice was to allow the detectives and the crime scene investigators to retrieve and document evidence, and prevent as much disruption to the crime scene as possible. [Exh. A, Morales Decl. ¶ 3.] | Disputed. Ex. 20 (Fischer Decl & Report) at 18-19: The given justification for the practice of delaying a coroner's investigation is the interest in preserving the crime scene. As discussed above, preservation of the crime scene is a critical and necessary function of the investigation. However, as also discussed above, the sheriff's department allowed numerous persons to enter the crime scene on multiple occasions prior to the formal processing of the crime scene after 6:00 a.m. The failure to secure the crime scene, which can, does and in this instance did cause significant damage to evidence, is inconsistent |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | with the County's stated justification for inhibiting another critical aspect of the investigation (coroner time of death examination).<br><br>"Further, standard police practice and custom recognizes that there are important functions that must be carried out despite possible disturbance of a crime scene. For example, Deputy Nourse entered the crime scene to confirm death and did a brief search for suspects and other victims. Both of these actions were necessary and proper, although they certainly posed a risk to the integrity of the crime scene. Likewise, the coroner's investigation of post-mortem changes, which must be done as early as possible upon discovery of the victim, is a standard and necessary part of a death investigation, unless time of death is already established or otherwise uncontested. Homicide detectives and coroner's investigators are trained to conduct such investigations so as to minimize the risk of disturbing evidence." |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|---------------------------------|
|     |                                     | Ex. 21 (Haddix Decl. & Report) at "Furthermore, when a body is assessed at the scene, the people responding from coroner or medical examiner offices exercise caution when approaching a body to minimize disruption of the scene. In Dr. Sheridan's deposition, he indicated that only a 'narrow little passageway' would be required for the coroner' investigators to approach a body to assess the postmortem changes and would "disturbed the scene as little as possible.' Many times, when attending scenes, I have been directed along a specific path to gain access to the body but to not disturb the scene. My movements within the scene and manipulation of the body were typically documented photographically. Lastly, simply because the body is being examined by someone knowledgeable of the assessment and interpretation of postmortem changes, that does not mean that the body must be removed from the scene at that time. I have attended a number of scenes in which an initial assessment of postmortem changes was |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | requested, but the body was removed at a later point in time."<br><br>Homicide Detail Policy 3.104: Coroner Notification, Exhibit AAA, "Remember the deputy coroner may be used to assist in cases where the body temperature or other evidence on the body may help with time of death." Thus, the policy reflects that having deputy coroner inspect the body not inconsistent with preserving the crime scene.<br><br>PMK Homicide Dep. (Ex. 17 at 76-77, practices in 1993 to 1997 same as reflected in Homicide Manual.<br><br>Sheridan Dep. (Ex. 11): 93.8-94.3: The detectives can accommodate the coroner examining the body during the crime scene processing:  His recommendation to the detectives was that they should create a narrow passageway, from the perimeter of the scene to where the body is so that the deputy coroner can examine the body. He does not have a detailed method for how this should be done, it is just |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
|  |  | based on the general principle—to disturb the scene as little as possible. |
| 3. | Accordingly, the Coroner's Department would receive an initial notification about a death to give them notice, and then wait for a follow-up call to inform them that the crime scene investigators had finished processing the crime scene before our office responded. [Exh. A, Morales Decl. ¶ 3.] | Undisputed. |
| 4. | The O.J. Simpson trial compelled Dr. Sheridan, in 1997, to begin advocating for the coroner's office to arrive at crime scenes as soon as possible. [Exh. C, Sheridan Depo. at 85: 2-86:6.] | Undisputed.<br><br>Objection: References to O.J. Simpson trial, irrelevant under FRE 402; prejudicial, FRE 401. |
| 5. | In 2001, the County enacted a policy that stated Deputy Coroner Investigators shall immediately respond to death scene investigations. The policy stated that an effective investigation requires a timely response; however, at times, due to heavy workload, it may not be possible to respond immediately. If so, the primary deputy handling the investigation the investigation shall note in the report the reason for his/her response delay. [Exh. A, Morales Decl. ¶ 4; Exh. F, Coroner's Policy 1:01 (COSB 03679).] | Partially Disputed. Policy 01-01: The policy also refers to Cal. Govt. Code § 27491.2(a), which states, "The coroner or the coroner's appointed deputy, on being informed of a death and finding it to fall into the classification of deaths requiring his or her inquiry, may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition or |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | release the body to the next of kin." Thus, Cal. Gov. Code sates a coroner may immediate examine a body to determine the circumstances, manner and means of death, without requiring permission of the homicide detectives. |
| 6. | After the 2001 policy was implemented, it was the custom, policy, and practice for a Deputy Coroner Investigator to immediately respond to the scene to attend a briefing and obtain basic preliminary information.  However, the Deputy Coroner Investigator was still not permitted to enter the crime scene or conduct an investigation until the crime scene had been thoroughly processed in order to avoid disturbing and compromising the crime scene.  This continues to be the current custom, policy, and practice today. [Exh. A, Morales Decl. ¶ 5.] | Disputed. See Response to # 2. |
| 7. | It is not now, nor has it ever been the policy in San Bernardino County to take a liver temperature to determine the time of death. [Exh. A, Morales Decl. ¶ 6.] | Undisputed. |
