1  BARRETT S. LITT (No. 45527)
   E-mail: blitt@kmbllaw.com
2  MARILYN E. BEDNARSKI (No. 105322)
   E-mail: mbednarski@kmbllaw.com
3  DAVID S. McLANE (No.124952)
   E-mail: dmclane@kmbllp.com
4  CAITLIN S. WEISBERG (No. 262779)
   E-mail: cweisberg@kmbllp.com
5  KAYE, McLANE, BEDNARSKI & LITT, LLP
6  975 East Green Street
   Pasadena CA 91106
7  Telephone: (626) 844-7660
8  Facsimile: (626) 844-7670
9
10 Wendy J. Koen (No. 255759)
   E-mail:  wkoen.defender@gmail.com
11 Law Office of Wendy J. Koen
   32818 Mira Street
12 Menifee, California 92584
13 Telephone: (858) 500-2300
14
15 Attorneys for Plaintiff WILLIAM J. RICHARDS

16           UNITED STATES DISTRICT COURT

17          CENTRAL DISTRICT OF CALIFORNIA

18 WILLIAM J. RICHARDS,                    CASE NO. 17-cv-00497-SJO-SP
19              Plaintiff,                 [Honorable S. James Otero]
20       v.
21 COUNTY OF SAN BERNARDINO,               PLAINTIFF'S OPPOSITION TO
   MARK NOURSE, NORMAN                     DEFENDANTS NOURSE, PARENT,
22 PARENT, TOM BRADFORD, JOHN              BRADFORD AND NAVARRO'S
   NAVARRO, DANIEL GREGONIS,               MOTION FOR SUMMARY
23                                         JUDGMENT
   NORMAN SPERBER, and DOES 1
24 through 10, inclusive,
25                                         Date:   June 10, 2019
                Defendants.                Time:   10:00 a.m.
26                                         Ctrm:   10C
27
28

1  TO THE COURT, DEFENDANTS, AND THEIR ATTORNEYS OF RECORD:

2      Plaintiff William J. Richards, by and through counsel of record, respectfully

3  submits this Opposition to Defendants Nourse, Parent, Bradford, and Navarro's

4  Motion for Summary Judgment (Dkt. No. 93).

5      Plaintiff's Opposition is based on the attached Memorandum of Points and

6  Authorities, the Separate Statement of Genuine Issues and Separate Statement of

7  Additional Material Facts submitted concurrently herewith, all declarations and

8  evidence cited by Plaintiff in opposition to Defendants' motion, all pleadings and

9  papers on file in this action, and such other evidence and argument as may be

10  presented on behalf of Plaintiff at the hearing on Defendants' motion.

11                          Respectfully submitted,

12                          KAYE, McLANE, BEDNARSKI & LITT, LLP

13

14  DATED: May 20, 2019       By:  _/S/ by Marilyn E. Bednarski_
                                   MARILYN E. BEDNARSKI
15                                 Attorneys for Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TABLE OF CONTENTS</u>

I.     INTRODUCTION……………………………………………………1

II.    FACTUAL BACKGROUND……………………………………...1

III.   LEGAL STANDARD REGARDING SUMMARY
       JUDGMENT………………………………………………………6

IV.    ARGUMENT………………………………………………8

   1.  Plaintiff's Reckless Failure to Investigate §1983 Claims Are Viable…….8

     A. Legal Support………………………………………8

     B. The Underlying Reckless Investigation §1983 Claims Have Been
      Established, at Least By Genuinely Disputed Facts, Such That They
      Must Proceed to Trial……………………………………....9

        1.  Nourse……………………………………………..11
        2.  Parent……………………………………………...13
        3.  Bradford……………………………………………...15
        4.  Navarro……………………………………………15

   2.  The Underlying §1983 Brady Suppression of Evidence Claims Have
      Been Established, at Least By Genuinely Disputed Facts Such That
      They Must Proceed to Trial………………………………16

        1.  Nourse……………………………………………..16
        2.  Parent, Bradford & Navarro……………………………17

   3.  Plaintiff's Underlying §1983 Destruction of Evidence
      "Youngblood" Claims Have Been Established, at Least by
      Genuinely Disputed Facts Such That They Must Proceed To Trial……..18

        1.  Nourse……………………………………………..19
        2.  Parent……………………………………………...19
        3.  Bradford……………………………………………...20
        4.  Navarro……………………………………………21

   4.  None of the Defendants Are Entitled to Qualified Immunity…………...21

V.     CONCLUSION………………………………………………...24

i

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5

6
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...............................................................................7

7
*Arizona v. Youngblood,*
   488 U.S. 51 (1988)..................................................................18, 22, 23

8
*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011)..............................................................................22

9

10
*Blankenhorn v. City of Orange,*
   485 F.3d 463 (9th Cir. 2007) ................................................................9

11
*Boyd v. Benton County,*
   374 F.3d 773 (9th Cir. 2004) ................................................................9

12
*Brady v. Maryland,*
   373 U.S. 83 (1963)................................................................................16

13

14
*California v. Trombetta,*
   467 U.S. 479 (1984)..............................................................................18

15
*Carrillo v. Cnty. of L.A.,*
   798 F.3d 1210 (9th Cir. 2015) .......................................................16, 22

16
*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)................................................................................6

17

18
*Conn v. City of Reno,*
   591 F.3d 1081 (9th Cir. 2009) ..............................................................7

19
*Cunningham v. Gates,*
   229 F.3d 1271 (9th Cir. 2000) ............................................................10

20
*Daniels v. Williams.,*
   474 U.S. 327 (1981)..............................................................................23

21

22
*Fraser v. Goodale,*
   342 F.3d 1032 (9th Cir. 2003) ..............................................................7

23
*Galbraith v. Cty of Santa Clara,*
   307 F. 3d 1119 (9th Cir. 2006) ...........................................................16

24
*Gomez v. Whitney,*
   757 F.2d 1005 (9th Cir. 1985) ..............................................................9

25

26
*Grossman v. City of Portland,*
   33 F.3d 1200 (9th Cir. 1994) ..............................................................23

27
*Grove v. De La Cruz,*
   407 F. Supp. 2d 1126 (C.D. Cal. 2005) ................................................6

28

*Hovey v. Ayers*,
   458 F.3d 892 (9th Cir. 2006) ........................................................................ 16

*Illinois v. Fisher*,
   540 U.S. 544 (2004) ...................................................................................... 18

*In Re Wank*,
   505 B. R. 878 (B.A.P. 9th Cir. 2014) .......................................................... 18

