BARRETT S. LITT (No. 45527)
E-mail: blitt@kmbllaw.com
MARILYN E. BEDNARSKI (No. 105322)
E-mail: mbednarski@kmbllaw.com
DAVID S. McLANE (No.124952)
E-mail: dmclane@kmbllaw.com
CAITLIN S. WEISBERG (No. 262779)
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Wendy J. Koen (No. 255759)
E-mail:  wkoen.defender@gmail.com
Law Office of Wendy J. Koen
32818 Mira Street
Menifee, California 92584
Telephone: (858) 500-2300

Attorneys for Plaintiff WILLIAM J. RICHARDS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| WILLIAM J. RICHARDS,<br><br>      Plaintiff,<br>  v.<br><br>COUNTY OF SAN BERNARDINO, MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10, inclusive,<br><br>      Defendants. | CASE NO. 17-cv-00497-SJO-SP<br><br>[Honorable S. James Otero]<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS GREGONIS AND SPERBER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   June 10, 2019<br>Time:  10:00 a.m.<br>Ctrm:  10C |

1 │ TO THE COURT, DEFENDANTS, AND THEIR ATTORNEYS OF RECORD:

2 │      Plaintiff William J. Richards, by and through counsel of record, respectfully

3 │ submits this Opposition to Defendants Gregonis and Sperber's Motion for Summary

4 │ Judgment (Dkt. No. 91).

5 │      Plaintiff's Opposition is based on the attached Memorandum of Points and

6 │ Authorities, the Separate Statement of Genuine Issues and Separate Statement of

7 │ Additional Material Facts submitted concurrently herewith, all declarations and

8 │ evidence cited by Plaintiff in opposition to Defendants' motion, all pleadings and

9 │ papers on file in this action, and such other evidence and argument as may be

10 │ presented on behalf of Plaintiff at the hearing on Defendants' motion.

11 │      Respectfully submitted,

12 │      KAYE, McLANE, BEDNARSKI & LITT, LLP

13 │

14 │ DATED: May 20, 2019     By:  */ s / Caitlin S. Weisberg*

    CAITLIN S. WEISBERG

15 │     Attorneys for Plaintiff

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

1
2

## <u>TABLE OF CONTENTS</u>

I.   FACTUAL BACKGROUND ............................................................... 1

   A.   Murder of Pamela Richards & Investigation ........................... 1

   B.   Defendant Gregonis's Role in the Investigation & Conviction ............. 1

      1. Blue Fiber in the Fingernail .......................................... 2

   2.   Bloodspatter Analysis & Dummy Experiment ....................... 4

   C.   Defendant Sperber's Role in the Investigation & Conviction ............... 6

   D.   Trials & Conviction ................................................... 10

   E.   Post-Conviction Proceedings ........................................ 12

II.  LEGAL STANDARD ..................................................................... 14

III. ARGUMENT ............................................................................. 14

   A.   Gregonis's Integral Participation in the Constitutional Violations
        Alleged Against the Detective Defendants ............................ 14

   B.   Legal Standard for Fabrication of Evidence Claims ................... 16

   C.   Gregonis's Bloodspatter Analysis .................................... 18

   D.   Plaintiff's Evidence Easily Creates a Disputed Issue of Fact on
        the Issue of the Allegedly Planted Blue Fiber ...................... 20

   E.   Sperber Was Not A Private Party; He Acted Under Color of Law ...... 21

   F.   Plaintiff Has Presented Sufficient Evidence that Sperber
        Knowingly and/or Recklessly Fabricated the Bitemark Evidence ....... 23

   G.   Neither Gregonis Nor Sperber Are Entitled to Qualified
        Immunity ............................................................ 24

IV.  CONCLUSION ............................................................................ 26

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

<u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5 *Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................14

6 *Arizona v. Youngblood*,
    488 U.S. 51 ...........................................................................................16

7 *Bender v. Gen. Servs. Admin.*,

8    539 F. Supp. 2d 702 (S.D.N.Y. 2008) ..................................................22

*Blankenhorn v. City of Orange*,

9    485 F.3d 463 (9th Cir. 2007) ................................................................15

10 *Boyd v. Benton County*,
    374 F.3d 773 (9th Cir. 2004) ................................................................15

11 *Brewer v. Hayne*,

12    860 F.3d 819 (5th Cir. 2017) ..........................................................22, 25

*Brown v. Miller*,

13    519 F.3d 231 (5th Cir. 2008) ..........................................................16, 17

14 *Caldwell v. City & Cty. of San Francisco*,
    889 F.3d 1105 (9th Cir. 2018) ..............................................................18

15 *Cooper v. Brown*,

16    565 F.3d 581 (9th Cir. 2009) ............................................................4, 20

*Costanich v. Dep't of Soc. & Health Servs.*,

17    627 F.3d 1101 (9th Cir. 2010) ..................................................16, 17, 18

18 *Cunningham v. Gates*,
    229 F.3d 1271 (9th Cir. 2000) ..............................................................15

19 *Dennis v. Sparks*,

20    449 U.S. 24 (1980)................................................................................21

*Devereaux v. Abbey*,

21    263 F.3d 1070 (9th Cir. 2001) ......................................................16, 17, 18, 24

22 *Duckwitz v. United States*,
    15 F.2d 195 (9th Cir. 1926) ..................................................................15

23 *Filarsky v. Delia*,

24    566 U.S. 377 (2012)..............................................................................21

*Fraser v. Goodale*,

25    342 F.3d 1032 (9th Cir. 2003) ..............................................................14

26 *Galbraith v. Cty. of Santa Clara*,
    307 F.3d 1119 (9th Cir. 2002) ..............................................................17

27 *Gantt v. City of Los Angeles*,

28    717 F.3d 702 (9th Cir. 2013) ..........................................................17, 18

*Gonzalez v. Spencer*,
 336 F.3d 832 (9th Cir. 2003) ................................................................23
*Gregory v. City of Louisville*,
 444 F.3d 725 (6th Cir. 2006) ................................................16, 18, 22
*Groom v. Safeway, Inc.*,
 973 F. Supp. 987 (W.D. Wash. 1997) ...........................................21, 22
*Grove v. De La Cruz*,
 407 F. Supp. 2d 1126 (C.D. Cal. 2005) ................................................14
*Guy v. City of San Diego*,
 608 F.3d 582 (9th Cir. 2010) ................................................................15
*Howerton v. Gabica*,
 708 F.2d 380 (9th Cir. 1983) ................................................................21
*In re Richards* (*Richards,*
 *III*), 55 Cal. 4th 948 (2012)..............................................11, 12, 13
*In re Richards*,
 63 Cal. 4th 291 (2016) ..............................................................1, 2, 12, 13
*Jones v. Williams*,
 297 F.3d 930 (9th Cir. 2002) ................................................................21
*Lacy v. Cty. of Maricopa*,
 631 F. Supp. 2d 1197 (D. Ariz. 2008) ......................................17, 18, 20
*Moldowan v. City of Warren*,
 578 F.3d 351 (6th Cir. 2009) ..........................................................22, 25
*People v. Coffman*,
 34 Cal. 4th 1, (2004) ............................................................................4
*Richards (* "*Richards II*"), No. E049135,
 2010 WL 4681260 (Cal. Ct. App., Nov. 19, 2010, No. E049135).......................13
*Rodriques v. Furtado*,
 950 F.2d 805 (1st Cir. 1991)..................................................................23
*Soto v. City of Sacramento*,
 567 F. Supp. 662 (E.D. Cal. 1983) ........................................................14
*Starks v. City of Waukegan*,
 946 F. Supp. 2d 780 (N.D. Ill. 2013)..........................................................22
*Stinson v. Gauger*,
 868 F.3d 516 (7th Cir. 2015) ..........................................................18, 25
*Tennison v. City & Cty. of San Francisco*,
 570 F.3d 1078 (9th Cir. 2009) ..............................................................17
*Trulove v. City & County of S.F.*, No. 16-CV-050 YGR,
 2018 WL 3429113 (N.D. Cal. July 16, 2018) ......................................18
*United States v. Bohl*,
 25 F.3d 904 (10th Cir. 1994) ................................................................16