| 8. | The decision of whether to take liver temperature has been at the discretion of Forensic Pathologist Dr. Frank Sheridan. [Exh. A, Morales Decl. ¶ 6.] | Undisputed. |
| 9. | Dr. Sheridan believes the liver temperature testing was very unreliable in determining time of death.  [Exh. A, Morales Decl. ¶ 6.] | Disputed.  Defendant should cite to Dr. Sheridan's testimony. Objection:  Hearsay. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| 10. | There are many variables involved with respect to a person's internal body temperature such as what they were doing before they died, whether they were sick, their size and body composition, and outdoor weather. [Exh. A, Morales Decl. ¶ 6; Exh. C, Sheridan Depo. at 96: 10-26; 97:1-21.] | Disputed: Contrary to what County says, Sheridan believes it would be useful for coroners to assess the body and provide information concerning lividity, body temperature and rigor mortis to assess time of death, an that they could do it during the homicide detectives processing of the scene: Sheridan Dep. (Ex. 11) at 23:2-23:22: Sheridan explained the kind of examination that the deputy coroner was expected to conduct at a murder scene, "basically describe the body in general terms"; find out the name, sex; describe the clothing. Then they would examine the body for rigor mortis and lividity and note whether the body was hot or cold. They also might describe objects present at the scene.<br><br>Sheridan Dep. (Ex. 11) at 45: 16-46:5: Sheridan answers "no" to the question about whether he relied on the police detectives /deputies offered him information about the condition of the body in terms of injuries temperature, lividity, and rigor mortis. This was the |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-----|-----|
| | | specific job of the deputy coroners. |
| | | Sheridan Dep. (Ex. 11): 55:6-55:12: Sheridan answers "no" to the question of ever doing an examination of a deceased person for purposes of attempting to determine time of death. He says that this can only be done at the scene. |
| | | Sheridan Dep. (Ex. 11): 56:6-56:25: Sheridan explains the observations that a coroner investigator would make as part of an examination to evaluate time of death. He says that they were trained to comment on the presence or absence of lividity and also rigor mortis, to give some idea whether the body was cold to the touch—this would be the basics. Other than that, they would comment on whether the body was decomposed (this would imply an even longer period of time). Additional information they would refer to is whether the decedent had a reliable history i.e. when the person was last seen. |
| | | Sheridan Dep. (Ex. 11): 84:15-86:6:  Sheridan does not recall if at all liver |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | temperatures at San Bernardino. After 1997, the office began looking at the procedures and reviewing some of the things they did— one of the key points Sheridan began to promote was the idea that the homicide units should have their deputies come to the scene as soon as possible to examine the body for rigor mortis, lividity, and temperature. He emphasized that: "the longer you wait the less useful that information is". |
|     |                                     | Sheridan Dep. (Ex. 11): 86.7-87.10: Sheridan goes onto explain that after a certain length of time, all the measurements that could be taken (i.e. the rigor mortis, lividity etc.) become essentially useless. It was for this reason that Sheridan began to emphasize to the homicide unit that they should get the coroner deputies to the scene as soon as possible as opposed to waiting for the police to finish their crime scene investigation. This was because the coroner instigator's measurements and observations might |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|-------------------------------|
|     |                                     | become virtually useless if they wait too long.<br><br>Sheridan Dep. (Ex. 11): 88:1-89:3:<br>Sheridan does not recollect a case, prior to 1999, where it was recognized that time of death was important which lead to the deputy coroner being allowed to come to the scene early. He mentions that there were certainly cases where time of death was an issue. Sheridan was the one pushing for a policy to allow the deputy coroner to come to the scene early, and he asked for meetings with the sheriff's department and homicide; he says that there are many agencies within the county; he's had to go back and remind them on some occasions.<br><br>Sheridan Dep. (Ex. 11): 90:11-91:14:<br>Sheridan testifies that its commons sense to do time of death measurements early. He says he has been trying to promote the idea that whatever hope you have of getting the time of death disappears if you don't get there early on. He uses the example of getting to a dead body early and feeling that |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | the body is warm. After touching it later on, you can feel how fast the temperature has changed which will provide an important piece of information that you'd otherwise wouldn't have if you got there later.<br><br>Sheridan Dep. (Ex. 11): 91: 15-92:10:<br>Sheridan agrees that taking core temperature at two points in time makes sense, and that rigor mortis and lividity should be seen early on if they're going to have any value at all. He presumes that this fact has been known before 1988; he does not recall anybody specifically telling him that, but he would imagine this was acknowledged; it made sense to him.<br><br>Ex. 21(Haddix Decl. & Report) at 10:  It would be useful in assessing time of death to analyze postmortem changes immediately, because they can assist in determining if person died with the hour.  Attempting do so more than 10 hours later as in this case after the body was found has little utility. The failure to respond to the scene and the practice of not |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | performing core body temperatures, although the coroner investigators were qualified to do so in 1993, deprived the investigation of information critical to assessing the post mortem interval and where Mr. Richard could have even been present at the scene at the time of death. |
| 11. | While there are some counties which conduct liver temperature testing, this is not a universal policy. [Exh. A, Morales Decl. ¶ 7; Exh. C, Sheridan Depo at 83:1-3.] | Undisputed. |