*Manning v. Miller*,
   355 F. 3d 1028 (7th Cir. 2004) .................................................................... 16

*Napue v.* Illinois,
   360 U.S. 264 (1959) ...................................................................................... 22

*Ogunrinu v. City of Riverside*,
   79 Fed.Appx. 961 (9th Cir. 2003) ................................................................. 9

*Riggs v. Williams*,
   87 Fed. Appx. 103 (10th Cir.) ...................................................................... 18

*S.E.C. v. M & AW Inc.*,
   538 F.3d 1043 (9th Cir. 2008) ...................................................................... 18

*Sanders v. English*,
   950 F.2d 1152 (5th Cir.1992) ......................................................................... 9

*Saucier v. Katz*,
   533 U.S. 194 (2001) ...................................................................................... 22

*Soto v. City of Sacramento*,
   567 F. Supp. 662 (E.D. Cal. 1983) ................................................................ 7

*Tennison v. City and County of San Francisco*,
   570 F.3d 1078 (9th Cir. 2009) ........................................................... 9, 16, 22

*United States v. Richard*,
   969 F. 2d 849 (10th Cir. 1992) .................................................................... 18

*Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*,
   739 F.2d 1434 (9th Cir. 1984) ....................................................................... 7

*Wereb v. Maui County*,
   727 F. Supp. 2d 898 (D. Haw. 2010) ............................................................ 7

*Whitley v. Hanna*,
   726 F.3d 631 (5th Cir. 2013) ......................................................................... 8

*Whitley v. Seibel*,
   613 F.2d 682 (7th Cir. 1980) ................................................................... 9, 22

*Winslow*,
   696 F.3d ......................................................................................................... 8

**Rules**

Federal Rule of Civil Procedure 56 ..................................................................... 6, 7

iii

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The patrol officer and detectives immediately decided Richards was their suspect and set about to prove that he was the killer. Their grossly deficient investigation included that they would not allow the coroner to the scene to assess time of death factors, they failed to preserve the integrity of the crime scene (including the victim's body), they interviewed witnesses with a focus on disproving Richards explanations, eliminating other suspects from consideration and over-relying on inadmissible hearsay and polygraph evidence. Their tunnel vision investigation blinded them from failing to look for and find Pamela Richards' killer.

## II.    FACTUAL BACKGROUND

William Richards and his wife Pamela had been married for 22 years and were living on property on Thrush Road where they planned to build their house. SAMF 136. In the meantime, they lived in a motor home at the top of the hill. SAMF 136. Richards had worked for the past twelve years as an engineer at a company 45 miles from home.  SAMF 137. Richards was working the night shift from 3 to 11 p.m. on August 10, 1993. SAMF 137.  They spent the morning together and before he left for work they hugged and Pamela left a love note in his lunchbox. SAMF 138.  His shift ended at 11, and he clocked out and left, believing that that his wife was working that night. SAMF 138. When he got home, the lights were out at the property and he went in the shed, turned on the light and got an iced tea. SAMF 139. When he stepped outside noticed Pamela's body which lying in the dirt. SAMF 139. He saw that she was dead, and he sat on the ground and pulled her into his lap and held her. SAMF 139. After a few minutes passed, at 11:55 p.m. he heard the phone ring in the motor home. SAMF 140. It was Eugene Price. SAMF 140. Richards told Price that his wife was dead. SAMF 140. Price told him to call 911, after which Richards made three 911 calls (11:58, 12:26 and 12:33) repeatedly asking why it was taking so long. SAMF 141.

1  Patrol Officer Nourse arrived at 00:38 a.m. SUF 1, 17. Richards had been alone for
2  over half an hour since his first 911 call. SAMF 141. Nourse suspected Richards and
3  began surreptitiously recording their conversation. SAMF 145. They were together
4  for several hours before the detectives arrived. SAMF 145.  Nourse wrote two
5  reports over the next two weeks, both containing numerous false statements. SAMF
6  142 (identifying at least 7 in 8/11/93 Report); SAMF 143-144 (identifying at least
7  another 4 in 8/27/93 Report).

8      Nourse had the duty of protecting the scene from contamination until relieved
9  of that duty by the homicide detectives. SAMF 150. Neither Nourse nor the
10  detectives who took over the scene from him preserved and protected the scene from
11  disturbance and contamination. SGI 27. Their failure to do so violated several SBC
12  policies. SAMF 150-157 (describing policies and duties concerning perimeters,
13  crime logs, documentation etc. and failures to follow). Multiple vehicle intrusions
14  contaminated the scene and obliterated any third party tire or shoe tracks. SAMF
15  146. In addition there were numerous canine and human intrusions in the entire
16  scene and the immediate area of the body. SAMF 147-148.

17      Nourse, who thought Richards knew too much and was lying briefed the
18  detectives together at the scene. SAMF 158. Nourse told them that Richards said he
19  had left work at around 11, and arrived home to find his wife dead. Def. Exh 93G,
20  Parent Report. SAMF 158. The detectives knew immediately that time of death was
21  an issue. SGI 43; SAMF 158. The estimate of time of death is complex and it is
22  imperative that all information available be examined by competent experts, such as
23  a coroner who is trained and not the patrolman. SAMF 159, 160 (desc. lividity), 161
24  (desc. rigor), 162 (desc. temperature)..

25      It was Nourse's job as a first responder to determine if she was alive, that is
26  had a pulse, and needed aid. SAMF 163. He was trained to feel for a pulse in a
27  specific way, and in specific locations by placing his index and middle fingers on
28  the inside of the victim's wrist and on the carotid artery in the neck just below the

1  chin. SAMF 163. Nourse did not examine the body for rigor, lividity or temperature.

2  SAMF 160-167.  The autopsy was conducted by the county coroner, Dr. Sheridan

3  (SUF 43), who himself did not go to the scene, but his coroner investigator

4  Randolph did go but was only allowed in after the homicide investigators had

5  "cleared the scene" at 10:43 a.m. SUF 44. The SBC homicide detectives had a

6  practice of preventing the coroner or his investigators from coming to the scene and

7  examining the body until the homicide detectives concluded their crime scene

8  investigation. SAMF 170. By the time his Randolph observed the body, that

9  information [temperature, lividity, rigor] was lost because of the 10-11 hour delay.