*United States v. Mason*,
   658 F.2d 1263 (9th Cir. 1981) ................................................................. 11

*Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*,
   739 F.2d 1434 (9th Cir. 1984) ................................................................. 14

*Wereb v. Maui County*,
   727 F. Supp. 2d 898 (D. Haw. 2010) ....................................................... 14

*West v. Atkins*,
   487 U.S. 42 (1988) ........................................................................... 22, 23

**Statutes**

42 U.S.C. § 1983 ............................................................................... 21, 22

Cal. Penal Code § 1473(e)(1) ................................................................. 13

Penal Code section 1473 ...................................................................... 13

**Rules**

Federal Rule of Civil Procedure 56 ......................................................... 14

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     **FACTUAL BACKGROUND**

A.     **Murder of Pamela Richards & Investigation**

On August 10, 1993, Pamela Richards ("Pamela" or "victim"), Plaintiff's wife, was murdered at their home. (SGI 1, SAMF 135-139) Plaintiff discovered her body shortly before midnight, when he returned home from work. (SAMF 137, 139-140) After Plaintiff discovered his wife, he cradled her in his arms, both before and after calling 911. (SAMF 139-141, 273) Plaintiff did not kill his wife and was not involved in any way in her murder. (SAMF 135-140, 209) The homicide investigation was conducted by Defendants Norman Parent, Tom Bradford, and John Navarro, detectives with the San Bernardino County Sheriff's Department ("SBSD") and Defendant Daniel Gregonis, a criminalist in the SBSD Scientific Investigation Division ("SID" or "Crime Lab"). (SAMF 210-211) Parent was the case agent; Gregonis was the case criminalist. (SAMF 210-211)

From the beginning, Plaintiff was an unlikely suspect. Pamela was brutally beaten, evidence was found in multiple locations around the Richards' property, and Pamela had defensive wounds on her body, all suggesting a prolonged attack. Plaintiff had minimal blood on his clothing and no wounds or other signs of a struggle. Moreover, circumstantial and time of death evidence strongly suggested that the attack began earlier in the evening, between 7:04 p.m. and 9:30 p.m., when Plaintiff was unquestionably at work. *See In re Richards*, 63 Cal. 4th 291, 313-15 (2016) (granting Mr. Richards's habeas petition, describing evidence); (SAMF Nos. 137, 254, 257, 374) Nevertheless, the SBSD Defendants focused their investigation immediately on Plaintiff, their prime suspect. (SAMF 145, 158, 186, 187)

B.     **Defendant Gregonis's Role in the Investigation & Conviction**

Gregonis was responsible for processing the crime scene with Parent, discussing the evidence and making decisions. (SGI 3, 6, 11, 21, SAMF 211) Valerie Seleska, a technician who took photos at the direction of Gregonis and

Parent, assisted them. (SF 11, SAMF 212) Gregonis was also the primary criminalist assigned to work on the Richards case, examining much of the evidence and collaborating with the defendant detectives. (SGI 1, 23, 26, 36, 37; SAMF 211) From the first night, before having seen, much less analyzed, any evidence, Gregonis believed that Plaintiff was the SBSD's suspect in the case. (SGI 16) He conducted the crime scene investigation and evidence analysis with this belief.

Plaintiff was arrested on September 3, 1993. (SAMF 215) The arrest was primarily based on allegations of prior physical abuse and the purported failure of a polygraph examination, evidence that was not admissible at the criminal trial. (SAMF 197-200, 215, 375) At the time that Plaintiff was arrested, almost no forensic analysis had been performed on the crime scene evidence. (SAMF 215)

### 1.      Blue Fiber in the Fingernail

Pamela had pink acrylic fingernails adhered to her natural nails, two of which were broken off, presumably in the struggle that resulted in her death; one of the broken-off acrylics was found at the scene some distance from the body. (SGI 30; SAMF 235) The two fingers were severed during the autopsy. (SGI 32; SAMF 235) On the first night, Bradford collected Plaintiff's clothing, and it was placed in the SBSD evidence / property storage unit. (SAMF 236)

On October 14, 1993, after Plaintiff was arrested and when there was no admissible evidence connecting him to the murder, Gregonis wrote a report stating that he discovered a tuft of light blue cotton fibers in a crack in Pamela's fingernail and "[t]he fibers recovered from the broken fingernail (Item C-14a) from Richards, Pamela are consistent with originating from the light blue shirt (Item B-5c) from Richards, William." (SAMF 241) This was the first time that Gregonis reported finding any fibers in the fingernail. (SAMF 241)

The tuft of blue fibers was ½ centimeter long—approximately the same length as these em-dashes—and comprised 15 individual fibers, grouped together. (SAMF 216-217) They were visible to the naked eye. (SAMF 218-221, 232-233)

1   Dr. Sheridan, the county medical examiner, conducted Pamela's autopsy,
2   which was attended by Parent, Navarro, and Seleska. (SAMF 222) Prior to the
3   washing the victim, Sheridan personally scraped the fingernails; he was assisted by
4   Seleska who held the container that collected the scrapings. (SAMF 223, 227-228)
5   According to Sheridan, fingernail scraping is the "actual scrapings off the tips of the
6   fingers, fingernails, *looking for any type of trace evidence, anything that might be*
7   *adhered to the nails*." (SAMF 224) Both Sheridan and Seleska were in close
8   proximity to the fingernails during the scraping, and Sheridan was looking directly
9   at the fingernails for any type of trace evidence. (SAMF 223-228) There is no
10  evidence that either one saw a tuft of blue fibers. (SAMF 223, 228, 231, 234) If
11  Sheridan had seen any trace evidence, such as a tuft of blue fibers, he would have
12  scraped it out with all of the other trace evidence; he would not have left it in the
13  fingernail. (SAMF 223-226) Navarro and Parent were also in close proximity to the
14  body; they did not see any fibers. (SAMF 230-231, 234)

15  At the end of the autopsy, after the body was cleaned and fully examined,
16  Sheridan severed the two fingers with broken nails for later comparison to the
17  acrylic fragment found at the crime scene. (SGI 32, SAMF 223, 235) Seleska
18  packaged the fingers at the autopsy and delivered them to the SBSD evidence /
19  property storage unit. (SAMF 235) In addition, either Sheridan or Seleska took the
20  victim's fingerprints during the autopsy, which would have put him/her in close
21  proximity to the fingernails. (SAMF 229) If either had noticed a tuft of blue fibers,
22  they would have collected it or pointed it out for collection. (SAMF 223-228)

23  On September 13-14, 1993, after Plaintiff was arrested, Gregonis took both
24  the severed fingertips and Plaintiff's shirt from the SBSD property / evidence unit.
25  (SAMF 237) Between the date of the autopsy and September 13-14, 1993, no one
26  else had checked out or handled the fingers. (SAMF 238) According to Gregonis's
27  handwritten notes, this is when he purportedly "discovered" the tuft in Pamela's
28  fingernail (SAMF 239). No one was present when Gregonis "discovered" the tuft of

blue fibers. (SAMF 234) Gregonis cut out a piece of Plaintiff's shirt to compare fibers to the fibers found in the fingernail, which he later discarded. (SGI 34) Gregonis videorecorded his "discovery" but did not document this videorecording in a report until more than three months later. (SGI 27; SAMF 240, 242)