| 12. | The County is not aware of any legal requirement now or in 1993, or any court cases, that mandated liver temperature testing had to be done. [Exh. A, Morales Decl. ¶ 7.] | Partially Disputed: Govt. Code Section Cal. Govt. Code § 27491.2(a), states, "The coroner or the coroner's appointed deputy, on being informed of a death and finding it to fall into the classification of deaths requiring his or her inquiry, may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition or release the body to the next of kin." |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | This mandate provides that the coroner may immediately examine the body. |
| 13. | The County is not aware of any requirement now or in 1993, that mandated the Coroner's Department staff or Forensic Pathologist must examine the victim's body as soon as possible. [Exh. A, Morales Decl. ¶ 7; Exh. E, Garavan Report at p. 6.] | Partially disputed. *See* response to #12. *See also* Homicide Detail Policy 3.104: Coroner Notification, Exhibit AAA, "Remember the deputy coroner may be used to assist in cases where the body temperature or other evidence on the body may help with time of death." Thus, the policy reflects that having deputy coroner inspect the body not inconsistent with preserving the crime scene. PMK Homicide Dep. (Ex. 17 at 76-77, practices in 1993 to 1997 same as reflected in Homicide Manual. |
| 14. | It is the County's understanding that several other counties had and continue to have the same policies as San Bernardino, whereby the coroner's investigation is done after the crime scene has been processed in order to avoid disruption of the crime scene. [Exh. A, Morales Decl. ¶ 7; Exh. C, Sheridan Depo at 86:14-87:4.] | Undisputed. |
| 15. | While it is often impossible to determine exact time of death, it is understood by the Coroner's office that determining an approximate time of death may be | Partially disputed. Ex. 21 (Haddix Decl and Report,) at 10, 11, even the evidence provided in ths case |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | important for homicides. [Exh. A, Morales Decl. ¶ 8.] | supported Mrs. Richards dying two hours or possibly more prior to the arrival of Office Nourse, which would have been at a time when Mr. Richards was still at work. Failing to provide valuable post-mortem information placed undue important on the observations of a non-expert individual, Officer Nourse, and derived the investigation of valuable information to assess time of death or the post-mortem interval. |
| 16. | During the operative period, and now, it is the custom and practice to include as much information in the Coroner's report as possible about information collected related to time of death such as when the victim was last seen alive, when they were found dead, and if there is any other relevant information. [Exh. A, Morales Decl. ¶ 8.] | Disputed. The facts establish that the deputy coroner does not assess time of death factors, including body temperature, lividity and rigor mortis until the crime scene is cleared, which deprives the coroner's report and the investigation of critical evidence concerning the body that could have been obtained if the deputy coroner could immediately assess the body of the deceased to assess these factors. This is pursuant to Sheriff' affirmative custom and practice to prevent the deputy coroner from assessing the body until the crime scene is |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
| | | cleared, however long it takes.  Thus, critical information concerning the body and time of death is destroyed as a result of the Sheriff's custom and practice.<br><br>Ex. 21(Haddix Decl. & Report) at 10:  It would be useful in assessing time of death to analyze postmortem changes immediately, because they can assist in determining if person died with the hour.  Attempting do so more than 10 hours later as in this case after the body was found has little utility.  The failure to respond to the scene and the practice of not performing core body temperatures, although the coroner investigators were qualified to do so in 1993, deprived the investigation of information critical to assessing the post mortem interval and where Mr. Richard could have even been present at the scene at the time of death.<br><br>Ex. 20 (Fischer Decl. & Report) at 20:<br>"It is clear from the testimony and records reviewed that the SBCSO practice has been to not allow the coroner/medical examiner |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | entry to the crime scene until the conclusion of the crime scene processing, even though the policy was modified at a later time to allow discretion to do so. That practice, however, had a net effect in this case of allowing evidence of time of death to be lost forever as it wasn't until 10 hours after the discovery of the victim that a representative from the coroner's office arrived on the scene." |
|     |                                     | County's practice of delaying any time of death investigation by the coroner's office until after the processing of the crime scene is contrary to established police practices and customs in 1993. |
|     |                                     | - The actions of Deputy Nourse and the detectives, in conformance with County practice, resulted in the destruction of time of death evidence and the presentation of unreliable evidence by Deputy Nourse at trial. It is abundantly clear that had detectives requested the coroner respond to the scene in a timely manner as well as made their own observations as to the condition of the |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | victim and related blood evidence, an informed and learned opinion regarding those matters would have better served the interests of justice and search for truth. By failing to timely have the coroner respond, valuable information and evidence was lost that could have helped narrow down a time of death estimate by a trained professional. This failure potentially harmed Mr. Richards' ability to present an alibi defense because time of death information may have established a time when Mr. Richards was at work or traveling home from work. Despite the difficulties and complexities of establishing time of death in any case, having the opinion, observations and benefit of trained, experienced professionals to add to the body of knowledge cannot be replaced with the testimony of one far less qualified.