10  SAMF 170-171.

11      Nourse was the only witness in the trial in which Richards was convicted

12  about time of death observations of the body: e.g., (the victim's wrist was limp and

13  pliable; body was not warm or cold, but very fresh; blood was bright red and very

14  fresh. SAMF 173. When asked based on what he saw, and his training and

15  experience coming into contact with bodies, what category he would place the

16  victim's body into he answered: [in the category of] [s]omeone who has just died in

17  my arms." SAMF 173. Nourse lied about his so called military medical background

18  in those proceedings, and those lies were only revealed in this litigation over 20

19  years later. SAMF 174-176.

20      The detectives worked the case together. They had regular morning meetings

21  where they discussed what each had done and would do in the investigation. SAMF

22  179; SGI 126. They read each other reports and would collectively determine

23  follow-up questions and subsequent investigation. SAMF 179. As case agent, Parent

24  gathered all the reports. SAMF 179. The SBCS policy required that the homicide

25  detective case agent be knowledgeable of all facts and events concerning the

26  investigation, to manage and direct the investigation, prepare the case for court and

27  assist the prosecution DDA during trial. SAMF 180. In this investigation there was

28  an "overall lack of general crime scene integrity," protection against loss of

evidence, documentation of evidence of who came and went and their shoe and tire impressions, so much so that the "absence of such procedures here undermin[es] the reliability of the search for prints conducted by Parent and his conclusion that there were no other prints than Richards, Pamela and Nourse." SAMF 181-5; quoting Pl. Exh. 23, Decl. & Rpt. Pl Crime Scene Expert Palmbach.

Gregonis was a criminalist employed by the SBCS in SID, and who regularly worked with the homicide division detectives. SAMF 186. Gregonis processed the crime scene with Detective Parent. SAMF 186. He was told and wrote in his notes from the crime scene that Richards was a suspect. SAMF 186. They did not process for fingerprints the inside of multiple smooth surfaces in the motor home such as the vacuum cleaner, stove, counter, telephone, door, smooth surfaces near the bloody pillows, or door handles, or the smooth fist sized rocks the perpetrator used to bludgeon the victim, or the vehicles at the scene. SAMF 157; SGI 37.

Detectives Bradford and Navarro left the crime scene at some point after the briefing and drove Mr. Richards to the Victorville station for an interrogation. Bradford was 95% certain that Richards was the killer when he first talked to him. SAMF 187. They observed his body and hands, asking him to remove his shirt. SAMF 187. He did not have bruises, scratches or other wounds on him. SAMF 187. The detectives, in violation of policy, failed to take fingernail scrapings from Richards's nails. SAMF 187; SGI 125-126, 188. Like he had told Nourse, Richards told Bradford that that he and his wife fought and had financial struggles. Richards knew that Pamela was in a kind of mid-life crisis, and had in the past months expressed that she was depressed and might want to live on her own. SAMF 190; SUF 61.When they last spoke about separating she did not want to split up. SAMF 190. She had struggled her entire life with depression, was diagnosed as bi-polar and the medications she was on could cause suicidal tendencies. SAMF 190. Pamela took care of the finances most of the time, but he would every once in a while have to take over, pay everything, and get her back on track. SAMF 191.

1    Eugene Price claimed to the detectives that he had nothing to do with her

2  killing. SAMF 192. He claimed to have last seen Pamela on Monday August 9, and

3  that on the 10th, he was visit[ing] some of his family and friends" in the

4  Camarillo/Ventura area that day and not home until after 9 p.m. SAMF 192. They

5  did almost nothing to verify Price's alibi, even though they suspected him and knew

6  that he had given other false and uncorroborated information to them. SAMF 193.

7  The detectives did have Price polygraphed, an investigatory tool they used at the

8  time to eliminate possible suspects. SAMF 195. They never asked Price to try to lift

9  a cement block, or to determine if he could. SAMF 194. They never searched his

10  home, took his clothes, or examined his vehicle for evidence. SAMF 194.

11    The detectives asked Mr. Richards if he would agree to take a polygraph and

12  he did. SAMF 196. SBCS Polygrapher Stansell attempted a polygraph on August

13  11, 1993, the day after Mr. Richards had discovered his wife murdered. SAMF 196.

14  Detective Bradford knew that polygraphs were not then in 1993 or ever were

15  admissible evidence in any court of law. SAMF 195. A few weeks later the

16  detectives asked a different SBC Polygrapher Caldwell to polygraph Richards.

17  SAMF 197. She questioned Mr. Richards extensively before the polygraph, ran a

18  polygraph test on him and then in a post polygraph interview told him he had failed

19  and continued to interrogate him. SAMF 197. None of the underlying polygraph

20  data or charts in this investigation exist anymore. SAMF 198; Decl. Bednarski

21  ISOMSJ at ¶2-5. The evidence concerning the polygraphs is the subject of

22  Plaintiff's pending Motion To Exclude Polygraph Evidence which Motion contains

23  a robust discussion of the facts relating to the polygraphs. Dkt. 98

24    Defendants devote a number of pages to allegations of domestic abuse, which

25  were primarily based on uncorroborated hearsay and which evidence is the subject

26  of Plaintiff's pending Motion to Exclude. Dkt. No. 99; SAMF 199. That motion

27  contains a robust discussion of the allegations. Dkt. 99.

28

1    Navarro wrote a report he called the "time and distance test" in which he

2    stated that it took him <u>41 minutes</u> to drive the 45 miles from Richards' work <u>to his</u>

3    <u>residence</u>.  SAMF 203; Def. 93Y.  Those representations were false because

4    Navarro: drove as fast as possible to see how fast he could make it; drove the entire

5    route over the speed limit; and did not drive all the way to the residence but quit

6    driving at the bottom of the dirt road. SAMF 203; SGI 97-101. Navarro also

7    approved the disposal of the motor home, in violation of SBCS policy. SAMF 201-

8    202.

9    Bradford admits that he did the mannequin blood spatter recreation with

10    Gregonis. SUF 102. A comprehensive discussion of the facts pertaining to the false

11    and unreliable "scientific" blood spatter testing and claimed finding of the blue fiber

12    under the fingernail by criminalist Daniel Gregonis as well as the comparison of

13    Richards' teeth to the mark on Pamela's hand by County hired odontologist Def. Dr.

14    Sperber is included in the Plaintiff's Opposition to the MSJ Sperber and Gregonis.

15    Dkt. 91.

16    Parent was integrally involved in setting obtaining Sperber's false evidence.

17    Two weeks before the 1997 trial he sent Sperber the distorted photos, and arranged

18    to get Sperber into the prison to make the mold from Mr. Richards' teeth. SUF 113-

19    114.