Photographs of the victim's hands / nails were taken during the autopsy both before and after the body was washed; although the photographs are of sufficient quality to see a single strand of the victim's hair in her hand, no blue fibers can be seen in the victim's fingernail. (SAMF 218-219) The blue fibers can clearly be seen in Gregonis's videorecording of the fiber removal, wedged into a crack in the nail, and it is obvious that the fibers would have been visible to the naked eye during the fingernail scrapings. (SAMF 220-221). Gregonis has admitted that they were visible to the naked eye. (SGI 31; SAMF 232-233)

Gregonis has denied that he planted the blue fiber in the fingernail but has presented no explanation for the fiber's appearance in the fingernail after the autopsy when both the fingernail and the shirt were in his custody. The only evidence that Gregonis did not plant the fiber are his own statements.[1]

### 2.    Bloodspatter Analysis & Dummy Experiment

Gregonis examined the bloodstains on the clothing and shoes Plaintiff wore on August 10-11, 1993. (SGI 37-39, SAMF 245) After Plaintiff was arrested,

---

[1] Gregonis has been the subject of multiple accusations of evidence misconduct, including falsifying evidence and testifying falsely. *Cooper v. Brown*, 565 F.3d 581, 632 (9th Cir. 2009) (Fletcher, J., dissenting from denial of rehearing en banc) ("[T]here is a strong likelihood that Gregonis falsified the results of those tests. During trial, Cooper's counsel forced Gregonis to admit that earlier in the trial he had repeatedly testified untruthfully."); *People v. Coffman*, 34 Cal. 4th 1, 127, (2004) ("Before the jury, Gregonis testified that test results were inconclusive as to the identity of the source of the urine[, but admitted on cross that] the stains on Murray's clothing were consistent with the clothing's coming into contact with, and absorbing, a preexisting urine deposit.")

1   Gregonis wrote a report stating that several of the bloodstains on Plaintiff's pants

2   and shoes were "consistent with medium energy blood spatter" indicating that

3   "these items were near an object impacting a bloody object." (SAMF 245) For most

4   of these stains, Gregonis admitted that he could not rule out that they were a post-

5   mortem transfer pattern, like a number of other stains on the clothing that he

6   concluded were a transfer patterns. (SAMF 246-247) However, for several of them,

7   Gregonis opined that they were definitively medium impact stains. (SAMF 247-250)

8   In photographs, these stains are barely visible, much less indicative that Plaintiff

9   was the perpetrator of an up-close and bloody assault of his wife. (SAMF 247-250)

10  On their face, and according to expert testimony, Gregonis's findings regarding

11  bloodspatter were inconsistent with the crime scene evidence demonstrating that the

12  victim was subjected to a brutal beating with stones and cinder blocks resulting in

13  extensive blood loss. (SAMF 253-254, 256-258)

14      Plaintiff hired a bloodstain expert for his criminal defense. (SAMF 254) That

15  expert disagreed with Gregonis's analysis, concluding that only two out of the

16  twenty-two stain areas on Plaintiff's clothing could be considered medium energy

17  blood spatter and the remaining were consistent with transfer or contact stains or

18  were unable to be observed because they had been destroyed by Gregonis during his

19  examination. (SAMF 247, 248, 250, 254) Plaintiff's expert warned against drawing

20  conclusions from isolated blood drops, as Gregonis had done, and concluded overall

21  that, in light of the crime scene evidence, "[t]he lack of finding more than two

22  isolated [potential medium energy] stains on the clothing from William Richards

23  strongly suggests that these clothing items were not worn by the perpetrator."

24  (SAMF 253-254) Gregonis received the defense expert's report but did not alter or

25  amend his conclusions; he testified at trial, consistent with his own reports, that the

26  bloodsplatter on Plaintiff's clothing incriminated him. (SAMF 252, 255)

27      Implicitly recognizing that the bloodstain evidence was inconsistent with

28  guilt, Gregonis, along with Bradford, constructed a biased and scientifically

indefensible "experiment" using a dummy filled with blood to demonstrate: (1) that the perpetrator could have bludgeoned the victim without receiving any significant bloodspatter on his/her clothing and (2) that if Plaintiff had cradled the victim, as he claimed, he would have had more blood on his clothing. (SAMF 259-277) This was Gregonis's first and is still his only dummy reconstruction experiment. (SAMF 261)

Gregonis extrapolated an inculpatory conclusion from an extreme minority of bloodstain evidence, where the overall bloodstain evidence was significantly more consistent with innocence than guilt. To undermine the exculpatory nature of the bloodspatter evidence, Gregonis conducted a reckless "experiment" that was designed to prove the prosecution's case. Based on his experience and training, Gregonis knew at the time that he conducted his analysis and reconstruction experiments that they were unfounded and scientifically indefensible. (SAMF 253-254, 256-258, 276-277)

### C.   Defendant Sperber's Role in the Investigation & Conviction

One of the injuries to the victim was a lesion on her right hand. (SAMF 278) During the autopsy, Sheridan, who had training and experience in recognizing bite marks, personally examined this injury and determined that it "most certainly" was not a bitemark because "basically it has none of the features of a bite mark at all, not just human, but not any kind of bite mark." (SAMF 279). The injury to the hand was not treated as a bite mark during the autopsy. (SAMF 280, 282-286) A single photograph of the injury was taken, at an angle. (SAMF 292-293)

In advance of the 1997 retrial, on a defense motion, the court appointed Gregory Golden (now deceased), the staff forensic odontologist for the County, to assist the defense. (SGI 84; SAMF 282, 313) Although employed by the County, the order specified that Golden should report confidentially to the defense attorney, consult with the defense attorney, and testify on behalf of the defendant. (SGI 84; SAMF 282) He was therefore not available to consult with the police, as he normally would have done. (SGI 54, 84, SAMF 282)

1    Thereafter, on a recommendation by Golden, Parent contacted Sperber to

2   perform forensic bitemark analysis and comparison for the County. (SGI 52, 54;

3   SAMF 307) Sperber was regularly employed by San Diego County and Imperial

4   County in the same position that Golden held in San Bernardino County. (SAMF

5   282, 288) Sperber was also a sworn officer of the San Diego Sheriff's Department

6   and the San Diego Police Department. (SAMF 289) He became an officer to

7   "protect the community" help the police agencies identify people and "deal with bite

8   mark evidence"; he considered himself a law enforcement investigator. (SAMF 289)

9   Sperber had worked with the County of San Bernardino one or two times before.

10  (SAMF 290) Sperber called Golden and discussed his findings with Golden before

11  Golden testified. (SAMF 307)

12    Parent was Sperber's primary point of contact and communicated with him on

13  several occasions. (SAMF 291) Parent told Sperber that they had a suspect in

14  custody who was the perpetrator, and Sperber assumed that Plaintiff was the

15  perpetrator. (SAMF 299-300, 304, 306) Sperber was told that the County had failed

16  three times to convict Plaintiff, and he saw himself as the hero who would secure a

17  conviction by showing that Plaintiff's teeth caused the hand injury. (SAMF 306)

18    By 1997, Sperber had already established himself as one of the preeminent

19  bitemark experts in the entire United States of America, if not the world. (SAMF