PMK Coroner (Morales) Dep. (Ex. 16) at 19: 16-26; 20: 1-12: Q. Okay. To determine rigor mortis, morbidity, those are factors the bear on time of death, correct? |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | A. Correct. Q. Would you need to be at the crime scene as quickly as possible in order to assess those factors? A. Yes. Q. Was that being done in 1993, to your knowledge? The Witness: What was happening in 1993 was we were very short staffed and a lot of investigations. And on homicide deaths a lot of times, because the scene has to be processed, nobody can actually go into that scene until - - until the CSI folks have done their work. And so there were a lot of times there wasn't anything to do. If you were to show up on a scene early, you would be standing there for 10 hours, 12 hours, until the crime scene folks processed the scene so you could get in without disturbing evidence

PMK Coroner (Morales) Dep. (Ex. 16) at 20: 14-20: Q. Well, how do you assess time of death if you have to wait 10 or 12 hours to look at the body to assess such factors as rigor mortis or lividity? A. You can't. You have to just - - you can only do it based on what you are |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | observing. If you have, you know, a ten-hour window, that comes into play as well. |
|     |                                     | PMK Coroner (Morales) Dep. (Ex. 16) at 22: 17-22: |
|     |                                     | Q. You know as a deputy coroner - - right? -- in your experience, if you were trying to assess time of death, you need to get to the body as quickly as possible to measure lividity, rigor mortis, body temperature, correct? A. It's helpful, yes. |
|     |                                     | PMK Coroner (Morales) Dep. (Ex. 16) at 96: 23-25: Best practice is to get to body as soon as you can if you want to get the best estimate of time of death. |
|     |                                     | PMK Homicide (Davenport) Dep. (Ex. 17) at 157: 22-25; 158: 1-8: Q. So -- so your testimony is for other factors, preservation of crime scene, not disturbing the crime scene. Based on your review of this case and what you thought was important in the case, you're saying that even though time of death, from the defense perspective may have been critical in the case, that this was consistent with the |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | sheriff's practice for the deputy coroner not to respond and assess any -- not to assess time of death until after the crime scene was cleared? A Yes. That was the practice back then. Trial 4 RT (Ex. 3) at 1362-1377, 1365-1368: Deputy Coroner Randolph testified that he was notified of death at 00.40 hours but did not make exam at that time because not requested by homicide, and when examine body at 10:30 could not assess time of death. |
| 17. | The coroner's office also includes physical characteristics of the victim so that a doctor can make a rough estimate of how long the person may have been dead. [Exh. A, Morales Decl. ¶ 8.] | Disputed. Sheridan Dep. (E. 11) at 117:15-118:5: Sheridan confirms that he testified earlier to the fact that it's important for a coroner investigator get out to a scene as quickly as possible to conduct an examination of postmortem changes— especially when time of death is important to note. He agrees that the closer in time that examination is done, the more likely they will have useful information. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | Sheridan Dep. (E. 11) at 86:7-87:10: Sheridan goes onto explain that after a certain length of time, all the measurements that could be taken (i.e. the rigor mortis, lividity etc.) become essentially useless. It was for this reason that Sheridan began to emphasize to the homicide unit that they should get the coroner deputies to the scene as soon as possible as opposed to waiting for the police to finish their crime scene investigation. This was because the coroner instigator's measurements and observations might become virtually useless if they wait too long.

Sheridan Dep. (E. 11) at 55:6-55:12: Sheridan answers "no" to the question of ever doing an examination of a deceased person for purposes of attempting to determine time of death. He says that this can only be done at the scene. |
| 18. | The County is not aware of information that the County has unconstitutional policies department-wide practices, or training on responding to crime scene investigations and whether or not to take | Disputed.
    Govt. Code Section Cal. Govt. Code § 27491.2(a), states, |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | liver temperature testing. [Exh. A, Morales Decl. ¶ 9.] | "The coroner or the coroner's appointed deputy, on being informed of a death and finding it to fall into the classification of deaths requiring his or her inquiry, may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition or release the body to the next of kin."<br><br>PMK Coroner (Morales) Dep. (Ex. 16) at 80:21-25, 81:1-2:<br>Q. Were you aware that other counties were doing liver testing to determine time of death?<br>A. Yes.<br>Q. And that includes L.A. County?<br>A. Yes.<br>Q. And that was back in 1993:<br>A. yes.<br><br>Liver testing is used to assess body temperature for time of death: |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | PMK Coroner (Morales) Dep. (Ex. 16) at 81: 22-25, 82: 1-13 : Q. But I am saying physically to do the liver testing. What does that entail? A. It's just a matter of making a small hole. It is usually like a probe-type device, goes into the liver, stays there, and takes a temperature. It is a very simple procedure. Anybody can really do it. Q. Really? So you could have done it? A. Uh-hu. Yes. Q. You could do it - - you could do it. It didn't require the forensic pathologist to go and do the liver testing? A. It required permission form the forensic pathologist because you're altering the body. |

Objection: Legal conclusion as to unconstitutional practices.
Further, summary judgment is unwarranted and impermissible if based simply on Defendants' declarations as to their own state of mind. *Conn v. City of Reno*, 91 F. 3d 1081 (9th Cir. 2010). "Proof of 'subjective awareness' is not limited to

MSJ SGI – COUNTY                                    - 24 -                        5:17-CV-00497-SJO-SP

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | their purported recollections of the individuals involved." Id. Finally, evidentiary facts are required to support or oppose a summary judgment motion. *National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (conclusory allegations without factual support are insufficient); *Schneider v. TRW, Inc.*,  938 F.2d 986, 991  (9th Cir. 1991) (motions to support or oppose summary judgment must cite evidentiary facts, not bald or conclusory assertions of the ultimate fact at issue); *Marshall v. East Carroll Parish Hosp. Service Dist.*, 134 F.3d 319, 324 (5th Cir. 1998)(conclusory assertions are insufficient to support or defeat a motion for summary judgment);  *See also Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)(evidentiary facts, supported by admissible evidence, are required to support or oppose summary judgment). |
| 19. | The County is not aware of any unconstitutionality in its policies, practices, or training. [Exh. A, Morales Decl. ¶ 9.] | Disputed.          Govt. Code Section     Cal. Govt. Code § 27491.2(a), states, "The coroner or the coroner's appointed deputy, on being |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|----------------------------------|