20    **III.    LEGAL STANDARD REGARDING SUMMARY JUDGMENT**

21    Under Federal Rule of Civil Procedure 56, summary judgment is granted only

22    if "there is no genuine dispute as to any material fact [such that] the movant[1] is

23    _____

24    [1]    "The moving party has the initial burden of identifying relevant portions of

25    the record that demonstrate the absence of a fact or facts necessary for one or more
essential elements of each cause of action upon which the moving party seeks

26    judgment." *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1129 (C.D. Cal. 2005)

27    (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party must
establish, through competent evidence, that there is no disputed issue of material

28

1  entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v.*

2  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Because "[c]redibility

3  determinations, the weighing of the evidence, and the drawing of legitimate

4  inferences from the facts are jury functions, not those of a judge," when reviewing a

5  grant of summary judgment, "[t]he evidence of the non-movant is to be believed,

6  and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The evidence

7  used to defeat summary judgment need not be in an admissible form, where it

8  reflects admissible content. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir.

9  2003) (holding that the district court properly considered a diary that defendants

10  moved to strike as hearsay because at summary judgment "we do not focus on the

11  admissibility of the evidence's form [; w]e focus instead on the admissibility of its

12  contents").

13      "Summary judgment is generally inappropriate when mental state is an issue,

14  unless no reasonable inference supports the adverse party's claim." *Vucinich v.*

15  *Payne, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984)

16  (citation omitted); *see also Soto v. City of Sacramento*, 567 F. Supp. 662, 668 (E.D.

17  Cal. 1983) ("[R]elevant issues relating to the mental state of a person, since always a

18  matter of inferences, are peculiarly decisions for the jury and are rarely, if ever,

19  susceptible to resolution on summary judgment."); *accord Conn v. City of Reno*, 591

20  F.3d 1081, 1098 (9th Cir. 2009), *vacated on other grounds* 658. F.3d 897 (2011). If

21  the nonmoving plaintiff presents evidence regarding the culpable mental state of a

22  defendant, that defendant "cannot succeed on summary judgment based simply on

23  his own assertions of his mental state." *Wereb v. Maui County*, 727 F. Supp. 2d 898,

24  916 (D. Haw. 2010).

25

26  _____

27  (…continued)
    fact, justifying judgment as a matter of law.

28

## IV.    ARGUMENT

Defendant's motion is primarily a factual assault overcome by the factual showing in this brief and supporting documents showing that there are genuine issues of material facts such that defendants are not entitled to summary judgment, Furthermore, with respect to the legal challenges Defendants muster, they are wrong. Plaintiff's facts and the law support the constitutional violations alleged and the Defendants are not entitled to qualified immunity.

### 1.    Plaintiff's Reckless Failure To Investigate §1983 Claims Are Viable

#### A.  Legal Support

Reckless investigation has been recognized in federal courts as a cognizable constitutional claim. In *Wilson v. Lawrence Cnty.*, the Eighth Circuit held that failure to investigate an alternate suspect lead supported a §1983 due process claim where the defendant officers also engaged in reckless investigatory misconduct, including coercion of a confession. 260 F.3d at 956 - 957. The Court reasoned:

> "[I]f Wilson's allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force [the confession] instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions."

*Id.* (internal quotation and citation omitted). In *Winslow v. Smith*, the Eighth Circuit found that defendant police officers could be held liable for recklessly ignoring exculpatory evidence and/or pressuring vulnerable witnesses to fill gaps in the investigation. *Winslow*, 696 F.3d, at 734 (finding genuine issues of fact precluded summary judgment on this claim). The court in *Winslow* held that to establish a substantive due process violation based on an inadequate investigation, the former criminal defendant must show that the law enforcement's failure to investigate was intentional or reckless, thereby shocking the conscience. *Id.* at 732.

The Fifth and Seventh circuits similarly recognize reckless investigation as a cognizable 1983 claim. *Whitley v. Hanna*, 726 F.3d 631, 654 (5th Cir. 2013)(*citing*

1  *Wilson*); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (defendant

2  deliberately ignored exonerating information indicating he had arrested the wrong

3  person); *see also*, *Whitley v. Seibel*, 613 F.2d 682, 686 (7th Cir. 1980) (intentional

4  acts in investigation violate due process). The Ninth Circuit has not directly

5  addressed the viability of reckless investigation claims, but has approvingly cited the

6  Eighth Circuit's decision in *Wilson* for the proposition that §1983 claims for police

7  investigatory misconduct require proof of reckless disregard. *Tennison v. City and*

8  *County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). *Tennison* did not

9  differ with any aspect of *Wilson's* reasoning, and, if anything, it suggests that the

10  Ninth Circuit would agree with the Eighth Circuit.

11      Defendants' argument to the contrary relies on *Ogunrinu v. City of Riverside*, 79

12  Fed.Appx. 961 (9th Cir. 2003)(unpubl.), whose unpublished status Defendants failed

13  to note (MSJ 14) and on *Gomez v. Whitney*, 757 F.2d 1005 (9th Cir. 1985), a 35 year

14  old Ninth Circuit case finding summary judgment for a reckless investigation claim

15  in which --unlike this case --the plaintiff had not established other constitutional

16  violations in addition to the reckless investigation claim, and. In neither case were

17  there multiple other constitutional violations or the outrageous wide ranging level of

18  recklessness as here.

19
20      **B.  The Underlying Reckless Investigation §1983 Claims Have Been
        Established, at Least By Genuinely Disputed Facts, Such That They Must
21      Proceed To Trial**

22      The detectives investigated the case as a team. As a team they worked the

23  entire case together, having regular morning meetings "round pounds," discussing

24  what each had done and collectively deciding what to do.  Defendants Parent,

25  Bradford and Navarro are liable as integral participants in the violations.

26  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("An officer's

27  liability under section 1983 is predicated on his 'integral participation' in the alleged

28  violation."); *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) ("'[I]ntegral

1  participation' does not require that each officer's actions themselves rise to the level

2  of a constitutional violation."); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.

3  2000) ("[P]olice officers have a duty to intercede when their fellow officers violate

4  the constitutional rights of a suspect or other citizen.").