20  287, 307) He had been a dentist for forty (40) years and had worked in forensic

21  dentistry for almost twenty (20) years on numerous cases, including several high-

22  profile cases, e.g., the prosecutions of Ted Bundy and Jeffrey Dahmer. (SAMF 287)

23  He was not a novice or a neophyte.

24    The photograph of the injury to the hand was "about the worst photograph"

25  that Sperber had ever dealt with. (SAMF 293) Sperber knew: that the photograph

26  was distorted and would not accurately record the shape of the bite mark; that

27  angular distortion could significantly impact the shape of a bitemark and made the

28  photo in this case "unreliable and inaccurate"; and that the photograph was not of

sufficient quality to perform a reliable comparison. (SAMF 293-295, 317) Sperber knew that there were methods to correct angular distortion in bitemark photographs, but he did not do so. (SGI 76, SAMF 316) Sperber knew that he had the option of rejecting the photograph and not giving an opinion, but Sperber didn't see that as his role: "My job is to assess what I have been given by the police or whoever it comes from and to give them my best shot, not knowing whether the guy being tried is guilty or not." (SAMF 296) Even though he knew he was given unreliable evidence, he "decided to work with what [he] had." (SAMF 293, 296)

Sperber concluded that the injury on the victim's hand was a bite mark and that Plaintiff's teeth were "consistent" with the bite mark. (SGI 67) Sperber listed four "levels" of certainty in his report (and later testimony), three of which concerned matches and only one of which did not concern a match: not consistent, consistent, possibly consistent, and consistent beyond a reasonable doubt. (SGI 67, 69) Sperber emphasized in his report that Plaintiff's "lower teeth are unique with reference to tooth #27 (lower right canine)" which was under erupted, and Sperber concluded that this was significant because the bitemark on the victim did not include a mark for tooth #27. (SGI 66, SAMF 298) In advance of trial, Sperber reported to the prosecutor that this feature would only appear in 1-2% of the population. (SGI 74)

Despite his knowledge "unreliable and inaccurate" Sperber testified at trial that the photo "could have been improved" but was a six or seven out of ten. (SAMF 297) He testified that he was able to make a "complete comparison" despite the distortion in the photograph, but that if the photograph was taken properly, he could have given a more "definitive" opinion that Plaintiff's dentition was a match. (SAMF 297) He testified at length about Plaintiff's "unique" tooth 27, which led him to conclude that this bite mark would not have been made by very many people in the population, "one or two or less" out of one hundred people. (SAMF 298)

Although Sperber's report and testimony referenced that Plaintiff "could not

be ruled out" and that Sperber was merely opining that Plaintiff's teeth were "consistent" with the bite mark, the overall message of his report and testimony was that the injury was a bite mark, that Plaintiff's teeth matched the bite mark, and that very few other people would have teeth that matched the bite mark. (SGI 69-70, 73-74; SAMF 298) This is in stark contrast to the defense expert Golden's testimony that the jury should "disregard the bite mark evidence completely based on the low value of the photograph and the generic nature of the bite." (SGI 93, SAMF 310) In the space of thirty minutes, Golden found a random sample of five lower arch molds that fit the purported bite mark as well or better than Plaintiff's teeth. (SAMF 309)

After Plaintiff's conviction, Sperber recanted his prior opinion. (SGI 77-78, SAMF 319) He stated that Plaintiff "was essentially ruled out," that his teeth were "not consistent" with the bitemark, and that he couldn't even say that the injury was a bitemark. (SAMF 319) The recantation occurred after Sperber was confronted with a photograph of the injury on the victim's hand where the photographic distortion was corrected. (SAMF 319) However, Sperber knew from the outset that the photograph was distorted and that the distortion made the photograph unreliable; he knew that the distortion could be corrected but didn't bother to do so. (SGI 76, SAMF 293-295, 316-317) Based on his extensive expertise, it would have been obvious to Sperber that if an undistorted mold of someone's teeth matched up to a distorted bitemark, then they would not match up to the same bitemark with the distortion corrected (or the real injury).

Further, with respect to Tooth # 27, Sperber used circular reasoning - he assumed that Tooth # 27 didn't make a mark because he assumed that Plaintiff was the perpetrator. (SAMF 304) Contrary to his own guidelines, he did not do a test bite into a surface, *e.g.*, Styrofoam, and therefore had no basis for saying that Plaintiff's Tooth # 27 would not leave a mark. (SAMF 301) In fact, Plaintiff's Tooth # 27 does leave a mark when he bites into Styrofoam. (SAMF 302) This is because Plaintiff's Tooth # 27 is not significantly lower than the rest of Plaintiff's teeth, which was

1  obvious from Sperber's examination of Plaintiff's teeth and from the mold made of
2  Plaintiff's teeth. (SGI 56; SAMF 303) Sperber admitted that to create the bruises on
3  the victim's hand (if a bite mark), the biter would have to bite down with quite a bit
4  of force and his teeth would sink into the skin. (SAMF 303) Accordingly, he knew
5  that his opinion regarding Tooth # 27 and the injury to the victim was baseless.

6     In general, to reach his conclusion that Plaintiff's teeth were consistent with
7  the purported bitemark, Sperber simply "eyeballed" a distorted photograph of the
8  injury and an overlay of Plaintiff's teeth and "assumed" that plaintiff was the
9  perpetrator. (SAMF 299-300, 304) With respect to the uniqueness of Plaintiff's
10 Tooth # 27, Sperber "guessed." (SAMF 314) Sperber falsely presented these
11 conclusions to the jury as scientific evidence, shrouded in his twenty years of
12 experience as a forensic dentist and extreme prominence in the field.

13    Since 1997, bitemark comparison has been thoroughly criticized. The 2016
14 report of the President's Council of Advisors on Science and Technology ("PCAST
15 Report") concluded that "bitemark analysis does not meet the scientific standards
16 for foundational validity and is far from meeting such standards. . . . the prospects of
17 developing bitemark analysis into a scientifically valid method [are] low." (SAMF
18 321) When confronted at his deposition with the PCAST report, and asked if the
19 report's conclusions about the scientific validity of bitemark analysis caused him
20 any concern or made him want to look at his old cases to determine if any of them
21 were problematic, Sperber said, "No, not at all." (SAMF 322) He also admitted that
22 he had never participated in any study to determine his false positive rate or
23 participated in any other study to assess false positive rates for bitemark comparison
24 analysis, yet claimed that his error rate was "zero." (SAMF 323)

25    **D.     Trials & Conviction**

26    Mr. Richards was subjected to three full trials, two in 1994 and one in 1997.
27 The first two resulted in hung juries and mistrials. At the 1997 trial, the jury again
28 deadlocked, but was given an *Allen* charge that it should continue deliberating,

resulting in a conviction several hours later.[2] At all three trials, Mr. Richards presented an innocence defense and by attempting to challenge the questionable forensic evidence presented against him. (SAMF 379)

Defendants quote the now-moot 2012 opinion of the California Supreme Court, *In re Richards* (*Richards III*), 55 Cal. 4th 948, 967 (2012), reversing the granting of Plaintiff's first habeas petition, as stating "[t]he case against petitioner was strong." (Mot. at 9:5) Defendants also include a long blockquote from this opinion characterizing the evidence of guilt. (Mot. at 9:5-26) This opinion, decided 4 to 3, was called the California Supreme Court's "worst opinion of the year" by the *Daily Journal*,[3] and the Supreme Court characterized the evidence very differently in the unanimous 2016 opinion that granted Plaintiff's subsequent habeas petition. The court highlighted: (1) evidence regarding extremely short window of time Plaintiff was home after work; (2) the insignificance of the shoeprint evidence; (3) the reasonableness of plaintiff's knowledge of the crime scene based on the time that he was there alone before Nourse arrived; (4) the physical and circumstantial evidence that Pamela died earlier in the evening when she stopped answering the phone; (5) the fact that there were no visible, fresh injuries on petitioner's face, arms, and hands compared with the evidence that Pamela fought her attacker; (6) the

---

[2] "'*Allen* charge' is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked . . . . In their mildest form, these instructions carry reminders of the importance of securing a verdict and ask jurors to reconsider potentially unreasonable positions. In their stronger forms, these charges have been referred to as 'dynamite charges,' because of their ability to 'blast' a verdict out of a deadlocked jury." *United States v. Mason*, 658 F.2d 1263, 1265 n.1 (9th Cir. 1981).