|     |                                     | informed of a death and finding it to fall into the classification of deaths requiring his or her inquiry, may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition or release the body to the next of kin." |
|     |                                     | PMK Homicide (Davenport) Dep. (Ex. 17) at 162-167: Davenport aware of Govt. Code Sec. 27491.2(a) but says does not conflict with practice of not allowing deputy coroner to examine the body until the crime scene is processed because says coroner "may" immediately, and not "shall" immediately examine the body. |
|     |                                     | Objection: Calls for a legal conclusion; irrelevant; overbroad. Further, summary judgment is unwarranted and impermissible if based simply on Defendants' declarations as to their own state of mind. *Conn v. City of Reno*, 91 F. 3d 1081 (9th Cir. 2010). |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | "Proof of 'subjective awareness' is not limited to their purported recollections of the individuals involved." Id. Finally, evidentiary facts are required to support or oppose a summary judgment motion. *National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (conclusory allegations without factual support are insufficient); *Schneider v. TRW, Inc.*, 938 F.2d 986, 991 (9th Cir. 1991) (motions to support or oppose summary judgment must cite evidentiary facts, not bald or conclusory assertions of the ultimate fact at issue); *Marshall v. East Carroll Parish Hosp. Service Dist.*, 134 F.3d 319, 324 (5th Cir. 1998)(conclusory assertions are insufficient to support or defeat a motion for summary judgment); *See also Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)(evidentiary facts, supported by admissible evidence, are required to support or oppose summary judgment). |
| 20. | During the operative time period, Sheriff's deputies were required to attend the Sheriff's Basic and Modular Academy programs at the Frank Bland | Undisputed. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | Regional Training Center, which is where training still occurs today. The Frank Bland Regional Training Center has provided essential law enforcement training to Sheriff's deputies and officers throughout the state since 1971. [Exh. B, Davenport Decl. ¶ 6.] | |
| 21. | The County's basic academy is certified by POST and accredited by San Bernardino Valley College. The basic academy delivers various subjects taught such as crime scene investigation, tactical communication, firearms and defensive tactics. [Exh. B, Davenport Decl. ¶ 7.] | Undisputed. |
| 22. | During the operative period, in addition to attending the Sheriff's academy, homicide detectives attended a homicide investigation school and a detective school. There is also an advanced detective school. They are also offered the opportunity to attend in-service trainings and courses on interviews, interrogations, informants, tracking, crime scene investigation, and other skills. [Exh. B, Davenport Decl. ¶ 8.] | Undisputed. |
| 23. | During the operative time period, the Department had the Sheriff's Department Manual. There may have also been a Homicide Manual. Sheriff's detectives conducting a homicide investigation were required to follow the Sheriff's Department Manual, as well as following general orders, special orders, and training bulletins. They were also required to follow the training they received at the basic academy, detective school, homicide school, and any other courses that they took. [Exh. B, | Partially Disputed.<br><br>No homicide manual was produced in discovery, or located by the SBC PMK: PMK Homicide (Davenport) at 16-19:<br>P. 16: 24-25, P. 17: 1<br>  Q. Okay. Did this homicide detail manual exist in 1993 as of the date of the murder of Pamela |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | Davenport Decl. ¶ 9.] | Richards on August 10, 1993? |
| | | A. I don't know. |
| | | P. 17:  17-25: |
| | | Q. I think you should have inquired because that's what we're here to try to figure out, what the exact policies and practices at the homicide division were in 1993.  And I'm trying to figure out was there - - was there particular memo that we issued periodically, or was there any type of booklet similar to this homicide detail manual that existed in 1993? |
| | | A. Not that I could find. |
| | | P. 18:  12-19: |
| | | Q. Ms. Coleman:  We would have produced it if were were able to find such - - |
| | | Mr. McLane: I'm sure you would have. |
| | | Q. I understand. |
| | | A. Right. |
| | | Q. So you looked for it; you just couldn't find it. |
| | | A. Yes. |
| | | P. 19: 5-7: |
| | | Q. Okay. So nothing that struck you as – but you didn't find anything going from '93 to '97? |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | A. No.<br><br>P. 19: 12-13:<br>    Q. Did you find one dated before 1993?<br>    A. No. |
| 24. | The County of San Bernardino created and continues to create their manuals and training lesson plans regarding discovery obligations (*Brady*) to be consistent with POST standards and guidelines as required by the Penal Code. [Exh. B, Davenport Decl. ¶ 10.] | Disputed:<br><br>McLane declaration, ¶¶ 2-3: The 1993 Sheriff manual and the 2017 Homicide detail manual do not discuss *Brady*, what is *Brady* or exculpatory material, or the legal requirements of *Brady*. See also response to 23: there is not homicide manual covering the years 1993-1997.  The SBC has a 1993 Sheriff Manual and a 2017 homicide detail manual, and did not produce a 1993 homicide manual and could not locate it.  Plaintiff asked in discovery Defendants' policies and training materials on *Brady* and exculpatory evidence, and none were produced.<br><br>Objection:  this is based on information and belief, and does not state the basis for his belief so the paragraph should be stricken as without foundation, lack of foundation. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| 25. | All County officers, including homicide detectives, are trained to turn over any and all evidence during criminal investigations. [Exh. B, Davenport Decl. ¶ 11.] | Disputed: McLane decl., ¶¶ 2-3: The SBC has a 1993 Sheriff Manual and a 2017 homicide detail manual, and did not produce a 1993 homicide manual and could not locate it. The 1993 Sheriff manual and the 2017 Homicide detail manual do not discuss *Brady*, what is *Brady* or exculpatory material, or the legal requirements of *Brady*. See also response to 23: there is not homicide manual covering the years 1993-1997.  Plaintiff asked in discovery Defendants' policies and training materials on *Brady* and exculpatory evidence, and none were produced.  Also, turn over everything leaves to the discretion of the officers what to document and what to turn over without any accountability or standards. |