5        There were a numerous gross deficiencies in this investigation, including and

6  not limited to the officer's and detectives actions: ■ failure to timely call the coroner

7  to the scene before time of death evidence was lost; ■ failed to preserve integrity of

8  scene; ■failure to make a crime log to preserve evidence of who came and went, his

9  or her purpose;■failure to make adequate records of shoe prints and tire tracks for

10  analysis for presence of third party perpetrator(s); ■ reliance on unreliable evidence

11  of time of death from Nourse at trial; ■failed to investigate leads regarding third

12  parties, such as the blond white male in the red Mazda, perpetrators known to be

13  active in the region, or the victim's other love interests. Pl. Exh. 20, Decl Fischer &

14  Report at p. 22-32. The record shows that the responding patrol officer and three

15  detectives immediately assumed that Richards was guilty. SAMF 158, 186-7. The

16  false and misleading report of the driving test by Navarro shows the team's

17  motivation to prove Richards was guilty by shortening the time of the drive (by

18  driving as fast as possible and over the speed limit all the way) and falsely

19  truncating the length of the drive (by stopping at the bottom of the hill, and failing to

20  drive all the way to the residence). SAMF 203, 206. Navarro's testified to a precise

21  time, that it took "41 minutes and some seconds" not 40 minutes or 42 minutes. SGI

22  98. His claim that he considered the gate to be the residence is undercut by his

23  knowledge that the residence was at the top of road he failed to time. SGI 101

24        Their recklessness is evidenced by their disregard of and failure to pursue

25  exculpatory and potentially exculpatory evidence including: Richards' evidence of

26  alibi; the absence of wounds on Richards; Pamela's activities that night including

27  her preparation to take the laundry (basket and purse in Suzuki, told brother); the

28  obvious evidence of the scope and length of the attack (multiple locations, weapons

and types of injuries); not tape recording favorable witnesses (e.g. Kathy Ojelnik
and others); failure to fingerprint the motor home or the bloody print on the paving
stone; and releasing the motor home without notice contrary to policy; failure to
investigate the credibility of hearsay claims of abuse by seeking records or
documentation; failing to test Price's alibi; failing to examine Price's body or
clothing; and, failure to fingerprint the motor home or the bloody print on the stone.

Defendants' effort to rebut this vast evidence of recklessness is largely based
on their self-serving claims that they [collectively] interviewed 34 people, and
waited three weeks to arrest Richards. Analysis of that number supports Richards
argument that the detectives were focused on proving Richards guilty and not on
finding the truth or the actual killer. The majority of interviews focused on finding
proof of abuse (9 persons-6 of whom were either Eugene Price or friends or
associates of his), marital problems (6 of the 34) and financial discord (8 of the 34).
Decl. Bednarski ISOMSJ at ¶7a to e. The two interviews conducted of close
relatives regarding Eugene Price's alibi were belated and intended to shore up, not
test, his alibi and no effort was made to interview independent witnesses or obtain
documents to test his alibi. Decl. Bednarski IOMSJ ¶7 f, g.

## 1. Nourse

Nourse's reckless investigatory misconduct includes his intentional false
statements in his reports, his failure to preserve the integrity of the crime scene or
keep a crime log, and his perjurious testimony concerning his EMT/medical
background all of which conduct violated established policies of the SBCS. The
evidence establishes at a minimum genuine issues of fact.

The sheer number of false statements supports both. Nourse's report prepared
August 13, 1993 included numerous false statements including: 1. "the victim did
not appear to be dead very long"; 2. "she was not warm but not cold"; 3. "there were
no signs of lividity"; 4. "[n]o signs of any rigor mortis"; 5. "The body was still very

soft and pliable. . . ".); 6. "A lot of the blood was still very damp and even wet in spots" 7. "There was very little moonlight if any as the sky was very cloudy and overcast." Nourse's report prepared August 27, 1993 contained additional false statements including: 8. "her face, scalp area and her hair was covered to a large extent with fresh blood;" 9. "There was a large amount of blood forming a small pool on the side of her face which was still in the liquid form and had not started to dry or turn color yet. It was still bright red" 10. The victim's  scalp and entire head of hair was completely covered in very fresh blood, . . . [t]he blood in her scalp and hair area was still fresh. It was still damp and wet in spots and had not started to darken up yet;" and, 11. "During the initial observations of the victim there was no dirt on or around the head or facial area of the victim. But upon later observations, approx . 2-3 hours later, . . . her entire head and facial area had been covered with dirt. The only explanation for this was the 3 or 4 dogs running loose in the area around the residence." SAMF 142-144.

Nourse's job was to determine if she was alive and needed aid or was dead. To do that, he only looked for a pulse and did not examine the body for temperature, lividity or rigor.  It was impossible for him to assess lividity without lifting or turning the body or removing the sleeping bag to observe her body (all of which he admitted he did not do). It was impossible for him to assess rigor, because he was not trained, did not have the experience or knowledge, and (as he admitted) did not do the examination that would be necessary requiring manipulating various specific joints in the body.

He wrote that the blood was "very fresh" red, not dark, etc. although he did nothing to assess how fast her blood dried. His reliance on the appearance of wet/dampness and red color, were faulty premises to assess the freshness of the killing. Criminalist Gregonis who began processing the scene almost 6 hours later at 6 a.m.,. described the blood was "crimson," "fresh," "damp and wet, which statements demonstrate the inappropriateness of drawing gross conclusions about

the time of death solely on the appearance of blood at the crime scene.  Pl. Exh. 20, Decl. & Rpt. Fischer at 18.  Plaintiff's Expert forensic pathologist Terri Haddix explains that even assuming that Nourse's observations were correct, his perceived temperature of the body being "not warm, not cold," and not rigid but soft and pliable, are more compatible with her having died hours earlier than with his statements that she was fresh, and very recently dead. Pl. Exh. 21, Decl. & Rpt. Haddix at 8. Thus Nourse was wrong and simply reckless when he testified at trial that she was very fresh, recently dead.  SAMF 173.

Additional evidence of the reckless disregard for the truth and deliberate falsification in his reports is that he lied in trial court hearings about his EMT/ medical background, training and experience in the military. SAMF 174-176. Nourse's falsification of his own background cannot be anything but deliberate. Contrary to Defendants' argument (MSJ 16), Plaintiff is not basing the 1983 falsification of evidence claim on his testimony in court; the relevance of the court testimony is that it evidences his reckless disregard for the truth of his written statements in the police reports.