[3] *New Balance at the California Supreme Court: New Trends and Patterns Are Emerging Among the Justices of the California Supreme Court*, Daily Journal, Aug. 2, 2013, *available at* https://www.dailyjournal.com/articles/271912-new-balance-at-the-california-supreme-court.

1   bloodstain pattern evidence ("Even more unusual was the evidence of blood on

2   petitioner's clothing. The few stains that the prosecution's expert identified as blood

3   spatter on petitioner's shoes and jeans were millimeter sized. But the area around

4   Pamela's body exhibited a radial spray of significant blood spatter, much of which

5   was centimeter sized"). Overall, the court stated: "[T]he case against petitioner was

6   entirely based on circumstantial evidence, and much of that evidence was heavily

7   contested. . . . with the exception of the bite mark evidence, the defense had a

8   substantial response to much of the prosecution's evidence against petitioner." *In re*

9   *Richards* ("*Richards IV*"), 63 Cal. 4th 291, 313-15 (2016) (granting Mr. Richards's

10   habeas petition). Defendants' motion does not challenge the materiality of the false

11   Gregonis and Sperber evidence.

**E.   Post-Conviction Proceedings**

13   At all times, Mr. Richards has consistently and repeatedly asserted his

14   innocence. (SF 135-140, 209, 326-328, 378) After trial, based on the new DNA

15   evidence showing the presence of third-party DNA on the murder weapons and in a

16   hair from the fingernail scrapings, and alleging that false forensic evidence

17   (bitemark and blue fiber) was used to convict him, Mr. Richards filed a petition for

18   writ of habeas corpus. (SAMF 326, 367-68)

19   With respect to the bitemark evidence, Plaintiff presented uncontested expert

20   testimony that to the extent that the injury on the hand was even a bitemark, Plaintiff

21   was ruled out as having created the bitemark; no witness, including Sperber,

22   testified to the contrary. *See Richards III*, 55 Cal. 4th at 975 (Liu, J., dissenting)

23   ("[T]he Attorney General offered no competing [bitemark] evidence. This is not a

24   case in which a habeas corpus evidentiary hearing has devolved into a fresh battle of

25   the experts. Instead, all of the experts [including Sperber] provided testimony

26   refuting critical facts underlying Dr. Sperber's trial testimony.").

27   Contrary to Sperber's assertion in the instant motion, he *did* recant his prior

28   opinions and testimony. (SGI 77-78, SAMF 319) Defendants rely on the now-

1  defunct analysis of the California Court of Appeal and the California Supreme Court

2  on the issue of whether Sperber's original trial testimony was "false." (Mot. at 8:9-

3  16, 8:27-9:3) Both of those opinions misstated the evidence and construed "opinion"

4  testimony as a different type of evidence that isn't false when it changes. Thereafter,

5  the California Legislature corrected that problem in 2014,[4] and the California

6  Supreme Court held that the evidence was false in 2016. *In re Richards* ("*Richards*

7  *IV*"), 63 Cal. 4th 291, 313-15 (2016).

8      After an evidentiary hearing in 2009, the trial court granted Plaintiff's first

9  habeas petition on actual innocence grounds, stating that the evidence pointed

10  unerringly to innocence." (SAMF 326) The California Court of Appeal reversed the

11  trial court, *In re Richards* ("*Richards II*"), No. E049135, 2010 WL 4681260 (Cal.

12  Ct. App., Nov. 19, 2010, No. E049135), and the California Supreme Court affirmed,

13  *In re Richards* ("*Richards III*") 55 Cal. 4th 948 (2012).[5] Following the California

14  Legislature's amendment of the definition of false evidence to include expert

15  opinion testimony, Plaintiff filed a new habeas petition with the California Supreme

16  Court, which was granted, vacating his conviction. *Richards IV*, 63 Cal. 4th 291.

---

18      [4] In 2014, in response to the *Richards III* ruling and for the purpose of
19  "keep[ing] innocent people out of prison," the legislature amended Penal Code
section 1473 to state that "'false evidence' shall include opinions of experts that
20  have either been repudiated by the expert . . . or that have been undermined by later
scientific research or technological advances." Cal. Penal Code § 1473(e)(1), added
21  by Stats. 2014, ch. 623, § 1; Sen. Com. on Pub. Safety, Rep. on Sen. Bill No. 1058
(2013-2014 Reg. Sess.) as introduced Feb. 18, 2014, pp. 4-6; Assem. Com. on
22  Public Safety, Report on Sen. Bill No. 1058 (2013-2014 Reg. Sess.) as amended
23  June 4, 2014, p. 3.

24      [5] Defendants reference portions of the intermediate California opinions
25  discussing the blue fiber evidence. Both characterized the evidence unfavorably but
26  did not make any findings. *Richards II*, 2010 WL 4681260, at *15; *Richards III*, 55
Cal. 4th at 969. None of the courts had the benefit of the evidence developed during
27  the civil rights case.

28

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is granted only if "there is no genuine dispute as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment." *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1129 (C.D. Cal. 2005) (citation omitted). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when reviewing a grant of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The evidence used to defeat summary judgment need not be in an admissible form, where it reflects admissible content. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

"[R]elevant issues relating to the mental state of a person, since always a matter of inferences, are peculiarly decisions for the jury and are rarely, if ever, susceptible to resolution on summary judgment." *Soto v. City of Sacramento*, 567 F. Supp. 662, 668 (E.D. Cal. 1983)); *Vucinich v. Payne, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (same). If the nonmoving plaintiff presents evidence regarding the culpable mental state of a defendant, that defendant "cannot succeed on summary judgment based simply on his own assertions of his mental state." *Wereb v. Maui County*, 727 F. Supp. 2d 898, 916 (D. Haw. 2010).

## III.   ARGUMENT

### A.   Gregonis's Integral Participation in the Constitutional Violations Alleged Against the Detective Defendants

Plaintiff has asserted claims against Parent, Bradford, and Navarro relating to

1   their investigation of the murder. For the reasons explained in Plaintiff's opposition

2   to their separate motion for summary judgment, filed concurrently herewith,

3   Plaintiff has presented sufficient evidence of those violations to proceed to trial,

4   including those relating to the crime scene investigation. Gregonis was the case

5   criminalist who was assigned to and did work with Parent to process the crime

6   scene; as such, he participated in the failure to preserve and collect evidence, the

7   destruction of evidence, and the reckless investigation. He is therefore equally

8   liable. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("An

9   officer's liability under section 1983 is predicated on his 'integral participation' in

10  the alleged violation."); *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)

11  ("'[I]ntegral participation' does not require that each officer's actions themselves

12  rise to the level of a constitutional violation."); *Cunningham v. Gates*, 229 F.3d

13  1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their

14  fellow officers violate the constitutional rights of a suspect or other citizen.").