|  |  | Objection:  Lack of foundation to ¶ 12 of the declaration of Davenport, lack of foundation there are no training materials produced, and no materials covering "discovery instruction", and "ongoing training" is meaningless.  The paragraph has no substance to render it irrelevant. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| 26. | It is against County policy to conceal exculpatory and/or material evidence. This requirement is a Department-wide policy which all officers are obligated to follow.  Homicide detectives receive additional discovery instruction during detective school and homicide school. Officers also receive ongoing training through regular instructional blocks. [Exh. B, Davenport Decl. ¶ 11.] | Disputed.<br><br>McLane decl., ¶¶ 2-3: The SBC has a 1993 Sheriff Manual and a 2017 homicide detail manual, and did not produce a 1993 homicide manual and could not locate it. The 1993 Sheriff manual and the 2017 Homicide detail manual do not discuss *Brady*, what is *Brady* or exculpatory material, or the legal requirements of *Brady*. See also response to 23: there is not homicide manual covering the years 1993-1997.  Plaintiff asked in discovery Defendants' policies and training materials on *Brady* and exculpatory evidence, and none were produced.  Also, turn over everything leaves to the discretion of the officers what to document and what to turn over without any accountability or standards.<br><br>Objection:  Lack of foundation to ¶ 12 of the declaration of Davenport, lack of foundation there are no training materials produced, and no materials covering "discovery instruction", and "ongoing training" is meaningless.  The |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | paragraph has no substance to render it irrelevant. |
| 27. | County detectives are trained and instructed to provide reciprocal and informal discovery through the prosecutor's office. Detectives are also trained to respond to formal discovery requests, and provide all relevant reports to the prosecutor's office, whether exculpatory or inculpatory. They are trained to turn over all evidence to the handling Deputy District Attorney. [Exh. B, Davenport Decl. ¶ 12.] | Disputed. McLane decl., ¶¶ 2-3: The SBC has a 1993 Sheriff Manual and a 2017 homicide detail manual, and did not produce a 1993 homicide manual and could not locate it. The 1993 Sheriff manual and the 2017 Homicide detail manual do not discuss Brady, what is Brady or exculpatory material, or the legal requirements of Brady. See also response to 23: there is not homicide manual covering the years 1993-1997.  Plaintiff asked in discovery Defendants' policies and training materials on Brady and exculpatory evidence, and none were produced.  Also, turn over everything leaves to the discretion of the officers what to document and what to turn over without any accountability or standards.

Also, no training materials or policies have been produced substantiating that they turn over all evidence to the Deputy District Attorney. (McLane decl., ¶ 3). |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | PMK Homicide witness Davenport testified that they have no written *Brady* policies, and no policies as to what to turn over to the district attorney. PMK Homicide Dep. (Ex, 17) at 192: 10-16; 193: 21-25, 194: 1. |
|     |                                     | PMK Homicide witness Davenport testified that their policy is to turn over everything, but it is not document with any policies. PMK Homicide Dep. (Ex, 17) at 192: 10-16; 193: 21-25, 194: 1-17. |
|     |                                     | They do not turn over everything because they do not turn over notes when a report is generated based on those notes. PMK Homicide Dep. (Ex, 17) at 87: 1-9. |
|     |                                     | Objection to paragraph 12 of Davenport declaration and this statement that they turn over everything:  lack of foundation, they do not turn over privileged materials, materials relating to informants, sealed materials etc, thus, this statement that |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | they turn over any and everything is without foundation, and overbroad. |
| 28. | During a homicide investigation, files and discovery are kept in the Murder Book.  It is County policy to hand over everything that is contained within the Murder Book to the handling District Attorney, who then provides it to defense attorneys. [Exh. B, Davenport Decl. ¶ 13.] | Disputed.<br><br>There are no written policies that they turn over the entire Murder Book to the deputy district attorney, or policies concerning the contents of the murder book, and whether the detective can keep materials from the murder book. (McLane decl, ¶ 3).<br><br><br>Objection:  lack of foundation, the detective does not know what the deputy district attorney turns over to the defense; also, |
| 29. | It is against County policy to fabricate evidence or to file false investigatory reports.  It is against County policy to knowingly or recklessly present false evidence, and detectives and officers are not trained to do so.  They are taught that such violations of the law and constitution are grounds for termination. [Exh. B, Davenport Decl. ¶ 14.] | Partially Disputed.<br><br>While the SBC has not produced any policies or materials to the Plaintiff that a homicide detective can be terminated for recklessly presenting false evidence, or any training materials concerning the same, its common sense the SBC practice would be to teach |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | detectives and officers not to recklessly present false evidence. [McLane decl. ¶ 3). |
| 30. | With respect to crime scene investigations, detectives are trained to work with the crime scene investigators to gather as much evidence as reasonably and promptly as possible, and thoroughly investigate matters.  [Exh. B, Davenport Decl. ¶ 15.] | Undisputed. |
| 31. | Detectives are trained to use their judgment as to how to process crime scenes as each case is unique, there are always numerous variables, and there is not a "one size fits all" way to investigate cases.  [Exh. B, Davenport Decl. ¶ 16.] | Partially disputed.  The SBC practice and custom is to never have the coroner inspect the body, even to determine time of death, while the crime scene is being processed, even though they are trained in time of death, are trained in time of death, that it may be important to determine time of death when a detective responds to a crime scene,. Davenport decl., ¶ 17; PMK Homicide (Davenport) Dep. (Ex. 17) at 115: 24-25, 116: 1-4: Q So you understand as a homicide detective, when you respond to a crime scene and there's a deceased body, that it may be important to determine  or start investigating time of death; is that correct? |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
|  |  | A. Yes.<br>PMK Homicide (Davenport) Dep. (Ex. 17) at143: 21-25, 144: 1-11:<br>Q So -- so this is what I've heard from multiple wit- -- what we've heard from multiple witnesses, including the coroner PMK person -- 2<br>A Right.<br>Q -- Detective Bradford, Detective Parent.<br>They all said the practice was -- back then is that the criminalists and the lead detective on the scene would process a crime scene, and when they completed the processing of the crime scene, then the -- the coroner deputy would go to the crime scene and examine the body.<br>A Yes. |
| 32. | During the operative time period, and now, it is the County's general policy and practice that the crime scene is processed before the coroner or forensic pathologist is permitted to enter the crime scene. The purpose of this is to allow the detectives and the crime scene investigators to retrieve and document evidence, and prevent as much disruption to the crime scene as possible.  [Exh. B, Davenport Decl. ¶ 17.] | Disputed.<br>Disputed.<br>Ex. 20 (Fischer Decl & Report) at 18-19:<br>The given justification for the practice of delaying a coroner's investigation is the interest in preserving the crime scene. As discussed above, preservation of the crime scene is a critical and necessary function of the investigation. However, as also discussed above, the |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|----------------------------------|