## 2.  Parent

Parent was the detective assigned to the crime scene and took that responsibility from Nourse. Contrary to Defendant's argument, the evidence establishes at a minimum genuine issues of fact as to Parent's compliance with his duty: to protect and preserve the crime scene from intrusion by humans, vehicles and dogs; and, to maintain and preserve evidence of intrusions with a crime log; and to fail to take reasonable actions available to prevent alteration and destruction of evidence (ask for lights, make a pathway, allow the coroner in by a controlled pathway to the body).  Whether or not Parent conducted the thorough search for footprints and tire tracks he claims he conducted of the crime is a genuine issue. SAMF 151, SGI 29-31. Had such a search been conducted, one would expect

documentation of it, but there was none. If he did it, but failed to document it, that
would be a violation of standard accepted police practices. Plaintiff's expert
Palmbach concludes from his complete review of the crime scene documentation
including photographs taken, that "there was an overall lack of general crime scene
integrity" and that reliable conclusions could not be drawn from the search based on
the affected scene. SAMF 181; Pl. Exh. 23, Decl. & Rpt. Palmbach. Further
evidence of the recklessness or disregard for the truth, is Parent's trial testimony that
he canvassed the scene for shoe prints and tire tracks and that all of the ones he
found were accounted for such that there were no third parties at the crime scene. He
had to know that testimony was unreliable and misleading because 1) no
comprehensive search took place; and, 2) even if he or others along with him
searched for hours, a search based on a scene that lacked overall integrity, had not
been properly preserved, and had been contaminated or destroyed in significant
respects cannot support a conclusion that no third parties were at the scene.  At a
minimum the evidence suggests that there was a far less methodical search than
Parent testified about, that is such that he could exclude all prints except Richards,
his wife and Nourse and conclude no third parties had been there.  The credibility of
Parent's claim that he did such a search should be left to the jury to decide.

Parent was also an active participant in the Sperber bite mark test and
testimony. He sent Sperber the distorted photos, got him into the jail to make the
mold from Richard's teeth, and despite being present at the autopsy and knowing
that the coroner believed the mark was a dog paw mark and not a human bite, listed
to and as case agent failed to correct Sperber's false testimony at trial.

Parent was the case agent in each of the trials, and sat at counsel table. He
failed to correct Nourse's false testimony concerning the recency of the victim's
death and his false and unreliable observations of the temperature, and absence of
lividity and rigor in the body.

### 3. Bradford

Bradford made his mind up the first night that Richards was guilty. He interrogated him for many hours through the afternoon and then participated in the sham search of the property with Parent. The interviews he conducted focused on abuse and marital problems and proving Richards guilty (Decl. Bednarski ¶7a-e) and he over-relied on uncorroborated hearsay from the victim to her friends, which he failed to independently vet by seeking documentation or medical records of and over-relied on inadmissible polygraph evidence. Both the alleged abuse and polygraph evidence are the subjects of pending Motions to Exclude. Dkt. 98, 99. In addition to his participation in the overall reckless investigation with the other two detectives on the team, Bradford specifically participated in the Gregonis blood spatter experiment. See Plaintiff's Opposition to MSJ Sperber and Gregonis.

### 4. Navarro

Navarro's report of his test drive was false and misleading in that he wrote it took 41 minutes, to drive from Richards' work to the residence, and claiming that he drove with the speed of traffic. Navarro has since admitted in his deposition that he drove as fast as possible, and always over the speed limit [to make the drive that fast, that is in 41 minutes]. The circumstantial evidence shows the deliberateness of these fabrications, or at a minimum there is a genuine issue of fact concerning his intent, case law, cited above at §III. supports that mental state is peculiarly a jury decision.  The detectives believed since the first night that Richards was the killer and knew that they had to fit him into a very tight window of time (given Navarro's time test Richards would have 11 minutes to kill Pamela before the phone call) Defendants' suggestion that Navarro's driving test did not affect the verdict (MSJ 19) is not persuasive.  SAMF 207; Pl Exh. 22, Rummel Decl. & Rpt at 10 (time of death critical in light of evidence he arrived home more than 11 minutes before 911 call). Navarro's report provided the basis for the prosecution to present the opportunity for Richards, a window of 11 minutes, to kill his wife.

### 2. The Underlying §1983 Brady Suppression of Evidence Claims Have Been Established, at Least By Genuinely Disputed Facts Such That They Must Proceed To Trial

Plaintiff has a constitutional right not to be subjected to a criminal trial when favorable evidence has been deliberately or recklessly withheld from the defense. *Tennison v. City & Cnty. of S.F.*, 570 F.3d 1078, 1087, 1089 (9th Cir. 2009; *Brady v. Maryland*, 373 U.S. 83 (1963)(defendant has due process right not to have government withhold exculpatory evidence). Establishing a Brady violation requires proof that: the evidence was (1) suppressed, (2) exculpatory, and (3) material. *Hovey v. Ayers*, 458 F.3d 892, 916 – 917 (9th Cir. 2006) (listing the elements of a Brady violation). For both the Brady claim and the *Devereaux* false evidence claim, evidence of guilt is irrelevant as is whether or not there was probable cause to arrest the accused.

### 1. Nourse

The prosecution's duty to produce exculpatory material, including impeachment material, extends to police officers. *Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1219 (9th Cir. 2015). Police investigators face liability when they fail to disclose their own fabrication of evidence. *Manning v. Miller*, 355 F. 3d 1028, 1034 (7th Cir. 2004); *Galbraith v. Cty of Santa Clara*, 307 F. 3d 1119, 1121, 1126-7 (9th Cir. 2006)(coroner found to have recklessly disregarded the truth when he asserted in his autopsy report that the plaintiff's wife was strangled to death, when amongst other things he did not do the autopsy work he claimed to have done and deliberately lied in the report to investigators and as a witness in court). The logical conclusion from *Miller* is that Nourse had to produce this information about himself which was exculpatory under Brady.

Nourse suppressed the truth and concealed his lack of medical background, training and training in the military. This suppression of evidence allowed him to appear as if he had the experience, ability and foundation to make observations

1  about the condition of a body relative to time of death. This evidence was

2  discovered in this civil litigation, more than twenty years after the trial. His

3  deposition revealed the falseness of the testimony he gave during the Richards'

4  proceedings.