15    Gregonis's motion is based entirely on his own (and the other defendants')

16  self-serving statements and explanations regarding the absence of bad faith. While

17  Gregonis is free to present these explanations at trial, the jury is equally free to

18  reject them. *Guy v. City of San Diego*, 608 F.3d 582, 588 (9th Cir. 2010) ("[A] jury

19  may properly refuse to credit even uncontradicted testimony."); *Duckwitz v. United

20  States*, 15 F.2d 195, 196 (9th Cir. 1926) ("[T]he credibility of the witness and the

21  sufficiency of the explanation offered were for the jury, and not for the court."). For

22  example, Gregonis claims that "he did not believe that the camper or vehicles

23  needed to be fingerprinted" (Mot. at 12:12-16) and gives explanations that are

24  directly contradicted by his earlier testimony, including that "[a]s far as the camper

25  and such, it probably would have been better to take fingerprints [at the crime

26  scene]." (SGI 14) Knowing, based on the blood, that the camper was part of the

27  crime scene, knowing that it should have been printed, and knowing that evidence of

28  third-party prints would be exculpatory to Plaintiff, Defendants' failure to do can be

1    reasonably explained by their belief that Plaintiff was the perpetrator and their

2    disinterest in collecting evidence that would tend to exculpate, rather than inculpate,

3    Plaintiff. This is the definition of bad faith. *United States v. Bohl*, 25 F.3d 904, 911

4    (10th Cir. 1994) (The bad faith inquiry "'necessarily turn[s] on the [government's]

5    knowledge of the exculpatory value of the evidence at the time it was lost or

6    destroyed.'" (quoting *Arizona v. Youngblood*, 488 U.S. 51, 56 n* (1988)).

7         Defendant claims that "[a]ll of the evidence Gregonis did collect refutes the

8    notion [that he] was intentionally overlooking evidence." (Mot. at 12:24-25)

9    Gregonis's collection of evidence that he thought might inculpate Plaintiff does not

10   provide an explanation for his failure to collect evidence that he knew would not

11   inculpate plaintiff (e.g., fingerprints) and would, on the contrary, potentially

12   exculpate plaintiff. The failure to fingerprint the camper is a glaring error by the

13   crime scene investigators. Gregonis's mental state with respect to this error,

14   including whether it was mere negligence, is an issue for the jury. *Costanich v.*

15   *Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1113 (9th Cir. 2010) (characterization

16   of false evidence (at summary judgment stage) as mere "recording errors and

17   misstatements" ran contrary to principle that the court "must draw all factual

18   inferences in favor of the non-moving party"); *Gregory v. City of Louisville*, 444

19   F.3d 725, 744 (6th Cir. 2006) (for forensic report that did not reference two of seven

20   hairs, rejecting argument "that [defendant's] 'failure to disclose,' if any, amounts

21   only to negligence" because "culpability is an issue of fact for a jury.").

22        **B.    Legal Standard for Fabrication of Evidence Claims**

23        Plaintiff alleges that Defendants Gregonis and Sperber fabricated their

24   forensic opinions in this case. "[T]he deliberate or knowing creation of a misleading

25   and scientifically inaccurate [forensic evidence] amounts to a violation of a

26   defendant's due process rights." *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008);

27   *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) ("[T]here is a clearly

28   established constitutional due process right not to be subjected to criminal charges

on the basis of false evidence that was deliberately fabricated by the government.")
There are several different standards for proving fabrication of evidence, depending
on the particular circumstances of the case.

First, the reckless or intentional fabrication, misstatement, or
misrepresentation of evidence, including forensic evidence, is unconstitutional.
*Devereaux*, 263 F.3d at 1074*; Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d
1101, 1111 (9th Cir. 2010) (distinguishing direct fabrication from other types of
*Devereaux* fabrication); *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir.
2013). False or incorrect forensic evidence includes evidence that is "misleading and
scientifically inaccurate," as well as evidence that has "no scientific basis." *Brown*,
519 F.3d at 237; *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir.
2002) (false evidence claim was based on the expert's "incompetence" and, *inter
alia*, the allegation that he "recklessly disregarded the truth by asserting in his
autopsy report that [the victim] was strangled by an assailant while ignoring
abundant evidence that pointed to suicide").[6]

This type of fabrication does not require that a defendant admit that s/he
fabricated evidence. A defendant violates a plaintiff's due process rights where his
"opinions were developed with reckless disregard for the truth and were in fact
incorrect." *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1197, 1206 (D. Ariz. 2008);
*Gantt*, 717 F.3d at 708 (due process fabrication of evidence claims are established
by "deliberate indifference to or reckless disregard for an accused's rights" (citing
*Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009))).
Recklessness with respect to the truth may be proven by evidence that the defendant
"in fact entertained serious doubts as to the truth" or that "circumstances evince

---

[6] Defendants argue that "[i]t is insufficient to allege the evidence was without
scientific merit," citing *Galbraith*. (Mot. at 18:7-8) Nothing in *Galbraith* supports
the Defendants' stated proposition.

1   obvious reasons to doubt the veracity" of the evidence. *Lacy*, 631 F. Supp. 2d at

2   1207. "The question is, whether the facts in the record, when viewed in the light

3   most favorable to Plaintiffs, permit the inference that, with reckless disregard for the

4   truth, [the expert] incorrectly interpreted [the evidence]" and gave opinions that

5   "were in fact incorrect." *Id.*

6        A defendant's knowledge of the falsity of the evidence or his recklessness

7   with respect to that falsity may be proven by circumstantial evidence and with the

8   opinions of experts. *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015) ("Intent is,

9   after all, most often proven circumstantially. . . . Rarely will there be an admission

10   of subjective intent"; recognizing district court's finding that plaintiff had presented

11   sufficient circumstantial evidence of intent to create disputed issue); *Gregory v. City*

12   *of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) ("Plaintiff's expert reports that

13   [defendant] Katz's findings are far afield of what any reasonable forensic examiner

14   would find from the evidence; this is sufficient evidence from which a jury might

15   reasonably infer that Katz fabricated her report.")

16        Second, fabrication of evidence may be proven where "[d]efendants used

17   investigative techniques that were so coercive and abusive that they knew or should

18   have known that those techniques would yield false information." *Devereaux*, 263

19   F.3d at 1076; *Costanich*, 627 F.3d at 1111. "[A]busive and coercive investigation

20   techniques need not involve extreme or aggressive conduct by police officers."

21   *Trulove v. City & County of S.F.*, No. 16-CV-050 YGR, 2018 WL 3429113, at *3

22   (N.D. Cal. July 16, 2018) (citing *Gantt*, 717 F.3d at 708 and *Caldwell v. City & Cty.*

23   *of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018)).

24        Third, fabrication of evidence is proven where "Defendants continued their

25   investigation of [plaintiff] despite the fact that they knew or should have known that

26   he was innocent." *Devereaux*, 263 F.3d at 1076; *Costanich*, 627 F.3d at 1111.

27       **C.**    **Gregonis's Bloodspatter Analysis**

28        With respect to the bloodspatter evidence offered by Gregonis, Plaintiff

1  alleges direct fabrication in addition to the other two forms of *Devereaux*

2  fabrication, but Gregonis does not address direct fabrication at all, or the cases

3  which demonstrate that recklessly incorrect and misleading forensic evidence is

4  false evidence, a standard which is satisfied here. *See supra* at I(B)(2). Rather,

5  Defendant focuses exclusively on the two alternative routes of proving fabrication

6  of evidence under *Devereaux*. Even for the *Devereaux* alternatives, Defendant relies

7  on disputed facts and his own self-serving statements regarding his mental state,

8  which cannot be the basis for summary judgment.