|     |                                     | sheriff's department allowed numerous persons to enter the crime scene on multiple occasions prior to the formal processing of the crime scene after 6:00 a.m. The failure to secure the crime scene, which can, does and in this instance did cause significant damage to evidence, is inconsistent with the County's stated justification for inhibiting another critical aspect of the investigation (coroner time of death examination).<br><br>"Further, standard police practice and custom recognizes that there are important functions that must be carried out despite possible disturbance of a crime scene. For example, Deputy Nourse entered the crime scene to confirm death and did a brief search for suspects and other victims. Both of these actions were necessary and proper, although they certainly posed a risk to the integrity of the crime scene. Likewise, the coroner's investigation of post-mortem changes, which must be done as early as possible upon discovery of the victim, is a standard and necessary part of a death investigation, unless time of |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | death is already established or otherwise uncontested. Homicide detectives and coroner's investigators are trained to conduct such investigations so as to minimize the risk of disturbing evidence."<br><br>Ex. 21 (Haddix Decl. & Report) at "Furthermore, when a body is assessed at the scene, the people responding from coroner or medical examiner offices exercise caution when approaching a body to minimize disruption of the scene. In Dr. Sheridan's deposition, he indicated that only a 'narrow little passageway' would be required for the coroner' investigators to approach a body to assess the postmortem changes and would "disturbed the scene as little as possible.' Many times, when attending scenes, I have been directed along a specific path to gain access to the body but to not disturb the scene. My movements within the scene and manipulation of the body were typically documented photographically. Lastly, simply because the body is being examined by someone |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|---------------------------------|
| | | knowledgeable of the assessment and interpretation of postmortem changes, that does not mean that the body must be removed from the scene at that time. I have attended a number of scenes in which an initial assessment of postmortem changes was requested, but the body was removed at a later point in time." |
| | | Homicide Detail Policy 3.104: Coroner Notification, Exhibit AAA, "Remember the deputy coroner may be used to assist in cases where the body temperature or other evidence on the body may help with time of death." Thus, the policy reflects that having deputy coroner inspect the body not inconsistent with preserving the crime scene. |
| | | PMK Homicide Dep. (Ex. 17 at 76-77, practices in 1993 to 1997 same as reflected in Homicide Manual. |
| | | Sheridan Dep. (Ex. 11): 93.8-94.3: The detectives can accommodate the coroner examining the body during the crime scene processing:  His recommendation to the |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | | detectives was that they should create a narrow passageway, from the perimeter of the scene to where the body is so that the deputy coroner can examine the body. He does not have a detailed method for how this should be done, it is just based on the general principle—to disturb the scene as little as possible. |
| 33. | The County is not aware of information that would demonstrate that the County had then or has now unconstitutional policies, unconstitutional department-wide practices, or unconstitutional training on discovery (*Brady),* or any unconstitutional or illegal policies, practices, or training with respect to conducting crime scene investigations (such as when to call the coroner). [Exh. B, Davenport Decl. ¶ 18.] | Disputed.<br><br>Objection:  overbroad, calls for speculation, lack of foundation, the very statement based on information and belief, without stating the basis for his information and belief, renders the statement irrelevant under FRE Rule 402, and unfairly prejudicial under FRE 403.<br> Further, summary judgment is unwarranted and impermissible if based simply on Defendants' declarations as to their own state of mind. *Conn v. City of Reno*, 91 F. 3d 1081 (9th Cir. 2010). "Proof of |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|--------------------------------|
|     |                                     | 'subjective awareness' is not limited to their purported recollections of the individuals involved." Id. Finally, evidentiary facts are required to support or oppose a summary judgment motion. *National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (conclusory allegations without factual support are insufficient); *Schneider v. TRW, Inc.*, 938 F.2d 986, 991 (9th Cir. 1991) (motions to support or oppose summary judgment must cite evidentiary facts, not bald or conclusory assertions of the ultimate fact at issue); *Marshall v. East Carroll Parish Hosp. Service Dist.*, 134 F.3d 319, 324 (5th Cir. 1998)(conclusory assertions are insufficient to support or defeat a motion for summary judgment); *See also Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)(evidentiary facts, supported by admissible evidence, are required to support or oppose summary judgment). |
| 34. | The Sheriff's Department Manual (1993) Policy No. 220, entitled RESPECT FOR CONSTITUTIONAL RIGHTS, states: "No person has a constitutional right to violate the law; neither may any person | Undisputed.<br><br>Objection:<br>Irrelevant under FRE 402. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | be deprived of his constitutional rights merely because he is suspected of having committed a crime. The task of determining the constitutionality of a statute lies with an appellate court of proper jurisdiction, not with an officer who seeks to properly enforce the law as it exists. Therefore, an officer may enforce any federal, state, or local statute which is valid on its face without fear of abrogating the constitutional rights of the person violating that statute. An officer who lawfully acts within the scope of his authority does not deprive persons of their civil liberties. He may, within the scope of his authority, make reasonable inquiries, conduct investigations, and arrest on probable cause. However, when an officer exceeds his authority by unreasonable conduct, he violates the sanctity of the law which he is sworn to uphold." [Exh. G, Sheriff's Department Manual (COSB 01330-01331.)] | |
| 35. | The Sheriff's Department Manual (1993) Policy No. 230, entitled INTEGRITY, states: The public demands that the integrity of its law enforcement officers be above reproach. The dishonesty of a single officer may impair public confidence and cause suspicion upon the entire Department. Succumbing to even minor temptation can be the genesis of a malignancy which may ultimately destroy an individual's effectiveness and may contribute to the corruption of countless others. An officer must scrupulously avoid any conduct which might compromise the integrity of himself, his fellow officers, or the Department. [Exh. | Undisputed.