5      **2. Parent, Bradford & Navarro**

6      The three detectives suppressed exculpatory evidence by not calling the

7  coroner to assess time of death. Contrary to Defendants' argument, the fundamental

8  underpinning of this claim is <u>not</u> whether they "processed the scene timely" (MSJ

9  16), rather whether their actions precluded and destroyed the exculpatory evidence

10  of time of death. The Defendants have no good justification for not calling the

11  coroner to assess time of death. They knew immediately upon being briefed that

12  time of death was an issue. They could have called the coroner, and nothing was

13  stopping them, but they did not. By the time the coroner was allowed in the

14  evidence was lost because of the 10-11 hour delay. SAMF 170-171. The evidence

15  shows that the lost evidence of time of death was exculpatory. Plaintiffs Expert

16  Haddix concludes from the evidence she reviewed that the attack took time, not a

17  mere matter of minutes, and that the swelling in her brain showed she was alive for

18  some time "many minutes to hours" even after she was bludgeoned. SAMF 172. A

19  qualified trained coroner investigator was denied the opportunity to collect the

20  precise exculpatory evidence by accurately assessing body temperature which drops

21  1.5 degrees per hour (SAMF 162) by examining the small muscles in which rigor

22  first appears between 2 and 4 hours after death (SAMF 161) and by examining the

23  body for lividity in the lowest areas of the body where blood settles after death

24  (SAMF 160).

25      The three detectives also suppressed exculpatory evidence by failing to

26  protect the integrity of the scene (including the body) which were not preserved and

27  were contaminated. This failure undermined any viable premise on which to draw

28  reliable conclusions from a search of the scene for footprints or tire marks.

### 3. Plaintiff's Underlying §1983 Destruction of Evidence "Youngblood" Claims Claims Have Been Established, at Least By Genuinely Disputed Facts Such That They Must Proceed To Trial

Under *Youngblood*, a plaintiff establishes a due process violation if he/she can show that 1) the government failed to preserve evidence that was "potentially useful" to the defense; and, 2) the government acted in bad faith in failing to preserve the evidence. *Riggs v. Williams,* 87 Fed. Appx. 103, 106 (10th Cir.), *cert denied*, 541 U.S. 1090, *citing, Arizona v. Youngblood,* 488 U.S. 51, 58 (1988).  Bad faith does not turn on whether the defendants thought that the suspect was guilty, but as the *Youngblood* court noted, "the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56. Whether destruction of evidence occurred in accordance with established policy is relevant in determining whether evidence was destroyed in bad faith. See *California v. Trombetta*, 467 U.S. 479, 488 (1984)("the officers here were acting in good faith and in accord with their normal practice"); *Illinois v. Fisher*, 540 U.S. 544, 548 (2004)("police acted in good faith and in accord with their normal practice"). The determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates . . . ." *United States v. Richard*, 969 F. 2d 849, 853 (10th Cir. 1992).

The Defendants' attack on Plaintiff's *Youngblood* claims is essentially a factual one, disagreeing with the evidence of destruction and disagreeing with the evidence of the state of mind of the defendants. This factual determination of mental state, as supported by the case law in III, is peculiarly a jury decision.  Additionally, in the face of this overwhelming evidence of an investigation reckless in virtually every aspect, the detective's self-serving declarations claiming that they  acted in good faith, merely creates a disputed issue of fact. "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are inappropriate at the summary judgment stage." *In Re Wank*, 505 B. R. 878, 891 (B.A.P. 9th Cir. 2014); *S.E.C. v. M & AW Inc.*, 538 F.3d 1043, 1054-55 (9th Cir.

1  2008)(this court and others have long recognized that summary judgement is

2  singularly inappropriate where credibility is at issue).

3  **1. Nourse**

4  Nourse's failure to preserve the crime scene from destruction is also based on

5  a sufficient factual showing.  Here there are numerous facts supporting that Nourse

6  acted in bad faith in failing to preserve the crime scene, including his violation of

7  two policies he was trained on: first, as the patrol officer responding to the scene of

8  a crime to preserve the integrity of the crime scene and the body until relieved of

9  that duty by the detectives; and, secondly, to keep a crime log of persons coming in

10  and out of the crime scene. Both policies have the purpose of protecting the integrity

11  of the crime scene for investigation. But Nourse was focused on his immediate

12  conclusion that Richards was lying and was the killer. He failed to cordon off the

13  body or the entire crime scene which extended to the bottom of the private road. He

14  allowed multiple officers to go over to the body and to either drive or attempt to

15  drive their vehicles up the road. Even after he observed that dogs were disrupting

16  the crime scene and body (sniffing, pawing and digging), he failed to take

17  reasonable and necessary steps to keep them out (including and not limited to

18  posting himself at the body so they would stay away, not securing Richards in the

19  patrol car, not requesting other officers who came (ex. McCarville, Gray, Jones etc.

20  to do those things, or calling for additional help).

21  **2. Parent**

22  Parent took over responsibility for the crime scene as the detective assigned.

23  He assumed the duties that Nourse had of protecting the crime scene and body from

24  contamination and destruction and of keeping the crime log, both of which policies

25  he violated. He also had the duty during the crime scene processing to collect,

26  document and photograph evidence, including processing for fingerprints, another

27  duty he failed to fulfill by failing to fingerprint multiple surfaces and objects inside

28  the motor home and a rock that bore a bloody print The integrity of the scene is the

fundamental underpinning of a competent crime scene investigation. An obvious
conclusion is that if a scene lacks integrity –if its condition has changed and does
not reflect the evidence as it was at the time of the murder—any conclusions based
on the presumptions of integrity or completeness are faulty. His failure to document
the search for footprints or tire tracks destroyed Richards' ability to establish that
there was evidence of third parties at the scene. He eventually proved that years later
through DNA testing showing third party blood on the murder weapon at the
location where the perpetrator would have held the stone, where blood was found
and years in DNA testing determined to be of a male-not Richards, as well as third
party hair evidence under the victim's nail. But for the detectives failure to protect
the integrity of the scene; the foot and tire evidence should have provided that third
party evidence in 1993 before his trial. The footprints and tire tracks was therefore
potentially exculpatory.

Parent's bad faith is shown by his violation of at least four SBCS policies (2
pertaining to crime scene preservation, 1 regarding the collection of evidence at the
scene, and another failure to correct false evidence). His bad faith is also shown by
his knowledge that he had not done a thorough and methodical search for shoe prints
and tire tracks and had no reliable basis on which to testify that there was an absence
of evidence of the presence of third parties. Additional evidence of Parent's bad
faith is his involvement with the Sperber false bite mark testing and report
(arranging it, sending him the distorted photos and likely attendance at Sperber's
pretrial oral report conference stating the opinion of the 1-2% of the population).
He knew from attending the autopsy and the coroner's testimony in the first trial,
that coroner found it was not a bite mark.  He knew the report and ensuing
testimony were false and failed to correct either, another violation of SBCS policy.