9       Gregonis argues that he "was entitled to rely on the probable cause the

10  investigating detectives had shown to secure Plaintiff's arrest." (Mot. at 14:1-2) This

11  statement is legally and factually unsupported. There is no record evidence that

12  Gregonis was aware of the factual basis for Plaintiff's arrest (which was minimal, if

13  extant), and Gregonis's "reliance" on the detective's decision to arrest plaintiff

14  proves the opposite of good faith. He should have been conducting an independent

15  and unbiased (preferably blind) investigation, not one targeted to a particular suspect

16  arrested by the defendant detectives. Defendants cite no law on this issue, and their

17  proposed rule would essentially invalidate *Devereaux* in any case where the

18  investigation continued after the arrest.

19       Gregonis also argues that "there is no indication that [he] (or anyone else)

20  found evidence exonerating Plaintiff." (Mot. at 14:2-3) To the contrary, Gregonis

21  himself examined the bloodspatter evidence that exonerated or tended to exonerate

22  Plaintiff (and which he construed falsely as inculpating) especially in combination

23  with the absence of any injuries to Plaintiff. Gregonis's colleague, Craig Ogino,

24  discovered a half-inch long hair under the victim's fingernail that belonged to an

25  unknown third party (and which he falsely reported was consistent with the victim's

26  hair). (SGI 25) And the defendant detectives confirmed in their investigation that

27  Plaintiff arrived home with, at best, a few minutes in which to commit the murder,

28  when the circumstantial evidence indicated that Pamela had died much earlier in the

1  evening. All of this evidence, along with other evidence, is evidence that exonerated

2  Plaintiff, although it was deliberately disregarded by the defendants.

3      Gregonis argues that there is "no proof Gregonis used techniques he knew or

4  should have known would yield false information" because he conducted his

5  analysis "honestly and prudently, based on the information provided to him and his

6  experience and training." (Mot. at 14:4-19). This, too, is a hotly disputed factual

7  issue in this case. Plaintiff's evidence demonstrates that Gregonis's analysis was

8  biased and scientifically indefensible, conducted after the fact to support the guilt of

9  an already-arrested suspect. That Gregonis was a qualified expert made his

10  fabrication of evidence in this case that much more damaging.

11      Finally, Gregonis argues that his analysis was subject to oversight and was

12  tested in the criminal trials. (Mot. at 14:20-15:1) This is true for most, if not all,

13  evidence fabricated by police and/or forensic experts; it is not a basis for avoiding

14  liability. *See, e.g.*, *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1197, 1202 (D. Ariz.

15  2008) (denying summary judgment for fabrication of evidence by medical expert

16  (pathologist) who testified and was cross-examined about allegedly false opinion).

17  **D.    Plaintiff's Evidence Easily Creates a Disputed Issue of Fact on the**
18  **         Issue of the Allegedly Planted Blue Fiber**

19      Defendants cannot and do not assert that the planting of a blue fiber in the

20  victim's fingernail would not constitute unconstitutional fabrication of evidence.

21  *Cooper v. Brown*, 565 F.3d 581, 595 (9th Cir. 2009) (Fletcher, J., dissenting from

22  denial of rehearing en banc) ("[I]f state actors planted this evidence, its presentation

23  at trial violated Cooper's due process rights . . . ."; addressing alleged fabrication by

24  Gregonis and his colleagues in the *Cooper* case). Instead, they assert that Plaintiff

25  has simply not presented sufficient evidence to support this claim.

26      As demonstrated in the statement of facts, Plaintiff's evidence establishes

27  that: (1) plaintiff is innocent; (2) in photographs, there were no blue fibers in the

28  victim's fingernail at the time of the autopsy; (3) Sheridan, with the assistance of

1   Seleska, were in close proximity to the fingernail with the express goal of scraping

2   out *all visible trace evidence* and they did not see any blue fibers; (4) the blue fibers

3   are clearly visible in video taken by Gregonis to document his "discovery"; (5) the

4   blue fibers were not microscopic—they were 15 individual fibers bunched together

5   and one-half a centimeter long—and were, in fact, visible to the naked eye; (6)

6   Gregonis had custody and control of the severed finger and Plaintiff's work shirt in

7   the two-day time frame that he made the "discovery" and was the only person who

8   had custody of the evidence after it was collected; and (7) Gregonis cut swatches

9   from Plaintiff's shirt for analysis and then, contrary to the most basic principles of

10  evidence handling, discarded them, all without checking if the shirt had any snags or

11  holes.

12          This is more than enough evidence to prove, by reasonable inference, that

13  Gregonis fabricated the blue fiber evidence. *Jones v. Williams*, 297 F.3d 930, 939

14  (9th Cir. 2002) (Silverman, J., concurring) ("[T]he jury can infer causation against

15  those in exclusive control of the event."). The only better evidence would be a direct

16  admission from Gregonis, which cannot be required.

17          **E.      Sperber Was Not A Private Party; He Acted Under Color of Law**

18          A person is liable under 42 U.S.C. § 1983 if he acts "under color of state

19  law;" however, "to act 'under color of' state law for § 1983 purposes does not

20  require that the defendant be an officer of the State." *Dennis v. Sparks*, 449 U.S. 24,

21  27 (1980). "Private persons, jointly engaged with state officials in the challenged

22  action, are acting 'under color' of law for purposes of § 1983 actions." *Id.* at 27-28.

23  Although a conspiracy is one method of proving that a person is "a willful

24  participant in joint action with the State or its agents," it is not the only method. *Id.*

25  at 27; *Groom v. Safeway, Inc.*, 973 F. Supp. 987, 991 (W.D. Wash. 1997) ("[A]

26  conspiracy is not the only way to satisfy the color-of-state-law requirement."). 

27  Rather, "[a]nyone whose conduct is 'fairly attributable to the state' can be sued as a

28  state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *Howerton v.*

1  *Gabica*, 708 F.2d 380, 382 (9th Cir. 1983) ("Action taken by private individuals

2  may be 'under color of state law' where there is 'significant' state involvement in

3  the action. . . . '[T]here is no specific formula for defining state action.'").

4     An employment relationship can be the basis for a finding that a non-

5  employee was acting under color of state law. *Bender v. Gen. Servs. Admin.*, 539 F.

6  Supp. 2d 702, 711 (S.D.N.Y. 2008) ("Section 1983 is not limited to actions against

7  state agents who are formally employed by the state. 'The fact that the State

8  employed [defendant] pursuant to a contractual arrangement that did not generate

9  the same benefits or obligations applicable to other 'state employees' does not alter

10  the [§ 1983] analysis.'" (quoting *West v. Atkins*, 487 U.S. 42, 55-56 (1988)));

11  *Groom*, 973 F. Supp. at 991 ("[T]he employment relationship gives the private

12  entity and the state agent an overlapping identity. . . . it does not matter whether [the

13  employment relationship] was an employee or an independent contractor.").