Objection: Irrelevant under FRE 402. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | G, Sheriff's Department Manual (COSB 01331.)] | |
| 36. | Sheriff's Department Manual (1993) Policy No. 536, entitled CRIME SCENE SUPERVISION, states in relevant part: The success of criminal investigations is largely dependent upon the rapidity and strategy of initial law enforcement response and the quality of the crime scene investigation. The initial investigation is clearly the important first link in a department's total investigative effort. The quality of that initial effort will determine the Department's overall success.<br>Generally, crime scene supervision shall be the responsibility of the first officer to arrive at the scene until relieved by the assigned officer (if different from the first officer). The assigned officer shall be responsible for preserving the crime scene while ensuring that the appropriate investigation is undertaken, whether it be done by the assigned officer himself or other investigators. [Exh. G, Sheriff's Department Manual (COSB 01367)] | Undisputed.<br><br>Objection:  Irrelevant under FRE 402. |
| 37. | Sheriff's Department Manual (1993) Policy No. 1003.20, entitled CRIME SCENE RESPONSIBILITIES, states: Crime scene investigations are conducted to protect, to gather, and to preserve all evidential facts and material that tend to prove or disprove that a crime has been committed, and to identify the party or parties responsible. It is imperative that the first officers<br>to arrive on any crime scene prevent the possibility of contamination or alteration | Undisputed. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|---|---|---|
| | of the crime scene and/or the physical evidence therein.<br>The prime responsibility of the officer first arriving at any crime scene is to protect it. This responsibility includes removal of all unauthorized persons from within the perimeters of the crime scene area, including unauthorized fellow officers. Tact and good judgment must be exercised to avoid alienating or driving away potential witnesses or others who may possess information of value to the investigation.<br>It is also of prime importance that the first officer on the scene render first aid to injured parties and/or summon medical assistance. [Exh. G, Sheriff's Department Manual (COSB 01609.)] | |
| 38. | Sheriff's Department Manual (1993) Policy No. 1003.30, entitled COMPLETING REPORTS, states, in relevant part: Once the preliminary investigation has been conducted, it is the officer's responsibility to prepare an accurate and detailed report on the incident. These reports should reflect the actual effort undertaken by the officer to prevent duplication of effort by followup investigators. [Exh. G, Sheriff's Department Manual (COSB 01609.)] | Undisputed. |
| 39. | The officers and detectives in this case have affirmed their understanding and compliance with their *Brady* obligations. [Co-Defendants' Motion for Summary Judgment, Parent Decl. ¶ 87, Bradford Decl. ¶ 71; Navarro Decl. ¶ 46.] | Partially Disputed.<br><br>They affirmed it in their declarations, but such post hoc justification for their conduct renders these statements worthless. |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|-------------------------------------|----------------------------------|
|     |                                     | Objection:  Irrelevant under Rule 402(did they affirm compliance with their *Brady* obligations in 1993, where is the proof of this? Many of the assertions contradict not only the record but prior testimony and as such, constitute what courts describe as "sham declarations." (*See, Cleveland v. Policy Management Systems Corp.* (1999) 526 U.S. 795, 906 Further, summary judgment is unwarranted and impermissible if based simply on Defendants' declarations as to their own state of mind. *Conn v. City of Reno*, 91 F. 3d 1081 (9th Cir. 2010). "Proof of 'subjective awareness' is not limited to their purported recollections of the individuals involved." Id. Finally, evidentiary facts are required to support or oppose a summary judgment motion. *National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997) (conclusory allegations without factual support are insufficient); *Schneider v. TRW, Inc.*,  938 F.2d 986, 991  (9th Cir. 1991) (motions to support or oppose |

| No. | DEFENDANTS' STATED FACTS & EVIDENCE | PLAINTIFF'S RESPONSE & EVIDENCE |
|-----|--------------------------------------|--------------------------------|
|     |                                      | summary judgment must cite evidentiary facts, not bald or conclusory assertions of the ultimate fact at issue); Marshall v. East Carroll Parish Hosp. Service Dist., 134 F.3d 319, 324 (5th Cir. 1998)(conclusory assertions are insufficient to support or defeat a motion for summary judgment); *See also Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)(evidentiary facts, supported by admissible evidence, are required to support or oppose summary judgment). |