### 3. Bradford

Bradford and Navarro failed to have Plaintiff's fingernails scraped. This was
a violation of policy. SAMF 188. They knew that Pamela was involved in a violent

altercation and had a number of defensive wounds. SGI 65. Whether or not Mr.
Richards came into contact with the victim's body, the fact that there were no skin
cells or other evidence underneath his fingernails would have been probative
evidence of his innocence.  SGI 65. Failing to scrape Richards fingernails destroyed
this evidence. SGI 65.

The record shows that the detectives failed to investigate third party
culpability in several respects: by failing to timely observe Price's hands, body and
clothing; by not investigating Eugene Price's alibi; by failing to fingerprint the scene
thoroughly, by failing to follow-up on the blond hair found under the victim's nail
despite knowing that a suspicious blond male in a red Mazda had come to the
property the night of the murder; and by failing to investigate offenders active in the
area, etc.

### 4.  Navarro

The defense asked for access to the motor home, but it was gone. Navarro had
given permission to the new owner to dispose of the motor home. The detectives
knew that it potentially contained evidence of the identity of the killer as at least part
of the assault on the victim had occurred in the motor home. The detectives also
knew long before the motor home release that Price had stated that he learned from
Pamela that Richards had shot a hole into the floor during an argument with Pamela,
and that the absence of a hole potentially would undermine suspect Price's
credibility.  When he released it, he failed to follow the directives in the SBCS
policy that he contact the DA and defense attorney, give notice in writing and
opportunity for the defense to inspect the vehicle prior to release. SAMF 202. This
on top of the overall recklessness of the investigation in which he participated,
including his false and misleading report of the drive test evidences bad faith.

### 4.  None of the Defendants Are Entitled to Qualified Immunity

The Defendants' qualified immunity arguments all fail as each of Plaintiff's

1 constitutional claims was clearly established law at the time of the 1993

2 investigation and because, as shown above, the facts in dispute establish

3 constitutional violations.  *See Saucier v. Katz*, 533 U.S. 194, 205-206 (2001). The

4 due process right not to be subjected to trial based upon false police reports was

5 clearly established as of 1959 in *Napue v.* Illinois, 360 U.S. 264 (1959); the due

6 process right not to be subjected to a criminal trial when favorable "*Brady*" evidence

7 has been deliberately or recklessly withheld from the defense was clearly

8 established in the *Brady* case in 1984 (*Tennison v. City & Cnty. of S.F.*, 570 F.3d

9 1078, 1087, 1089 (9th Cir. 2009); see also *Carrillo v. Cnty. of L.A.*, 798 F.3d 1210,

10 1219 (9th Cir. 2015)); and, the due process right that the government not in bad faith

11 fail to preserve potentially exculpatory evidence was clearly established in 1988 by

12 the decision in *Arizona v. Youngblood,* 488 U.S. 51 (1988).

13   Additionally, these detectives were clearly on notice in 1993 that the

14 constitution entitled a defendant to a fair trial based on the truth, and not on an

15 investigation grossly lacking in integrity and conducted in violation of numerous

16 policies and best practices. Cases as far back as 1980 recognized substantive due

17 process liability for intentional acts in an investigation. *Wilson v. Lawrence Cnty*,

18 260 F.3d 946, 956-9057 (9th Cir. 2001)(coercion of confession) *citing*, *Whitely v.*

19 *Seibel*, 613 F.2d 682, 686 (7th Cir. 1980). In determining whether a law has been

20 clearly established, there does not need to be a case directly on point, but existing

21 precedent must have placed the constitutional question beyond debate. *Ashcroft v.*

22 *al-Kidd*, 563 U.S. 731, 740 (2011).

23   Defendants' argument (Mtn. 24) that Nourse is immune from the reckless

24 investigation is factually inaccurate and based on <u>no</u> authority for its premise that a

25 first responder is allowed to lie in his reports. Besides that he was not merely a first

26 responder, he had the duty to preserve and protect the scene, he interrogated and

27 recorded Richards, prepared a supplemental report, and was the only witness in all

28 the trials as to time of death. The false statements were assertions of fact on the

1    critical issue of time of death in official reports which he knew would be used to

2    prosecute someone. Similarly Navarro is not entitled to immunity for his false and

3    misleading report which concealed how the actual driving test was done.

4          Contrary to Defendants argument as framed that "latitude" [for discretionary

5    acts] give Detective Parent the right to immunity on the *Youngblood* claim (MSJ

6    24), the law does not permit officers to destroy potentially exculpatory evidence in

7    bad faith. *Youngblood*, 488 U.S. at 57 (Due Process Clause requires a different

8    result when we deal with the failure of the State to preserve evidentiary material of

9    which no more can be said then that it could have been subjected to tests, the results

10   of which might have exonerated the defendant).The law requires officers to collect

11   apparently exculpatory and potentially exculpatory evidence so that it is not lost

12   forever. Regarding his tracking search, the law does not allow him to employ a

13   method so faulty and without underlying integrity that reliable conclusions cannot

14   be drawn. Again, here the multiple violations of policies of the SBCS resulted in the

15   loss and destruction of exculpatory and potentially exculpatory evidence. Similarly

16   Navarro is not entitled to qualified immunity for his release of the motorhome which

17   was potentially exculpatory evidence. Defendants' argument that Bradford and

18   Navarro's are immune for their failure to scrape Richards fingernails fails. Mtn. 25.

19   Policy required them to do that and they did not. Defendants' reliance on *Daniels v.*

20   *Williams*. 474 U.S. 327 (1981) is misplaced because in the Richards' case there is

21   genuine issue as to the issue of reckless and or bad faith whereas in *Daniels* there

22   was only evidence of negligence.

23         Finally, the detectives are not entitled to immunity from reliance on the

24   practice of not calling the coroner until after processing the crime scene because that

25   practice patently violates the fundamental constitutional principles not to destroy

26   exculpatory and potentially exculpatory evidence. *Grossman v. City of Portland*, 33

27   F.3d 1200, 1209 (9th Cir. 1994)(no qualified immunity for statutes authorizing

28   patently unconstitutional conduct). These experienced homicide detectives knew the

importance of obtaining and preserving evidence of time of death in general in a homicide investigation, and specifically in this case as they knew from the first moments at the scene: time of death was an issue; only a coroner or his investigator was qualified to make time of those assessments; such evidence is forever lost by delay.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED: May 20, 2019          By:    */S/ by Marilyn E. Bednarski*
                                     MARILYN E. BEDNARSKI
                                     Attorneys for Plaintiff

Dm156636v.7