14     Under this authority, without establishing a conspiracy, retained forensic

15  experts and similar professionals have been held to be acting under color of state

16  law. *See, e.g.*, *Brewer v. Hayne*, 860 F.3d 819, 821 (5th Cir. 2017) (privately

17  employed "retained government experts" were acting under color of law; "We are

18  persuaded that Defendants, as consulting forensic experts, were engaged in the

19  criminal investigative functions of the state. . . ."); *Moldowan v. City of Warren*, 578

20  F.3d 351, 372 (6th Cir. 2009) (Defendant dentist "a forensic odontologist and

21  consultant for" the county, "represented the State of Michigan in the underlying

22  criminal proceedings against plaintiff"); *Gregory v. City of Louisville*, 444 F.3d 725,

23  740 (6th Cir. 2006) ("[e]xpert forensic examiners act in an investigatory fashion

24  when they interpret and document physical evidence."); *Starks v. City of Waukegan*,

25  946 F. Supp. 2d 780, 798 (N.D. Ill. 2013) (private dentist defendants were "willful

26  participants in joint action" with the state because they "'became involved in the

27  prosecution when they were hired by the prosecution to compare an alleged bite

28  mark on [the victim] with the [plaintiff's] teeth.'" (citation omitted)); *see also, e.g.*,

1   *Gonzalez v. Spencer*, 336 F.3d 832, 834 (9th Cir. 2003), *abrogated on other grounds*

2   *by Filarsky v. Delia*, 566 U.S. 377 (2012) (private outside counsel retained by the

3   county "act[ing] under color of state law"); *Rodriques v. Furtado*, 950 F.2d 805, 814

4   (1st Cir. 1991) ("The scope and motivation for the [private doctor's] search were

5   established solely by the state's investigatory goals.")

6          At the time that Sperber conducted his investigation and rendered his opinion,

7   he was a sworn police officer, government official, and employed agent of the

8   County of San Bernardino. He was retained to perform forensic analysis that would

9   have been performed by a County employee (Golden) if he had not already been

10  appointed to the defense. Functionally, there is nothing that distinguishes Sperber

11  from Gregonis except that one was paid a salary and the other was paid on contract;

12  both were experts who were conducting forensic analysis for the government.

13  "Under color of state law" is not dependent on the form of employment. *West v.*

14  *Atkins*, 487 U.S. 42, 55-56 (1988) ("It is the [defendant]'s function within the state

15  system, not the precise terms of his employment, that determines whether his actions

16  can fairly be attributed to the State.").

17         Even if a conspiracy were required, there is sufficient evidence to establish

18  joint action and a conspiracy. According to Sperber, Parent did tell him that Plaintiff

19  was the murderer and that the county had failed to convict him twice. Parent and

20  Sperber spoke multiple times before Sperber issued his opinion in this case, and

21  Sperber was influenced by Parent and his own desire to "be the hero." As a result,

22  Sperber issued a false opinion that he later recanted when confronted with its falsity.

23         **F.   Plaintiff Has Presented Sufficient Evidence that Sperber**

24              **Knowingly and/or Recklessly Fabricated the Bitemark Evidence**

25         Sperber's argument relies almost exclusively on disputed facts and inferences

26  and his own self-serving testimony. In the space of two pages, Defendant asserts at

27  least four times that he was acting "honestly," (Mot. at 18:10, 19:13, 19:22, 19:23),

28  yet, he falsely construes his own habeas recantation as merely that "he could no

1 longer give the same opinion in 2007." (Mot. at 19:10-13; SGI 77-78; SAMF 319)

2      Sperber issued incorrect and baseless forensic conclusions: that the lesion on

3 the victim was a human bite mark (it was not); that the distorted photograph was

4 sufficient for odonatological analysis (it was not); that plaintiff's teeth were

5 "consistent" with the lesion (they were not); that Plaintiff's Tooth # 27 would not

6 register in a bitemark (it would); and that the Tooth # 27 anomaly was only shared

7 by 1-2% of the population (baseless). Sperber was aware that his conclusions were

8 based on nothing more than "eyeballing" the evidence, "assumptions," and

9 "guess[ing]." Sperber was an authority on photographic distortion, knew that the

10 distortion would render a direct comparison to Plaintiff's teeth meaningless, and

11 knew that photographic distortion could be corrected. Sperber admitted that he

12 thought that Plaintiff was the perpetrator and that he wanted to "be the hero" for the

13 prosecution that had failed twice to convict.

14      Sperber's defense is based on the position that he gave a very conservative

15 opinion in 1997, admitted the limits of the photograph, and did not "overstate" his

16 conclusions. (Mot. at 18:10-19:24) But this too is disputed. (SGI 69-71, 73-74;

17 SAMF 293-306, 314-317) Contrary to Defendant's suggestion, Plaintiff is not taking

18 issue with "tone," "characterization," "detail," or "mistakes." (Mot. at 19:5-10)

19 Plaintiff is taking issue with knowingly and recklessly false forensic evidence. The

20 bottom line is that Sperber's reckless and baseless 1997 opinions *inculpated*

21 Plaintiff, when he later admitted that the very same evidence, properly analyzed,

22 *exculpated* plaintiff. It was false evidence that was instrumental in securing

23 Plaintiff's wrongful conviction.

24     **G.    Neither Gregonis Nor Sperber Are Entitled to Qualified Immunity**

25      Both Defendants Gregonis and Sperber are accused of fabricating evidence.

26 The fabrication of evidence is a clearly established and obvious constitutional

27 violation. *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (that

28 fabrication of evidence violates due process is a "virtually self-evident"

1    proposition). In earlier briefing, Plaintiff cited numerous cases holding that the

2    fabrication of forensic evidence has been a clearly established constitutional

3    violation for decades. (Dkt. No. 51 at 17:25-20:25; Dkt. No. 61 at 11:8-16:28)

4    Neither defendant identifies any legal principle regarding the fabrication of evidence

5    that was unclear in 1993-1997. (Mot. at 20:1-24:4)

6       Gregonis merely argues that "bloodspatter analysis and reconstruction had

7    been conducted for the prosecution and defense for decades" at the time of the

8    Richards case. (Mot. at 21:6-16) The existence of a forensic discipline does not

9    make *fabrication* of evidence within that discipline beyond clearly established law.

10   Similarly, Sperber argues that "consistent" was a term in wide use in criminal cases

11   and therefore "Dr. Sperber would have no reason to believe that providing this

12   opinion to the District Attorney would be unlawful." (Mot. at 23:4-23:16) If

13   Plaintiff's teeth were "consistent" with the lesion on Pamela's hand and there were a

14   scientific basis for reaching that conclusion, refuted here by Plaintiff's evidence,

15   there would be no issue with using that term. However, the widespread use of a term

16   in appropriate circumstances does not immunize Sperber's false use of the term.

17      Sperber also argues at length that Golden's similar opinions "supports that

18   qualified immunity is proper." (Mot. at 22:5-23:26) Setting aside the disputed facts

19   regarding Golden's opinions, his testimony that the jury should "disregard" the bite

20   mark evidence, the degree to which he was directly influenced by Sperber, whether

21   or not he had the same mental state as Sperber, and whether or not he would qualify

22   as a "reasonable official," Sperber is misconstruing the qualified immunity inquiry.

23   Where law is "clearly established," every reasonable official understands that law,

24   regardless of whether a particular official violates it or claims to misunderstand it.

25   Here, the law was clearly established. *Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir.

26   2017); *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015); *Moldowan v. City of*

27   *Warren*, 578 F.3d 351, 397 (6th Cir. 2009).

28

1  **IV.    CONCLUSION**

2         For all of the foregoing reasons, Plaintiff respectfully requests that the Court

3  deny Defendants' motion for summary judgment.

4                                        Respectfully submitted,

5                                        KAYE, McLANE, BEDNARSKI & LITT, LLP

6

7  DATED: May 20, 2019          By:   _/ s / Caitlin S. Weisberg_

8                                     CAITLIN S. WEISBERG
                                      Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28