BARRETT S. LITT (No. 45527)
E-mail: blitt@kmbllaw.com
MARILYN E. BEDNARSKI (No. 105322)
E-mail: mbednarski@kmbllaw.com
DAVID S. McLANE (No.124952)
E-mail: dmclane@kmbllaw.com
CAITLIN S. WEISBERG (No. 262779)
E-mail: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Wendy J. Koen (No. 255759)
E-mail:  wkoen.defender@gmail.com
LAW OFFICE OF WENDY J. KOEN
32818 Mira Street
Menifee, California 92584
Telephone: (858) 500-2300

Attorneys for Plaintiff WILLIAM J. RICHARDS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM J. RICHARDS,<br><br>              Plaintiff,<br><br>      v.<br><br>COUNTY OF SAN BERNARDINO, MARK NOURSE, NORMAN PARENT, TOM BRADFORD, JOHN NAVARRO, DANIEL GREGONIS, NORMAN SPERBER, and DOES 1 through 10, inclusive,<br><br>              Defendants. | CASE NO. 17-cv-00497-SJO-SP<br>[Honorable S. James Otero]<br><br>**PLAINTIFF'S NOTICE OF APPEAL** |

TO THE CLERK OF THE COURT, DEFENDANTS, AND THEIR

ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff WILLIAM J. RICHARDS hereby

appeals to the United States Court of Appeals for the Ninth Circuit from the

Judgment (Dkt. No. 143), filed and entered on September 20, 2019, and from the

Order Granting Defendants' Motions for Summary Judgment (Dkt. No. 138), dated

September 3, 2019 and entered on September 4, 2019, on which the Judgment is

based. True and correct copies of the Judgment (Dkt. No. 143) and Order Granting

Defendants' Motions for Summary Judgment (Dkt. No. 138) are attached hereto as

Exhibits A and B, respectively.

The parties to this appeal and their legal representatives are as follows:

Plaintiff:                           William J. Richards

Counsel for Plaintiff:               BARRETT S. LITT (No. 45527)
                                     E-mail: blitt@kmbllaw.com
                                     MARILYN E. BEDNARSKI (No. 105322)
                                     E-mail: mbednarski@kmbllaw.com
                                     DAVID S. McLANE (No.124952)
                                     E-mail: dmclane@kmbllaw.com
                                     CAITLIN S. WEISBERG (No. 262779)
                                     E-mail: cweisberg@kmbllaw.com
                                     KAYE, McLANE, BEDNARSKI & LITT, LLP
                                     975 East Green Street
                                     Pasadena California 91106
                                     Telephone: (626) 844-7660
                                     Facsimile: (626) 844-7670

Plaintiff:                      William J. Richards

Counsel for Plaintiff:          Wendy J. Koen (No. 255759)
                                E-mail:  wkoen.defender@gmail.com
                                LAW OFFICE OF WENDY J. KOEN
                                32818 Mira Street
                                Menifee, California 92584
                                Telephone: (858) 500-2300

Defendants:                     County of San Bernardino
                                Mark Nourse
                                Norman Parent
                                Tom Bradford
                                John Navarro
                                Daniel Gregonis
                                Norman Sperber

Counsel for Defendants:         Susan E. Coleman (No. 171832)
                                Email: scoleman@bwslaw.com
                                BURKE, WILLIAMS & SORENSEN, LLP
                                444 South Flower Street, Suite 2400
                                Los Angeles, California 90071-2953
                                Tel: (213) 236-0600

Date:  October 16, 2019         KAYE, McLANE, BEDNARSKI & LITT, LLP


                                By:  */ s / Caitlin S. Weisberg*

                                    CAITLIN S. WEISBERG
                                    Attorneys for Plaintiff

# EXHIBIT A

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**CENTRAL DISTRICT OF CALIFORNIA**

11

12   William J. Richards,                          )   Case No. 5:17-cv-00497-SJO-SP
                                                    )
13              Plaintiff,                          )   **JUDGMENT**
                                                    )
14              vs.                                 )
                                                    )
15   COUNTY OF SAN BERNARDINO,                      )
     MARK NOURSE, NORMAN                            )
16   PARENT, TOM BRADFORD, JOHN                     )
     NAVARRO, DANIEL GREGONIS,                      )
17   NAVARRO, DANIEL GREGONIS,                      )
     NORMAN SPERBER, and DOES 1                     )
18   through 10, inclusive,                         )
                                                    )
19              Defendants.                         )
                                                    )
20                                                  )
                                                    )
21   _____           )

22
23
24
25
26
27
28

Pursuant to the Order Granting Defendants' Motions for Summary Judgment (Dkt. No. 138), IT IS HEREBY ADJUDGED that this action is dismissed with prejudice and Judgment is hereby entered for Defendants.

**JUDGMENT IS SO ENTERED.**

DATED:  September 20, 2019

*S. James Otero*

HON. S. JAMES OTERO
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  **CV 5:17-00497-SJO (SPx)**          **DATE:** September 3, 2019

**TITLE:**     **William J. Richards v. County of San Bernardino, et al.**

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                              Not Present
Courtroom Clerk                               Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**           **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                   Not Present

========================================================================
**PROCEEDINGS (in chambers):   ORDER GRANTING DEFENDANTS GREGONIS AND SPERBER'S MOTION FOR SUMMARY JUDGMENT**, ECF No. 91**; ORDER GRANTING DEFENDANTS BRADFORD, NAVARRO, NOURSE, AND PARENT'S MOTION FOR SUMMARY JUDGMENT**, ECF No. 93**; ORDER GRANTING COUNTY OF SAN BERNARDINO'S MOTION FOR SUMMARY JUDGMENT**, ECF No. 94.

This matter is before the Court on Defendants Daniel Gregonis ("Gregonis") and Norman Sperber's ("Sperber") Motion For Summary Judgment ("Gregonis and Sperber Motion") (ECF No. 91), Defendants Tom Bradford ("Bradford"), John Navarro ("Navarro"), Mark Nourse ("Nourse"), and Norman Parent's ("Parent") Motion for Summary Judgment ("Officers' Motion") (ECF No. 93), and Defendant County of San Bernardino's Motion for Summary Judgment ("County's Motion") (ECF No. 94).  All three motions were filed on May 3, 2019.  Plaintiff filed three separate Oppositions to the Motions on May 20, 2019.  Defendants filed three separate Replies on May 31, 2019.  The Court held argument on this matter on August 26, 2019.  (*See* Rough Tr. Of Proceedings, ECF No. 135.).  For the reasons stated below, the Court **GRANTS** the Gregonis and Sperber Motion, the Officers' Motion, and the County's Motion.

I.     <u>INTRODUCTION</u>

After four trials and two hung juries, the County of San Bernardino convicted Plaintiff William Richards in 1997 for the murder of his wife, Pamela Richards, who had been murdered in August of 1993.  In the fourth trial, the prosecution introduced bite mark evidence for the first time, presenting evidence and expert testimony showing that a bite mark on Pamela's hand potentially matched Plaintiff's teeth.

By 2014, the prosecution's bite mark expert, Dr. Norman Sperber, had repudiated his expert opinion that Plaintiff could have produced the bite mark, based in part on technological advances that revealed that the bite mark likely did not match Plaintiff's teeth.  *See In re Richards*, 63 Cal.

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   CV 5:17-00497-SJO (SPx)        DATE: September 3, 2019

4th 291, 308-09 (2016). The California Supreme Court vacated Plaintiff's conviction, holding that "Dr Sperber's [trial] testimony constituted false evidence because the opinion has 'been undermined by later scientific research or technological advances.'" *Id.* at 310 (quoting Cal. Penal Code § 1473(e)(1)).

Although the California Supreme Court did not exonerate Mr. Richards of the crime of murdering his wife – the Court's decision only vacated his conviction – the County of San Bernardino elected not to prosecute Mr. Richards again. He is currently pursuing litigation in Superior Court to seek a declaration that he has been exonerated of the crime of murdering his wife. (Rough Tr. Of Proceedings at 131:8-15.)

Plaintiff now brings a lawsuit under 42 U.S.C. Section 1983. He contends that constitutional violations committed by the law enforcement officers and other personnel investigating the murder of his wife resulted in the conviction that the California Supreme Court overturned. Plaintiff focuses on constitutional violations related to the fabrication of evidence that was used to convict him.

Proving a Section 1983 violation based on the planting or manipulation of evidence requires meeting a legal standard higher than the one applied by courts to vacate a conviction in the first place. A plaintiff must show not only that the evidence used to convict him was false or unreliable – which would result in the vacatur of a conviction – but also that law enforcement officials operated intentionally, recklessly, or with deliberate indifference to the truth when they obtained this evidence. *See, e.g.*, *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (holding that "to support such a claim [of fabrication of evidence], a plaintiff must, *at a minimum,* point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [a plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."). A plaintiff also must show that the officer's evidentiary misconduct **caused** the plaintiff's conviction. *See Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Although a plaintiff may successfully establish that a law enforcement official manipulated evidence, if this evidence was not necessary to secure that plaintiff's conviction, then the Section 1983 action fails. *See id.*

Mr. Richards runs into this high standard in the instant case. Even if the Court makes all inferences in favor of his version of the facts, he does not carry his burden to show that the investigating officers committed any constitutional errors in their investigation of Pamela's murder. Where there may be some evidence suggesting that an officer may have been negligent, Mr. Richards cannot show that this misconduct caused his conviction. Therefore, the Court **GRANTS** the instant Motions.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| **Priority** | ____ |
| **Send** | ____ |
| **Enter** | ____ |
| **Closed** | ____ |
| **JS-5/JS-6** | ____ |
| **Scan Only** | ____ |

**CASE NO.:** <u>CV 5:17-00497-SJO (SPx)</u>          **DATE:** <u>September 3, 2019</u>

II.    <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Unless noted otherwise, the following facts are either undisputed or supported by sufficient admissible evidence that they are "admitted to exist without controversy" for the purposes of this Motion.  L.R. 56-3.[1]  Additionally, in the factual summary below, the Court spends some time summarizing the specific investigatory steps taken by the Defendants.  Many of Plaintiff's claims pertain to purported missteps taken with respect to the investigation or lack of investigation that took place at the crime scene.

A.    <u>Officer Mark Nourse First Responds To The Crime Scene</u>.

On the night of August 10, 1993, Officer Mark Nourse of the San Bernardino Sheriff's Department received a call that a body had been found at a residence in a remote part of San Bernardino County.  (Pl.'s Statement of Genuine Disputes Of Fact In Response to Officers' Motion ("Pl.'s Facts Officers' Motion") ¶ 1, ECF No. 108-1.)  Officer Nourse immediately drove to the location of the call, where he met Plaintiff.  (Pl.'s Facts Officers' Motion ¶ 2.)  Mr. Richards was living there with his wife, Pamela, in a motor home while they built a house on the property land.  (Pl.'s Statement of Additional Material Facts In Response to Motions for Summary Judgment ("Pl.'s Additional Material Facts") ¶ 136, ECF No. 112.)

---

[1]    The parties dispute some purportedly "uncontroverted" material facts.  In some instances, the alleged dispute is immaterial or relates to the characterization of an underlying fact.  In the latter cases, the Court examines and relies on the underlying undisputed fact.

The parties also have submitted several evidentiary objections in connection with the instant Motions. The Court declines to rule on the evidentiary objections and the motions in limine at the present time.  In reaching its conclusion here, the Court cites to the undisputed evidence in the record as well as factual findings that the Court makes with respect to **material** facts for which there is no evidentiary dispute.  *See Burch v. Regents of Univ. of California,* 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("Instead of *objecting,* parties should simply *argue* that the facts are not material. Similarly, statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment.")

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** CV 5:17-00497-SJO (SPx)        **DATE:** September 3, 2019

At this time, Mr. Richards informed Officer Nourse that he had found his wife lying on the property and that she was dead. (Pl.'s Facts Officers' Motion ¶ 3.) Plaintiff informed Officer Nourse that she was "stone cold" and had been dead for hours. (Pl.'s Facts Officers' Motion ¶ 3.) Plaintiff also purportedly told Officer Nourse that he thought Pamela had been dead for hours "because the battery [was] dead on the Toyota [Motorhome]." (Pl.'s Facts Officers' Motion ¶ 3.) Plaintiff had wrapped the victim in a sleeping bag at this time, which Officer Nourse did not disturb. (Pl.'s Additional Material Facts ¶ 166; Pl.'s Facts Officers' Motion ¶ 19.)

Officer Nourse subsequently conducted a visual and physical inspection of the victim's body. (Pl.'s Facts Officers Motion ¶ 4.) He felt for a pulse at her neck and wrist, and it was his opinion at this time that she was neither warm nor cold. (Pl.'s Facts Officers' Motion ¶ 4.) Officer Nourse did not document removing the sleeping bag from the victim's body.

Officer Nourse also contends that he found that he was able to move her arm and hand freely to check her pulse at her wrist, and her limb was not stiff. (Pl.'s Facts Officers' Motion ¶ 5.) Officer Nourse also argues that he saw blood on and around the victim's head that appeared to be fresh because the blood glistened and looked wet. (Pl.'s Facts Officers' Motion ¶ 5.)

Plaintiff disputes these facts. Plaintiff contends that Nourse testified that he did not move any part of Pamela's body and also lacked expertise to determine if the blood was "fresh." (Pl.'s Facts Officers' Motion ¶ 5.) It is undisputed, however, that Officer Nourse did conduct a visual inspection of the body, determine that the victim was dead, and contact homicide investigators. (Pl.'s Facts Officers' Motion ¶ 6.)

After contacting homicide investigators, Officer Nourse asked Plaintiff to move towards his patrol car so that they would not disturb the crime scene. (Pl.'s Facts Officers' Motion ¶ 7.) It is undisputed that Officer Nourse did not erect a barrier or use caution tape to preserve the crime scene. (Pl.'s Facts Officers' Motion ¶ 8.) This violated the San Bernardino County policies at the time. (Pl.'s Facts Officers' Motion ¶ 8.) Officer Nourse contends that he did not do so because of the remote location of the crime scene and because there were no signs of anyone else at the property. (Pl.'s Facts Officers' Motion ¶ 8.) The failure to cordon off the scene or body or document tire marks may have led to law enforcement's inability to confirm whether or not third parties had come to the crime scene. (Pl.'s Facts Officers' Motion ¶ 8.) Because of the lack of a barrier, Plaintiff's dogs also approached the crime scene and the victim's body. (Pl.'s Facts Officers' Motion ¶ 9.)

Officer Nourse contends that instead of calling animal control or securing the dogs, he would yell at the dogs and chase them away. (Pl.'s Facts Officers' Motion ¶¶ 8-9.) The Officer Defendants

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  <u>CV 5:17-00497-SJO (SPx)</u>        **DATE:** <u>September 3, 2019</u>

contend that the dogs were at a distance barking and did not disturb the crime scene, except for one of the dogs approaching the crime scene once. (Pl.'s Facts Officers' Motion ¶ 27.) Plaintiff, however, contends that the dogs pawed and disturbed the victim's body and the crime scene. (Pl.'s Facts Officers' Motion ¶ 27; Pl.'s Additional Material Facts ¶ 148.) According to Plaintiff, there was significant dirt on the victim's head. (Pl.'s Facts Officers' Motion ¶ 27; Pl.'s Additional Material Facts ¶ 148.)

      B.    <u>Initial Investigation At Crime Scene</u>

In the early hours of the morning of August 11, 1993, after Officer Nourse had called for backup and conducted an initial inspection of the crime scene, Sergeant Bart Gray contacted Detectives Parent, Bradford, and Navarro to report to Plaintiff's address in response to the homicide. (Pl.'s Facts Officers' Motion ¶ 13.) Detectives Parent, Bradford, and Navarro served as the primary homicide detectives investigating the Pamela Richards murder. (Pl.'s Facts Officers' Motion ¶ 12.)

There are several disputes of fact concerning the steps that Officer Nourse and the detectives did take or should have taken with respect to the crime scene during their initial investigation. The parties hotly dispute whether Plaintiff told them whether he had disturbed the crime scene. Although the Officer Defendants contend that Mr. Richards said that he had moved things around at the crime scene, Plaintiff states that he touched very few things. (Pl.'s Facts Officers' Motion ¶ 20.) The parties also dispute the visibility at the crime scene. While Plaintiff says it was dark, he contends that there was some light that aided visibility and could have allowed the Officer Defendants to continue the investigation at night. On the other hand, the Officer Defendants contend that it was so dark that a person could hardly see and that it was necessary to delay the investigation until visibility improved. (Pl.'s Facts Officers' Motion ¶¶ 22-24.) The issue of visibility is important because it impacts whether the Officer Defendants should have waited several hours for the sun to rise before contacting the coroner and other personnel to help with analyzing the crime scene.[2] Ultimately, it is undisputed that the investigating officers decided not to continue processing the crime scene until it was light out. (Pl.'s Facts Officers' Motion ¶ 28.)

///
///
///

----

[2] Although the Officer Defendants contend that Detectives Navarro and Bradford were not involved with the preservation of the crime scene, it is undisputed that they spent time at the crime scene and would have been involved in the initial decisions concerning how to deal with the victim's body and other evidence. (Pl.'s Facts Officers' Motion ¶ 16.)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:** <u>CV 5:17-00497-SJO (SPx)</u>       **DATE:** <u>September 3, 2019</u>

 

C.    <u>Collecting Evidence At Crime Scene In Morning</u>

At approximately 6:00 am on August 11, 1993, at first light, Criminalist Dan Gregonis, Forensic Specialist Valerie Seleska, and Detective Parent began to process the crime scene. (Pl.'s Facts Officers' Motion ¶ 28.) Detective Navarro and Bradford had accompanied Plaintiff to the Sheriff's station where they conducted an initial interview.

The following facts pertain to Mr. Gregonis, Ms. Seleska, and Detective Parent's processing of the crime scene.

As a criminalist, Mr. Gregonis' job responsibilities were to work with a team of homicide investigators and crime scene personnel to help document the crime scene, and recognize, collect, and preserve physical evidence. (Pl.'s Statement Of Facts In Response to Gregonis and Sperber Mot. ("Pl. Facts Gregonis and Sperber Motion") ¶ 2, ECF No. 100-1.) Although he had first arrived at the crime scene at 3:49 AM, (Pl. Facts Gregonis and Sperber Mot. ¶ 3), he did not begin processing the crime scene until around 6:00 am in part because he and the other investigating detectives believed that there was not enough light. (Pl. Facts Gregonis and Sperber Mot. ¶¶ 5-6, 11.)

At the beginning of the crime scene investigation, Detective Parent contends that he examined the crime scene to see if there were tread marks or foot prints coming into or leaving the property. (Pl.'s Facts Officers' Motion ¶ 29.) He also states that he conducted a search of the perimeter of the property for evidence and did not encounter vegetation that had been broken or brushed aside. (Pl.'s Facts Officers' Motion ¶ 32.) Detective Parent states that he did not find any signs of robbery nor sexual assault. (Pl.'s Facts Officers' Motion ¶ 32.) Detective Parent also did not find shoe prints. Plaintiff contends that Detective Parent did not conduct these searches and failed to comply with existing policies by documenting these searches. (Pl.'s Facts Officers' Motion ¶¶ 29-31.)

In terms of collecting evidence, Detective Parent helped direct Ms. Seleska to take photographs of the scene, and it is undisputed that she took at least 300 photographs. (Pl.'s Facts Officers' Motion ¶ 33.) He also collected other evidence, including a description of the crime scene and drawings of the property where evidence was collected. (Pl.'s Facts Officers' Motion ¶ 34.)

Mr. Gregonis later analyzed the forensic evidence. For example, Mr. Gregonis collected numerous blood samples around the crime scene and analyzed them for DNA. This was done to see if the blood on those objects was consistent with Plaintiff, the victim, or a third party. (Pl.'s Facts Officers' Motion ¶ 35.)

MINUTES FORM 11
CIVIL GEN                                       ___ : ___
                                              Initials of Preparer _____

Case 5:17-cv-00497-SJO-SP Document 143 Filed 10/16/19 Page 7 of 35 Page ID #:7246

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   **CV 5:17-00497-SJO (SPx)**        DATE: September 3, 2019

Along with Mr. Gregonis, Detective Parent decided not to take fingerprints at several parts of the crime scene, including on cement blocks that appeared to have been the murder weapon.  (Pl.'s Facts Officers' Motion ¶ 36.)  Detective Parent believed that the blocks and other surfaces would not be conducive to finding prints.  (Pl.'s Facts Officers' Motion ¶¶ 36-37.)  Mr. Gregonis agreed with Detective Parent's decision, although Plaintiff disputes whether Mr. Gregonis and Detective Parent made the correct decision.  (Pl. Facts Gregonis and Sperber Mot. ¶ 14.)  Mr. Gregonis also did not check to see whether the motor home on the property in which the victim and Plaintiff had been living had a battery.  (Pl. Facts Gregonis and Sperber Mot. ¶ 17.)  The motor home was subsequently disposed of after the processing of the crime scene.    (Pl. Facts Gregonis and Sperber Mot. ¶ 18.)

Detective Parent also examined the victim's purse, which was found inside her car.  There, he found a business card for Charles Dunbar, a divorce attorney in Victorville, California.  (Pl.'s Facts Officers' Motion ¶ 38.)  He also found a note from Plaintiff relinquishing certain property to his wife after a divorce.  (Pl.'s Facts Officers' Motion ¶ 38.)  The purse also contained a list of items for property settlement and spousal support.  (Pl.'s Facts Officers' Motion ¶ 39.)  Based in part on this evidence, and the inference that Plaintiff and his wife's marriage was ending, Detective Parent concluded that Plaintiff may have had a motive to murder his wife.

The parties dispute when the Officer Defendants contacted the coroner to investigate the crime scene and what steps they ought to have taken.  It is undisputed that the Officer Defendants did not request that the coroner immediately come to the scene to do a liver temperature reading of the victim. (Pl.'s Facts Officers' Motion ¶ 43.)  At 10:43 AM on August 11, 1993, Deputy Coroner Randolph arrived at the scene and rolled the victim's body out of the sleeping bag. (Pl.'s Facts Officers' Motion ¶¶ 44-45.)

Mr. Gregonis and the other investigating officers also collected samples from the crime scene. For example, they collected hairs on the victim's left hand.  (Pl. Facts Gregonis and Sperber Mot. ¶ 22.)  Mr. Gregonis later processed these hairs for DNA samples.  (Pl. Facts Gregonis and Sperber Mot. ¶ 23.)

After Detective Parent, Mr. Gregonis, and the others processed the crime scene and gathered evidence, the County of San Bernardino released the crime scene.  (Pl.'s Facts Officers' Motion ¶ 41.)  Plaintiff contends that the County released the crime scene before all of the evidence was gathered and before defense counsel had the opportunity to examine the motor home for exulpatory evidence.  (Pl.'s Facts Officers' Motion ¶ 41.)

///

Case 5:17-cv-00497-SJO-SP   Document 140   Filed 09/03/19   Page 8 of 35   Page ID #:6726

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

 

 

 

      **D.**   <u>Autopsy</u>

On August 13, 1993, forensic pathologist Dr. Frank Sheridan conducted an autopsy of the victim. (Pl.'s Facts Officers' Motion ¶ 46.)  Detective Navarro, Detective Parent, and Ms. Seleska attended the autopsy.  (Pl.'s Facts Officers' Motion ¶ 46.)  Dr. Sheridan stated that the cause of death was from manual strangulation and a massive trauma to the skull and head area. (Pl.'s Facts Officers' Motion ¶ 47.)

There was a bite mark on the victim's hand, a key piece of evidence that ultimately led to Plaintiff's conviction after his fourth trial. Dr. Norman Sperber, an expert witness, provided testimony for the first time at Plaintiff's fourth trial in which he suggested that the bite mark on the victim's hand could match Plaintiff's teeth.  During the autopsy, Dr. Sheridan did not ask the detectives whether or not he should swab the bite mark, and the detectives did not ask that this be done.  (Pl.'s Facts Officers' Motion ¶ 48.)  Dr. Sheridan opined in the autopsy report that the bite mark might have been created by a dog.  (Pl.'s Additional Material Facts ¶ 149.)

During the autopsy, Dr. Sheridan also scraped the Plaintiff's fingernails, a standard practice during autopsies in looking for evidence.  Dr. Sheridan testified in his deposition that he was "looking for any type of trace evidence, anything that might be adhered to the nails."  (Pl. Facts Gregonis and Sperber Mot. ¶ 47.)  This scraping process is significant because Plaintiff contends that blue fibers matching Plaintiff's shirt that Mr. Gregonis found on the victim's fingernails one month after her death should have been located by Dr. Sheridan. (Pl.'s Additional Material Facts ¶ 223.)  Because the blue fibers were not found until a month later, Plaintiff suggests that Mr. Gregonis may have planted the blue fibers on the victim's body.

After scraping the fingernails, Mr. Gregonis analyzed the scrapings and found that they contained one light blond hair and one dark hair.  (Pl. Facts Gregonis and Sperber Mot. ¶ 25.)  Plaintiff contends that the light blond hair was materially exculpatory information because later proceedings showed that the blond hair came from a third party.  (Pl. Facts Gregonis and Sperber Mot. ¶ 25.)  Neither Mr. Gregonis nor the other investigating officers pursued the blond hair evidence further.  (Pl.'s Additional Material Facts ¶ 367.)

After finishing the autopsy, Dr. Sheridan severed two of the victim's fingers for further processing by Mr. Gregonis.  (Pl.'s Additional Material Facts ¶ 223.) This is significant because Plaintiff contends that Dr. Sheridan and others were in close contact with the victim's fingers, but did not locate blue fibers on the fingernails.

///

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 5:17-00497-SJO (SPx)</u>     **DATE:** <u>September 3, 2019</u>

E.     <u>Interviews</u>

The detectives conducted interviews of about 34 individuals in the course of the investigation. (Pl.'s Facts Officers' Motion ¶ 49.)  In the early morning hours of August 11, 1993, Detectives Bradford and Navarro conducted the first interview with Plaintiff.  (Pl.'s Facts Officers' Motion ¶ 50.) The Officer Defendants contend that there was no policy in place to record interviews, but they sought to record as many interviews as possible.  (Pl.'s Facts Officers' Motion ¶ 68.)

During his interview, Plaintiff stated that he found the victim laying face-down.  (Pl.'s Facts Officers' Motion ¶ 51.)  He used a flashlight to examine her.  (Pl.'s Facts Officers' Motion ¶ 51.) He rolled her over and touched her and described as "stone cold."  (Pl.'s Facts Officers' Motion ¶ 51.)  He then sat down and held the victim's body in his arms.  (Pl.'s Facts Officers' Motion ¶ 52.) While he was holding her in his arms, Plaintiff stated that he noticed a brick lying by her head. He also stated that he noticed the brick had blood all over it and a piece of the victim's skull next to it.  (Pl.'s Facts Officers' Motion ¶ 57.)

Plaintiff also reported that a short time after finding the victim, the phone rang, and it was Eugene Price.  (Pl.'s Facts Officers' Motion ¶ 53.) Plaintiff explained that Mr. Price was the victim's boyfriend, who she had been seeing for the last couple of months.  (Pl.'s Facts Officers' Motion ¶ 53.)  There is some evidence in the record that Plaintiff may have been upset about his wife's relationship with Mr. Price.  (Pl.'s Facts Officers' Motion ¶ 95.)  Mr. Price is an important figure in the investigation, because Plaintiff suggests that he may have been a third party involved in the victim's murder.  (Pl.'s Additional Material Facts ¶ 376.)

During his interview, Plaintiff informed the detectives that he and the victim had frequent arguments over finances.  (Pl.'s Facts Officers' Motion ¶ 59.)  Plaintiff stated that the victim used to borrow money behind his back, which was a problem in their marriage.  (Pl.'s Facts Officers' Motion ¶¶ 62, 76.)  He also argued with his wife about calling him at work.  (Pl.'s Facts Officers' Motion ¶ 60.)  Some of the other interviews conducted by the Officer Defendants confirmed Plaintiff and the victim's financial problems and arguments.  (Pl.'s Facts Officers' Motion ¶¶ 62, 76, 84, 94.)

While Plaintiff was at the Sheriff's station, Detectives Navarro and Bradford decided not to scrape Plaintiff's fingernails for evidence.  (Pl.'s Facts Officers' Motion ¶ 65.)  They believed at the time that it was not necessary because Plaintiff admitted that he had contact with the victim's body. (Pl.'s Facts Officers' Motion ¶ 65.)  Plaintiff contends that the victim had a number of defensive wounds, and scraping Plaintiff's fingernails would have revealed evidence of Plaintiff's innocence. (Pl.'s Facts Officers' Motion ¶ 65.)

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 5:17-00497-SJO (SPx)          DATE: September 3, 2019

After the interview of Plaintiff and the other interviews conducted, Detectives Navarro, Parent, and Bradford produced reports on their investigation.  The reports were variously dated between August 13, 1993 and August 31, 1993.  (Pl.'s Facts Officers' Motion ¶ 66.)  Detectives Navarro, Parent, and Bradford contend that the interviews were completed to the best of their ability and that the reports contained all of the information that they deemed to be relevant and exculpatory. (Pl.'s Facts Officers' Motion ¶ 67.) Plaintiff disputes this and states that the Officer Defendant did not conduct as many interviews as they should have, and also conducted cursory interviews in some circumstances. (Pl.'s Facts Officers' Motion ¶ 67.)  Plaintiff takes particular issue with the Officer Defendants' failure to investigate whether a third party could have committed the murder. (Pl.'s Additional Material Facts ¶ 376.) Plaintiff suggests that Mr. Price should have been investigated as a suspect.  (Pl.'s Additional Material Facts ¶ 376.) Plaintiff also sets out other leads that the Officer Defendants did not pursue, such as analyzing the motor home for evidence of an argument between Mr. Price and the victim or following up on a lead about a red or blue car at the property (Pl.'s Facts Officers' Motion ¶¶ 89, 123, 124.)

On September 3, 1993, the Officer Defendants administered a polygraph exam to Plaintiff.  (Pl.'s Facts Officers' Motion ¶ 93.)  The parties dispute the admissibility of this exam, but it is undisputed that the exam itself took place.  Because of the objections surrounding the polygraph exam, the Court does not use evidence of the results in reaching its conclusions below.

      F.    Time and Distance Driving Test

On August 17, 1993, Detective Navarro conducted a time and distance driving test from Plaintiff's place of work, Schuller Manufacturing in Corona, to the Richards' residence.  (Pl.'s Facts Officers' Motion ¶ 97.)  On the night of the murder, Plaintiff had been working the night shift, from 3 pm to 11 pm.  (Pl.'s Additional Material Facts ¶ 137.)  Detective Navarro subsequently wrote a report called the "time and distance test."  (Pl.'s Additional Material Facts ¶ 203.)

Detective Navarro conducted the test to determine if Plaintiff could have left his workplace and killed Ms. Richards in the timeframe that the Officer Defendants suspected, between when he left work around 11 pm, the phone call Plaintiff received from Mr. Price at 11:55 pm, and Plaintiff's first phone call to the police at 11:58 pm.  (Pl.'s Facts Officers' Motion ¶ 97; Pl.'s Additional Material Facts ¶ 140.)

During this driving test, Detective Navarro approximated that it took around 41 minutes to reach Plaintiff's residence, although it is undisputed that he only drove to the bottom of the hill where Plaintiff resided.  (Pl.'s Facts Officers' Motion ¶¶ 97-98, 101.)  Plaintiff contends that Officer Navarro conducted a biased experiment to try to create as much evidence as possible that would

MINUTES FORM 11
CIVIL GEN                                    Page 10 of   35                    Initials of Preparer _____

_____ : _____

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:   CV 5:17-00497-SJO (SPx)            DATE: September 3, 2019**

confirm that Plaintiff had enough time to leave his office, kill his wife, and then contact police. (Pl.'s Facts Officers' Motion ¶ 99; Pl.'s Additional Material Facts ¶ 204.)

      H.    <u>Blue Fiber Discovery</u>

On September 13, 1993, using a microscope, Mr. Gregonis examined two fingertips that were severed from the victim's hand during the autopsy.  (Pl. Facts Gregonis and Sperber Mot. ¶ 26.) At this time, he discovered light blue fibers on the fingernails.  (Pl. Facts Gregonis and Sperber Mot. ¶ 27.)  On September 14, 1993, Mr. Gregonis videotaped his removal of the light blue fibers using a microscope. (Pl. Facts Gregonis and Sperber Mot. ¶ 27.)  Plaintiff contends that the blue fibers were not present on the fingernails before Mr. Gregonis analyzed the severed fingers, but that he discovered them afterwards, suggesting that Mr. Gregonis may have planted the blue fibers.   (Pl. Facts Gregonis and Sperber Mot. ¶ 28.)

Mr. Gregonis subsequently compared the blue fibers to a sample from Plaintiff's shirt and concluded that the blue fibers from the fingernails matched Plaintiff's shirt.  (Pl. Facts Gregonis and Sperber Mot. ¶ 28.)  According to Mr. Gregonis' notes, he had discarded other samples from Plaintiff's shirt.   (Pl. Facts Gregonis and Sperber Mot. ¶ 34.)

The parties dispute whether the blue fibers would have been visible during the initial processing of evidence.  Mr. Gregonis contends that the blue fibers were not visible, both because they are microscopic and because the fingernails were covered with blood and dirt at the crime scene.  (Pl. Facts Gregonis and Sperber Mot. ¶ 31.)  Plaintiff contends that the blue fibers were visible to the naked eye.   (Pl. Facts Gregonis and Sperber Mot. ¶ 31.)

The parties also dispute whether the blue fibers could have been located during the scraping of the victim's fingernails during the autopsy.  Mr. Gregonis contends that fingernail scrapings are collected but not examined, while Plaintiff argues that the blue fibers  would have been observed during the process of scraping and severing fingernails.  (Pl. Facts Gregonis and Sperber Mot. ¶ 32.)  Dr. Sheridan also testified that had he seen blue fibers, he would have included them in evidence.  (Pl. Facts Gregonis and Sperber Mot. ¶ 50.)

      G.    <u>Blood Spatter Experiment</u>

In addition to the purported discovery of the blue fiber on Plaintiff's fingernails, Mr. Gregonis was also involved in analyzing blood stains and blood spatter at the crime scene.  (Pl. Facts Gregonis and Sperber Mot. ¶ 37.)  He made several findings with respect to the blood stains on the victim's pants.  (Pl. Facts Gregonis and Sperber Mot. ¶¶ 38-39.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)        **DATE:** September 3, 2019

The core issue with respect to Mr. Gregonis' blood stain investigation concerns an experiment that he conducted, the results of which suggested that Plaintiff committed the murder.  Mr. Gregonis conducted an experiment where he reconstructed the blood spatter that he believed to have happened at the crime scene.  (Pl. Facts Gregonis and Sperber Mot. ¶ 40.)  This experiment was conducted in part because Mr. Gregonis sought to explain how there was relatively little blood spatter on Plaintiff, despite a significant amount of blood at the crime scene.  (Pl. Facts Gregonis and Sperber Mot. ¶ 42.)  The experiment involved Mr. Gregonis filling a dummy with fake blood and dropping a large rock on the dummy to recreate the blood spatter at the crime scene.  Plaintiff contends that the reconstruction and the experiment were baseless and scientifically indefensible. (Pl. Facts Gregonis and Sperber Mot. ¶ 42.)

It is undisputed that Mr. Gregonis had training and experience prior to August 1993 in bloodstain analysis, including co-teaching a course called "Bloodstain Pattern Interpretation."  (Pl. Facts Gregonis and Sperber Mot. ¶ 46.)  It is also undisputed that Detective Bradford participated in the blood spatter experiment conducted by Mr. Gregonis.  (Pl.'s Facts Officers' Motion ¶ 102.)

    I.    <u>Bite Mark Evidence</u>

A key piece of evidence in this matter was a bite mark on the victim's right hand.  Before the fourth trial, Plaintiff retained Dr. Thomas Golden, a forensic ondologist, to opine regarding the alleged bite mark on the victim's hand.    (Pl.'s Facts Officers' Motion ¶ 111; Pl. Facts Gregonis and Sperber Mot. ¶ 52.)  Detective Parent subsequently contacted Dr. Norman Sperber to examine the bite mark on Plaintiff's hand.    (Pl.'s Facts Officers' Motion ¶ 112.) After Detective Parent contacted him, the County of San Bernardino hired Dr. Sperber to serve as an independent expert witness based on his examination of the evidence. (Pl. Facts Gregonis and Sperber Mot. ¶ 54.)

On May 21, 1997, Detective Parent sent photographs of the bite mark to Dr. Sperber for his review. (Pl.'s Additional Material Facts ¶ 206.)  On May 30, 1997, Detective Parent accompanied Dr. Sperber to the West Valley Detention Center to take a forensic dental impression of Plaintiff's teeth.    (Pl.'s Facts Officers' Motion ¶ 114.)  Dr. Sperber did not review other material in the investigation before opining on the bite mark, including evidence from the autopsy. (Pl. Facts Gregonis and Sperber Mot. ¶ 57.)  Dr. Sperber did not review photographs of the crime scene or photographs of the victim's other injuries.  (Pl. Facts Gregonis and Sperber Mot. ¶ 58.)

On June 7, 1997, Dr. Sperber sent a letter to the District Attorney prosecuting Plaintiff.  The letter noted: "The photographs are not taken at right angles (perpendicular) to the bitemark, nor is the scale (ruler) at right angles to the bitemark. These factors can lead to distortions in the

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 5:17-00497-SJO (SPx)      DATE: September 3, 2019**

photographs." The letter also concluded, in relevant part: "the photographs are not of an ideal quality, and yet I cannot rule out the fact that his teeth could have been capable of producing the bitemark." (Pl.'s Facts Officers' Motion ¶ 115.)  Dr. Sperber concluded: "[Richards'] remaining lower teeth are consistent with the bitemark. I rate comparisons as follows, with increasing degree of certainty: Not consistent, consistent, possible, and reasonable dental certainty."  (Pl.'s Facts Officers' Motion ¶ 115.)  Plaintiff has consistently argued that the photographs of the bite marks are distorted and that Dr. Sperber could not reach any conclusions with respect to the shape of the bite mark based on the photographers.

Plaintiff was tried four times for the murder of his wife, and Dr. Sperber proved to be a key witness at the fourth trial.  The first trial ended in a mistrial due to a hung jury.  During the second trial, the Judge recused himself early in the proceedings, either just before or during voir dire.  At the third trial, there was a mistrial due to a hung jury.  Finally, the fourth proceedings, the only proceedings in which the prosecution presented the bite mark evidence and Dr. Sperber's testimony, ended in a conviction.   (Pl.'s Facts Officers' Motion ¶ 110.)

Plaintiff attempted to challenge Dr. Sperber's testimony with the testimony of Dr. Golden. (Pl. Facts Gregonis and Sperber Mot. ¶¶ 82-85.)  Despite this testimony, the jury convicted Plaintiff of his wife's murder.

K.     Subsequent Proceedings and Plaintiff's Exoneration

After his conviction, Plaintiff brought two habeas petitions in state court.  In  2007, he brought a habeas petition in San Bernardino County Superior Court, claiming that his 1997 murder conviction was based on false evidence. Plaintiff  presented evidence challenging the blue cotton fibers found under Pamela's fingernail and new DNA evidence taken from the cinder block and from a hair found under one of Pamela's fingernails.  Plaintiff also presented new photographs of the bite mark and used new technology to analyze the bite mark.  The new photographs and techniques raised questions about Dr. Sperber's analysis and testimony.[3]

As part of the first habeas petition, Dr. Sperber repudiated some of the testimony that he had offered at the fourth trial. He concluded: "With the benefit of all of the photographs [of the crime scene and Pamela's injuries], and with my added experience, I would not now testify as I did in 1997," and "I cannot now say with certainty that the injury on the victim's hand is a human bite

_____

[3]  For a more detailed summary of the state habeas proceedings, the Court directs the parties to the California Supreme Court's decision in the appeal of the second habeas petition.  *See In re Richards*, 63 Cal. 4th 291 (2016).

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  CV 5:17-00497-SJO (SPx)          DATE: September 3, 2019

mark injury." *In re Richards*, 63 Cal. 4th at 305.  He also stated: "My opinion today is that [petitioner's] teeth ... are not consistent with the lesion on the hand."  *Id*. at 306.

Based on this, the trial court granted the habeas petition.  The California Supreme Court overturned this decision.  The Court concluded that Dr. Sperber's trial testimony stating that Plaintiff's bite mark matched the bite mark on the victim's hand was not "false" within the meaning of the California habeas statute.  *See* Cal. Penal Code § 1473.

The California Legislature subsequently enacted a new law that amended the California habeas statute, stating: "For purposes of this section, 'false evidence' shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." *In re Richards*, 63 Cal. 4th at 309 (quoting Cal. Penal Code § 1473).

Plaintiff then brought a second habeas proceeding on the basis of this amendment.  Ultimately, the California Supreme Court vacated Plaintiff's conviction, holding that Dr. Sperber's expert opinion constituted "false evidence" under the terms of the amended California habeas statute. The Court also concluded that Plaintiff had been prejudiced by Dr. Sperber's expert evidence because the bite mark evidence was central to his conviction:  "with the exception of the bite mark evidence, the defense had a substantial response to much of the prosecution's evidence against petitioner. Under these unique circumstances, it is reasonably probable that the false evidence presented by Dr. Sperber at petitioner's 1997 jury trial affected the outcome of that proceeding." *In re Richards*, 63 Cal. 4th at 315.

L.    The Instant Lawsuit

After his conviction was vacated and he was freed from incarceration, Plaintiff commenced the instant lawsuit on March 16, 2017.  In the Third Amended Complaint ("TAC"), Plaintiff brings 42 U.S.C. Section 1983 causes of action against Officer Nourse, Dr. Sperber, Detective Bradford, Detective Parent, Detective Navarro, and Mr. Gregonis for constitutional violations committed during the course of the investigation and prosecution of Plaintiff.  (TAC ¶¶ 76-83, ECF No. 65.) According to Plaintiff, these Defendants engaged in a sustained effort to manipulate evidence in order to secure his conviction.  Plaintiff also brings 42 U.S.C. Section 1983 causes of action against the County of San Bernardino.  (TAC ¶¶ 84-93.)  Plaintiff contends that the County's customs and policies, and the absence of certain customs and policies, resulted in the alleged constitutional violations that he suffered.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)        **DATE:** September 3, 2019

In the instant Motions for summary judgment, Officer Nourse, Dr. Sperber, Detective Bradford, Detective Navarro, Detective Parent, and Mr. Gregonis primarily contend that they did not recklessly or deliberately falsify evidence in violation of Plaintiff's constitutional rights. The County of San Bernardino primarily contends that the polices or customs in place in 1993 and 1994 did not lead to the investigating officers' violation of Plaintiff's constitutional rights.

These proceedings followed.

II.    DISCUSSION

   A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party does not need to produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* "Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and f]actual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248.   At the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See id.* at 249.  A court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

   B.   Legal Standards for Section 1983 Claims

There are four types of Section 1983 claims that Plaintiff brings in the instant case.  First, Plaintiff contends that some Defendants suppressed and failed to disclose favorable evidence to him in violation of the Due Process Clause of the Fifth and Fourteenth Amendments (i.e. they committed *Brady* violations).  Second, Plaintiff contends that some Defendants failed to preserve and gather evidence that would have revealed his innocence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.  Third, Plaintiff contends that some Defendants deliberately fabricated and manipulated evidence in violation of the Fourth, Fifth and Fourteenth Amendments.  Fourth, Plaintiff brings a *Monell* claim against the County of San Bernardino, contending that the County's policies and customs, and the absence of certain policies and customs, resulted in the constitutional violations that took place in the instant action.

The standards for each of these claims are as follows.

   1.   Section 1983 Claim Based on *Brady* Violation

Plaintiff brings a cause of action based on Defendants' deliberate or reckless suppression of evidence in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. *See Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).  To prevail on these claims, Plaintiff must show that: (1) Defendants suppressed evidence that was favorable to Plaintiff, (2) the suppression harmed Plaintiffs, and (3) Defendants acted with deliberate indifference to Plaintiff's rights or for the truth.  *See id*; *see also* Ninth Circuit Model Jury Instructions 9.33A, Particular Rights – Fourteenth Amendment – Due Process – Deliberate or Reckless Suppression of Evidence.

Plaintiff is "not...required to show that officers acted in bad faith in withholding material, exculpatory evidence . . . . Instead, a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison*, 570 F.3d at 1088.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

The second prong of a Section 1983 cause of action under *Brady* is akin to a causation requirement. To show that Defendants' suppression of evidence harmed him, Plaintiff must show that: (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the "proximate cause" or "legal cause" of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question. *See Spencer*, 857 F.3d at 798.

> 2.    Section 1983 Claim Based On Failure To Preserve and Investigate Potentially Exculpatory Evidence

Plaintiff's next set of claims relate to Defendants' failure to preserve and gather potentially exculpatory evidence, including that some Defendants purportedly did not secure the crime scene from contamination.  "The duty to preserve evidence is limited to material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence." *Cooper v. Calderon*, 255 F.3d 1104, 1113 (9th Cir. 2001) (quoting *Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997)).  Even if the evidence is "essential to and determinative of the outcome of the case, no due process violation occurs absent a showing of **bad faith**." *Illinois v. Fisher*, 540 U.S. 544, 547–49 (2004) (emphasis added).

Much like a Section 1983 claim based on a violation of *Brady*, a failure to investigate claim requires that Plaintiff show that he suffered prejudice because of Defendants' conduct.  *See Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).   Plaintiff must show that the bad faith failure to investigate additional evidence caused his wrongful incarceration. *See Spencer*, 857 F.3d at 799-800.

> 3.    Section 1983 Claim Based on Deliberate Fabrication of Evidence

Plaintiff also brings a cause of action under Section 1983 based on Defendants' purported fabrication or manipulation of evidence.  "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001).

There are four types of deliberate fabrication clams.  Plaintiff must show either that: (1) Defendants deliberately fabricated evidence that was used to criminally charge, prosecute, or convict Plaintiff; (2) Defendants continued their investigation of Plaintiff despite the fact that they knew that Plaintiff was innocent and the results of the investigation were used to criminally charge, prosecute, or convict Plaintiff; (3) Defendants continued their investigation of Plaintiff and were

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: __CV 5:17-00497-SJO (SPx)__          DATE: _September 3, 2019_____

deliberately indifferent to Plaintiff's innocence and the results of the investigation were used to criminally charge, prosecute, or convict Plaintiff; or (4) Defendants used techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information that was used to criminally charge, prosecute, or convict Plaintiff. *See id*. at 1074-76.

As with the other causes of action summarized thus far, Plaintiff must show that Defendants' fabrication of evidence caused his conviction. *See Spencer*, 857 F.3d at 798. "Mere 'careless[ness]' is insufficient, as are mistakes of tone." *Id*. (quoting *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) and *Costanich v. Dep't of Social and Health Serv.*, 627 F.3d 1101, 1113 (9th Cir. 2010)). "Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim." *Id*. (citing *Black v. Montgomery County*, 835 F.3d 358, 371 (3d Cir. 2016)).

        4.      Section 1983 Claim Based on *Monell* Liability

Plaintiffs' final set of claims are *Monell* claims against the County of San Bernardino, which employed Defendants Gregonis, Dr. Sperber, and the Officer Defendants. To establish liability for governmental entities under *Monell*, Plaintiff must prove: (1) that he possessed a constitutional right of which he was deprived; (2) that the County had a policy; (3) that this policy amounts to deliberate indifference to Plaintiff's constitutional rights; and, (4) that the policy is the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Absent an official policy, *Monell* liability of a local governing body may attach when an officer or employee of the local governing entity commits a constitutional violation pursuant to a "longstanding practice or custom." *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

Inadequate training may also give rise to *Monell* liability under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish inadequate training, Plaintiff must show that: (1) he was deprived of a constitutional right; (2) the County had a training policy that amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact; and (3) Plaintiff's constitutional injury would have been avoided had the County properly trained those officers. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (internal quotations and alterations omitted).

///
///
///
///

MINUTES FORM 11
CIVIL GEN                              Page 18 of  35                    Initials of Preparer _____

___ : ___

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: **CV 5:17-00497-SJO (SPx)**      DATE: **September 3, 2019**

C.      Application

1.      Criminalist Dan Gregonis

The Court begins by analyzing Plaintiff's allegations against Mr. Gregonis, a criminalist and a forensic ondologist employed by the County of San Bernardino.  He processed the crime scene, examined the victim's dead body for evidence, and analyzed blood spatter on Plaintiff's body.  According to Plaintiff, Mr. Gregonis violated the Constitution by: (1) manipulating fingernail samples from the victim's body to find blue fibers on the victim's body that matched Plaintiff's shirt, and (2) conducting a biased and unreliable blood spatter analysis that implicated Plaintiff.  Plaintiff brings a fabrication of evidence claim against Mr. Gregonis along the lines of *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).  The Court addresses the merits of these two claims in turn.

a.      Fabrication of Evidence and Blue Fibers

The Court **GRANTS** summary judgment to Mr. Gregonis with respect to the blue fiber allegations.  Plaintiff does not point to any evidence that Mr. Gregonis planted blue fibers on the victim's fingernails nor does he show that Mr. Gregonis had a motive to deliberately  fabricate evidence in the first place.  Plaintiff also cannot show that Mr. Gregonis' purported manipulation of the evidence caused the harm that he faced – his conviction and wrongful incarceration.

i.      Lack of Evidence of Fabrication

As a threshold matter, the Court notes that there is no evidence in the record supporting Plaintiff's theory that Mr. Gregonis planted blue fibers on the victim's body.  Plaintiff asks this Court to draw this conclusion from the mere fact that, at the initial stages of the investigation, no investigating officer in close proximity to the victim documented blue fibers on the victim's fingernails.  Several weeks after the fact, Mr. Gregonis discovered the blue fibers.

Plaintiff's theory amounts to pure conjecture.   There are several other, far more plausible explanations for the late discovery of the blue fibers on the victim's body.  For one, the fibers may not have been easily visible to the naked eye.  As the parties conceded at oral argument, the fibers were less than 1 cm in length.  (Rough Tr. Of Proceedings 85:24-86:25.)   Another explanation for the late discovery of the blue fibers is that although Dr. Sheridan and the other investigating officials initially missed the blue fibers, this may have been because their job was not to look for this type of evidence.  Mr. Gregonis, as the criminalist and the forensic ondologist, had the job to conduct a microscopic analysis.  During this analysis, Mr. Gregonis discovered the blue fibers.

Priority         ____
Send             ____
Enter            ____
Closed           ____
JS-5/JS-6        ____
Scan Only        ____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

Plaintiff's theory also suffers from another major deficiency: he is unable to point to facts that show that Mr. Gregonis had a motive to deliberately manipulate the evidence to convict Plaintiff. The lack of evidence showing motive is ultimately fatal to his cause of action against Mr. Gregonis.  *See Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). In *Caldwell*, a plaintiff successfully brought a deliberate fabrication claim against an officer that had stopped the plaintiff between six and nine times before the plaintiff's murder investigation by the same officer.  The plaintiff successfully demonstrated that the investigating officer was "out to get [him] after [the plaintiff] had reported the officer to the [Office of Citizen Complaints] for alleged abuses." *Id.* In the instant case, by contrast, there is no evidence that Mr. Gregonis had a motive to manipulate the blue fiber evidence other than Mr. Gregonis' motive to convict Plaintiff, who was a primary suspect in this case.   Under *Caldwell*, a plaintiff alleging the deliberate fabrication of evidence but that cannot produce direct evidence of the fabrication must point to facts establishing a motive beyond the desire to convict a defendant, such as a police officer's targeting of the plaintiff on prior occasions.  *Id.*  Plaintiff does not meet this standard.

Plaintiff insists that Mr. Gregonis should not be able to get away simply by producing  "self-serving statements and explanations regarding the absence of bad faith." (Gregonis and Sperber Mot. at 15.)  Be that as it may, on a motion for summary judgment, Plaintiff himself must point to evidence showing that Mr. Gregonis manipulated and planted evidence.  Plaintiff also must have evidence showing that Mr. Gregonis had a motive to manipulate and plant evidence to convict Plaintiff.  Although Mr. Gregonis brings the motion for summary judgment, Plaintiff still carries the burden of proof on a Section 1983 claim.  Plaintiff is not able to carry this burden.  Instead, Plaintiff only speculates as to a possible explanation for why Mr. Gregonis discovered the blue fibers at a later stage of the investigation.  Without further evidence supporting Plaintiff's theory, the Court grants summary judgment to Mr. Gregonis with respect to his alleged planting of blue fibers on the victim's body.

ii.    Causation

The Court also grants Mr. Gregonis summary judgment with respect to the blue fibers for a separate reason: Plaintiff does not carry his burden to show that the planting of blue fibers on the victim's body resulted in his conviction.  *See Spencer*, 857 F.3d at 799.

It is undisputed that Plaintiff faced three trials in this matter given to a jury for a verdict (and a fourth that was not given to the jury for a verdict).  In the first two trials, the prosecution presented significant evidence, including: (1) blue fibers on the victim's body that matched Plaintiff's shirt; (2) blood spatter on Plaintiff; and (3) the victim's time of death and how Plaintiff had the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:   CV 5:17-00497-SJO (SPx)          DATE: September 3, 2019

opportunity to kill her before calling police. Despite this evidence, the first two trials resulted in a hung jury. *See In re Richards*, 63 Cal. 4th at 300, 314–15. At the third trial where this matter was given to a jury, for the first time, the prosecution presented evidence of a bite mark on the victim's hand that purportedly matched Plaintiff's jaw. Dr. Sperber testified that he believed that the bite mark could have originated from Plaintiff. This jury convicted Plaintiff of his wife's murder. The logical inference from this is that the bite mark evidence, not the blue fiber evidence, was necessary to convict Plaintiff.

In his briefing in state court, Plaintiff himself acknowledged this central fact. *In re Richards*, 63 Cal. 4th at 321 ("In [Plaintiff's] most recent petition, he again noted that 'the difference between the first two unsuccessful trials and the third trial was the introduction of bite mark evidence through Dr. Sperber.'"). Moreover, the California Supreme Court held that Dr. Sperber's evidence, not the presence of blue fibers, was the reason that Plaintiff was convicted after his third trial. *See In re Richards*, 63 Cal. 4th at 313 ("In that context, the case against petitioner was entirely based on circumstantial evidence, and much of that evidence was heavily contested. Upon examination of this circumstantial evidence admitted against petitioner, it appears that Dr. Sperber's testimony was 'material' for purposes of section 1473."); *see also id.* at 321 ("[T]he fact that two prior juries hung without the bite mark evidence further suggests that admission of this evidence at the third trial was prejudicial, and I join the court in holding that Richards's conviction must be reversed.") (Corrigan, J. concurring)).

Accordingly, Plaintiff has not carried his burden of showing that any purported planting of the blue fibers resulted in his conviction.

         b.     Fabrication of Evidence With Respect To Bloodspatter Analysis

Plaintiff also takes issue with the blood spatter analysis conducted by Mr. Gregonis. Although there were only a few millimeter-sized spots on Plaintiff's shoes and jeans, the area around the victim's body had significant blood spatter. Despite the relative absence of blood on Plaintiff, Mr. Gregonis concluded that the blood spatter patterns on Plaintiff's right shoe and pants indicated that this clothing was in close proximity to an object impacting a bloody object. To support this conclusion, Mr. Gregonis conducted an experiment in which he filled a dummy with blood and bludgeoned the dummy in the way that he believed resembled the murder of Plaintiff's wife. According to Mr. Gregonis, the outcome of this experiment showed that Plaintiff could have committed the murder while avoiding having some blood spatter on his pants, because the bludgeoning object absorbed blood.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority    ____
Send        ____
Enter       ____
Closed      ____
JS-5/JS-6   ____
Scan Only   ____

**CASE NO.:  CV 5:17-00497-SJO (SPx)**        **DATE: September 3, 2019**

Plaintiff contends that Mr. Gregonis' experiment and his conclusions were biased and represented fabricated evidence, created to convict Plaintiff.  To support this conclusion, Plaintiff points to the purportedly spurious nature of Mr. Gregonis' blood spatter experiment.  Plaintiff also cites to the testimony of his own blood spatter expert who warned against drawing conclusions from Mr. Gregonis' analysis.

To prevail on a fabrication of evidence claim, Plaintiff must show either that: (1) Mr. Gregonis deliberately fabricated evidence; (2) Mr. Gregonis continued his investigation despite knowing that Plaintiff was innocent; or (3) Mr. Gregonis used techniques that were so abusive that he knew or should have known that those techniques would yield false information.  *See Devereaux*, 263 F.3d at 1074-76. Plaintiff also must show that Mr. Gregonis' manipulation of the blood spatter evidence **caused** Plaintiff's conviction and incarceration.  *See Spencer*, 857 F.3d at 799.

For the reasons set out below, Plaintiff does not carry his burden with respect to any of these types of claims.

        i.      <u>Deliberate Fabrication of Blood Spatter By Mr. Gregonis</u>

The Court begins with the first type of claim.  There is no evidence in the record that Mr. Gregonis fabricated physical evidence, such as placing blood spatter where it did not otherwise exist. Moreover, Plaintiff does not point to evidence showing that Mr. Gregonis had a motive to manipulate his blood spatter analysis.  *See Caldwell*, 889 F.3d at 1112.

        ii.      <u>Continuing Investigation of Blood Spatter Despite Knowing That Plaintiff Was Innocent</u>

As for the second type of fabrication of evidence claim, Mr. Gregonis had no reason to suspect that Plaintiff was not guilty when he conducted his analysis. At most, he knew that the police had arrested Plaintiff based on probable cause.  Mr. Gregonis did not continue his investigation into the blood spatter with the knowledge that Plaintiff was innocent.

        iii.     <u>Use of Abusive and Unreliable Techniques</u>

As for the third type of fabrication of evidence claim, Plaintiff cannot point to any evidence showing that Mr. Gregonis acted with disregard for the truth or with the knowledge that his techniques would yield false information. By contrast, the undisputed facts show that Mr. Gregonis was educated and taught courses on "Bloodstain Pattern Interpretation."  He also consulted

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  **CV 5:17-00497-SJO (SPx)**          DATE: September 3, 2019

several available resources to design his blood spatter experiment.  (Pl.'s Facts Gregonis and Sperber Mot. ¶ 46.)

At worst, Mr. Gregonis' techniques were questionable.  However, questionable techniques do not amount to a constitutional violation under Section 1983.  *See Brewer v. Hayne*, 860 F.3d 819, 825-26 (5th Cir. 2017). Moreover, if Mr. Gregonis' testimony and methods were as unreliable as Plaintiff insists they were, Plaintiff's defense counsel should have objected to them at trial or brought a motion on *Daubert* grounds to exclude Mr. Gregonis' expert testimony.  This did not occur.   A Section 1983 action is not a remedy for the introduction of inadmissible expert testimony.

The instant case closely resembles the Fifth Circuit's decision in *Brewer*.  There, two exonerated plaintiffs brought a Section 1983 action against forensic experts who had testified at their murder trials concerning bite marks on the victims' bodies.  Subsequent proceedings, and the advent of new technology, revealed the experts' bite mark testimony to be unreliable.  A state court vacated the *Brewer* Plaintiffs's conviction. Despite this, the Fifth Circuit emphasized the high bar to meet on a Section 1983 claim based on purportedly spurious expert testimony: "Plaintiffs are thus tasked with demonstrating not that the evidence Defendants presented is no longer considered trustworthy, but rather that Defendants intentionally created false evidence or intentionally produced evidence that they knew to be scientifically inaccurate by the standards of the day." *Brewer*, 860 F.3d at 824. The Fifth Circuit went on to conclude that while the bite mark analysis may have been negligent, the *Brewer* Plaintiffs had not met the higher standard required by Section 1983.  *Id*. at 825-26.

The same principle applies here.  As in *Brewer*, the standard for showing an expert's reckless disregard or deliberate indifference for the truth is high.  *See id*.  Instead of pointing out facts that allow Plaintiff to meet this heightened standard, Plaintiff relies on the simple fact that the California Supreme Court vacated his conviction.  This is not enough to carry Plaintiff's burden on a claim under Section 1983.

                                iv.    Causation

As a final matter, even if Plaintiff could show that Mr. Gregonis deliberately fabricated the blood spatter experiment, Plaintiff still would lose on causation grounds for the same reasons analyzed previously.  Plaintiff cannot show that the biased blood spatter experiment caused the conviction that the California Supreme Court ultimately overturned.  The prosecution presented this blood spatter evidence at Plaintiff's first two trials, which resulted in hung juries.  The third trial, where the only material difference was the use of bite mark evidence, resulted in Plaintiff's conviction.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority      ____
Send          ____
Enter         ____
Closed        ____
JS-5/JS-6     ____
Scan Only     ____

CASE NO.:   CV 5:17-00497-SJO (SPx)          DATE: September 3, 2019

The bite mark evidence, not the blood spatter evidence, primarily caused Plaintiff's wrongful conviction.

    c.    <u>Mr. Gregonis and The Other Defendants</u>

Plaintiff finally contends that Mr. Gregonis participated in the constitutional violations committed by the Officer Defendants, including the failure to process the crime scene, the failure to preserve and collect evidence, and the destruction of evidence. Because the Court grants summary judgment to the Officer Defendants, the Court also grants summary judgment to Mr. Gregonis on this issue.

    2.    <u>Dr. Norman Sperber</u>

The Court next analyzes the purported constitutional violations committed by Dr. Sperber whose expert analysis was the central cause of Plaintiff's conviction. Plaintiff contends that Dr. Sperber violated the Due Process Clause by producing incorrect and baseless forensic conclusions about the bite mark on the victim's hand. Dr. Sperber also purportedly used a distorted photograph to reach these conclusions. In 2014, using new evidence and techniques to analyze the photographs of the bite mark, Dr. Sperber filed a declaration in Plaintiff's state habeas proceedings stating that, "'[w]ith the benefit of all of the photographs [of the crime scene and Pamela's injuries], and with my added experience, I would not now testify as I did in 1997,' and 'I cannot now say with certainty that the injury on the victim's hand is a human bite mark injury.'" *In re Richards*, 63 Cal. 4th at 305.

The Court addresses whether Dr. Sperber's testimony and his recanting of that testimony reveals that he deliberately fabricated evidence in 1997. The Court holds that it does not.

    a.    <u>State Action</u>

The Court begins by addressing whether Plaintiff can bring an action against Dr. Sperber in the first place, as Dr. Sperber was a private party hired by the County of San Bernardino to provide expert analysis at Plaintiff's fourth trial.

Although neither the Supreme Court nor the Ninth Circuit have reached the specific issue of whether private forensic experts working for the prosecution are "state actors," other Circuits have found that they are. *See Brewer*, 860 F.3d at 824 ("Defendants, as consulting forensic experts, were engaged in the criminal investigative functions of the state protected at common law and are here entitled to assert qualified immunity."); *Moldowan v. City of Warren*, 578 F.3d 351, 372 (6th

MINUTES FORM 11
CIVIL GEN
____ : ____
Initials of Preparer _____

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  CV 5:17-00497-SJO (SPx)        **DATE:** September 3, 2019

Cir. 2009) (holding that a forensic investigator testifying on behalf of the state is akin to an investigating law enforcement officer).

The Court is persuaded by the analysis of these other Circuits.  "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).  At the time that Dr. Sperber conducted his bite mark investigation, he had been hired by the County prosecuting Plaintiff and was undertaking the "criminal investigative functions of the state."  *Brewer*, 860 F.2d at 824.  Dr. Sperber was a state actor for purposes of Section 1983 analysis.

> b.    Fabrication Of Evidence and Bite Marks

The Court next determines if Plaintiff can point to evidence showing that Dr. Sperber fabricated evidence concerning the bite mark.  As with the blood spatter claim against Mr. Gregonis, Plaintiff must show either that: (1) Dr. Sperber deliberately fabricated evidence; (2) Dr. Sperber continued his investigation despite knowing that Plaintiff was innocent; or (3) Dr. Sperber used techniques that were so abusive that he knew or should have known that those techniques would yield false information.[4]  *See Devereaux*, 263 F.3d at 1074-76.

The Court can dismiss the first two types of claims quickly.  There is no evidence that Dr. Sperber himself altered physical evidence or that he had knowledge of Plaintiff's innocence at the time of his testimony.  Plaintiff also does not point to evidence that Dr. Sperber had a motive to convict Plaintiff, aside from the motivation of law enforcement to convict a suspect that they have arrested based on probable cause. *See Caldwell*, 889 F.3d at 1112.  Dr. Sperber only knew that Plaintiff was being tried for a murder and that law enforcement had probable cause to bring a prosecution.

As for the use of abusive techniques, Plaintiff does not carry his burden to show that Dr. Sperber's analysis was so unreliable that he knew it would yield false information.  As a forensic ondontologist – a person that applies dental science to legal investigations – Dr. Sperber was qualified to conduct the bite mark analysis. Dr. Sperber ultimately stated that he could not rule out that Plaintiff's teeth produced a bite mark on the victim's body.  He also emphasized that one particular tooth mark was similar to Plaintiff's tooth.  Despite reaching this conclusion, Dr. Sperber carefully limited his findings, suggesting in his expert report that his analysis was limited by the quality of

---

[4]  Assuming that Plaintiff can show that Dr. Sperber fabricated his expert testimony, Plaintiff can demonstrate causation for the reasons summarized above:  Dr. Sperber's bite mark testimony was vital to Plaintiff's conviction.

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:  CV 5:17-00497-SJO (SPx)**          **DATE:** September 3, 2019

the photographs: "The photographs are not taken at right angles (perpendicular) to the bitemark, nor is the scale (ruler) at right angles to the bite mark.  These factors can lead to distortions in the photographs."  Dr. Sperber also never concluded that the bite marks were an exact match of Plaintiff's.  Instead, he stated that "the photographs are not of an ideal quality, and yet I cannot rule out the fact that [Plaintiff's] teeth **could have** been capable of producing the bitemark."

As with Mr. Gregonis' blood spatter experiment, Plaintiff's defense attorney could have objected to Dr. Sperber's testimony and raised issues concerning Dr. Sperber's expert methodology on a *Daubert* motion.  This did not take place.  (Rough Tr. Of Proceedings at 85:8-14.)  Plaintiff also could take issue with the district attorney for presenting Dr. Sperber's testimony in the first place.  Even though Dr. Sperber limited his findings and did not reach the conclusion that the bite mark matched Plaintiff – he only concluded that he could not rule out Plaintiff as the source of the bite mark – the district attorney still decided to call Dr. Sperber as an expert witness.

Plaintiff, however, turns his attention to Dr. Sperber.  Unfortunately for Plaintiff, he does not carry his burden to establish that Dr. Sperber used methodology that was so spurious that it amounts to a constitutional violation.  Indeed, the allegations against Dr. Sperber resemble the allegations against the experts in *Brewer*, analyzed above. As with the *Brewer* experts, there is nothing that shows that Dr. Sperber's techniques were unsound when judged against the techniques utilized by experts at the time of Plaintiff's trial.  Dr. Sperber was always careful to qualify his opinion and state that he was relying on the best technology that was available to him.  *See Brewer*, 860 F.3d at 825-26.  Accordingly, the Court cannot conclude that Dr. Sperber's actions were so abusive that his expert analysis amounted to falsification of information.

Therefore, the Court **GRANTS** summary judgment to Defendant Dr. Sperber.

### 3.    Patrol Officer Nourse

The Court next analyzes the Section 1983 claims brought against Patrol Officer Mark Nourse, the first officer to respond to the crime scene.  Plaintiff alleges that Officer Nourse failed to disclose exculpatory evidence to Plaintiff and that he failed to investigate and preserve exculpatory evidence.  Plaintiff also contends that Officer Nourse fabricated evidence at the crime scene.  The Court addresses each of the claims in turn.

### a.    Exculpatory Evidence

According to Plaintiff, Officer Nourse falsely testified at trial that he had a medical background and training in the military.  With this purportedly false testimony, Officer Nourse was improperly able

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

to opine as to the condition of the victim's body relative to the time of death without having the expertise required to give an opinion on this topic.

To the extent that Plaintiff brings a claim against Officer Nourse for false testimony, this is untenable as a cause of action. Officer Nourse is entitled to absolute immunity for testimony that he gave at trial. *See Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241 (9th Cir. 2015).

Additionally, the Court is not persuaded that the information that Officer Nourse purportedly failed to disclose – his lack of medical training and military background – was *Brady* material. Plaintiff's defense team ostensibly would have used this information to cross-examine Officer Nourse and impeach him. Although impeachment evidence can be a *Brady* violation, *see United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009), it is unclear if the evidence concerning Officer Nourse's background was central to the prosecution's case. Officer Nourse was one witness at the trial and the prosecution presented significant other evidence beyond Officer Nourse's testimony, including the bite mark evidence. Indeed, the bite mark evidence, not Officer Nourse's testimony, was the central reason that Plaintiff was convicted. *See In re Richards*, 63 Cal. 4th at 315.

        b.      Failure to Preserve Crime Scene and Gather Exculpatory Evidence

As the first responder to the crime scene, Officer Nourse purportedly failed to cordon off the body or the crime scene after he discovered the victim. He also did not ensure that Plaintiff's dogs stayed away from the crime scene when the dogs appeared to be interfering with the victim's body. Officer Nourse, along with the other detectives, decided to continue the investigation the next morning, so that sunlight could aid them in this investigation.

When considering the constitutional obligations of law enforcement officials "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a plaintiff must show that the law enforcement officials acted in "bad faith." *Youngblood*, 488 U.S. at 57. Here, Officer Nourse operated as well as he could under the circumstances. There is no evidence of "bad faith." In the extreme darkness of the middle of the night, Officer Nourse served as a first responder, assessed whether the victim was dead or not, and called for back-up from homicide detectives. He attempted to prevent the dogs from disturbing the crime scene, and made a judgment call to not call animal control. In these circumstances, there is no evidence that Officer Nourse deliberately took actions to conceal evidence that might have exonerated Plaintiff.

Plaintiff also does not carry his burden to show that Officer Nourse's failure to preserve the crime scene prejudiced him in some way. *Youngblood*, 488 U.S. 51 at 57. As noted *supra*, the

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

California Supreme Court concluded that the bite mark evidence constituted the primary reason that Plaintiff was convicted.  Plaintiff has not shown that there was potential evidence at the crime scene that would have helped him respond to the bite mark evidence (or that otherwise would have helped him avoid a conviction).  In fact, the California Supreme Court held that the defense team already had access to significant other evidence that rebutted the prosecution's theory and resulted in two mistrials.  *In re Richards*, 63 Cal. 4th at 315.  Plaintiff, however, could not adequately rebut the bite mark evidence.  Accordingly, Plaintiff does not show that Officer Nourse's purported missteps with respect to preserving the crime scene prejudiced Plaintiff.

Officer Nourse is entitled to summary judgment as to allegations that he failed to preserve the crime scene and gather exculpatory evidence.

                    c.    Fabrication Of Evidence

Plaintiff next contends that Officer Nourse fabricated evidence.  He purportedly made a range of false statements in his initial report of the crime, including statements that "the victim did not appear to be dead very long"; "she was not warm but not cold"; "there were no signs of lividity"; "no signs of any rigor mortis"; "the body was still very soft and pliable"; "a lot of the blood was still very damp and even wet in spots"; "there was very little moonlight if any as the sky was very cloud and overcast"; and "her face, scalp area and her hair was covered to a large extent with fresh blood." (Pl.'s Additional Material Facts ¶ 142-43.)  He subsequently prepared a report on August 27, 1993 that contained additional purportedly false statements.  (Pl.'s Additional Material Facts ¶ 144.)

Officer Nourse's statements are matters of opinion and are statements that he could make as a lay officer with no medical training.  As the first responder on the scene, he had to determine if the victim was dead and then had to begin an investigation.  According to his report, he assessed whether the victim was indeed dead, made an initial determination of whether the victim had recently deceased, and sought to preserve the crime scene to the best of his ability.  There is no evidence in the record that Officer Nourse deliberately fabricated any of the statements in his report.

Moreover, as noted previously, Officer Nourse's observations about the victim's body did not cause the harm that Plaintiff faced.  There was significant other evidence presented at Plaintiff's fourth trial, most notably the bite mark evidence, which resulted in Plaintiff's conviction.  Officer Nourse's actions had little to do with that evidence.

                                                                              ___ : ___

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** CV 5:17-00497-SJO (SPx)  **DATE:** September 3, 2019

Finally, Plaintiff does not point to evidence that Officer Nourse had a motive to pursue and convict Plaintiff, aside from conclusory allegations that Officer Nourse did not like how Plaintiff looked and had made up his mind that Plaintiff was the perpetrator. *See Caldwell*, 889 F.3d at 1112. Without a motive, Plaintiff has difficulty carrying his burden to show that Officer Nourse deliberately fabricated statements in his report.

The Court **GRANTS** summary judgment to Officer Nourse as to the fabrication of evidence claim.

### 3. Detective Parent

Detective Parent served as one of the primary homicide detectives investigating the murder of Pamela Richards. According to Plaintiff, Detective Parent violated Plaintiff's due process rights by failing to preserve evidence at the crime scene and fabricating evidence with Dr. Sperber.

#### a. Failure to Preserve Crime Scene and Gather Exculpatory Evidence

Like Officer Nourse, Detective Parent purportedly undertook several actions that failed to preserve the crime scene and precluded investigators from securing evidence that would have exonerated Plaintiff. After arriving at the crime scene, Detective Parent jointly decided with other investigating officers not to call the coroner until several hours had passed. According to Plaintiff, this prevented the officers from accurately assessing the time of Pamela's death, which would have helped Plaintiff avoid his conviction. Plaintiff was at work until around 11 pm on the night of the murder, and Plaintiff hoped to show that Pamela had been killed much earlier than that. Detective Parent also purportedly did not conduct an expansive search for fingerprints. As a result, Detective Parent only found fingerprints belonging to the victim, Plaintiff, and Officer Nourse.

When it comes to the failure to investigate exculpatory evidence, the Court reaches the same conclusion for Detective Parent as it did for Officer Nourse. Plaintiff cannot point to any evidence that Detective Parent operated in "bad faith" aside from the fact that the California Supreme Court vacated Plaintiff's conviction for the murder of his wife. Detective Parent, along with the other law enforcement officials, decided not to process the crime scene immediately because it was dark and remote. While a difficult decision, this is a judgment call that investigating officials have to make under the circumstances.

The same conclusion applies to Detective Parent's failure to investigate Eugene Price as a possible suspect. Not only did Detective Parent fail to interview Mr. Price, but he also purportedly did not check Mr. Price's alibis, including that Mr. Price was purportedly out shopping with his daughter at the time of the murder. Plaintiff's allegations against Detective Parent amount to

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  **CV 5:17-00497-SJO (SPx)**          DATE: September 3, 2019

speculation.  Indeed, no criminal investigation is perfect.  There are almost always steps that investigating officials do not take that they would take if they had access to unlimited resources. Moreover, even if Detective Parent had been negligent, which he was not, "[n]egligent failure to investigate other leads or suspects does not violate due process." *Wilson v. Lawrence Cty.*, 260 F.3d 946, 955 (8th Cir. 2001) (citing *Daniels v. Williams,* 474 U.S. 327, 334 (1986)).

There may also be valid reasons that Detective Parent and the other detectives did not investigate Mr. Price.  They have stated that they decided not to investigate Mr. Price because he appeared physically incapable of committing a murder, having burned his hands in a helicopter accident. (Pl.'s Facts Officers' Motion ¶ 118.)  Mr. Price's daughter also presented a potential alibi, noting that she and Mr. Price were looking for rentals in Camarillo on the evening of the murder.  (Pl.'s Facts Officers' Motion ¶ 121.)  The detectives had to make judgment calls and decisions that must take place in any criminal investigation.  Plaintiff has not shown that Detective Parent, or the other detectives, operated in "bad faith."

The absence of Detective Parent's "bad faith" distinguishes the instant case from *Wilson v. Lawrence County*, where the Eighth Circuit concluded that an intentional failure to investigate other leads, coupled with coercing a confession from a suspect, could give rise to a cause of action under Section 1983.  Here, Detective Parent did not coerce Plaintiff into giving a confession or plant inculpatory evidence at the crime scene.  Instead, Detective Parent concluded that Plaintiff was a suspect and then investigated him, using the judgment of a law enforcement official.

As a final matter, Plaintiff has not presented evidence to show that the failure to preserve the crime scene or the failure to investigate Eugene Price prejudiced him.  As noted previously, the bite mark evidence ultimately led to Plaintiff's conviction. It is unclear if there was evidence at the crime scene that could have challenged Dr. Sperber's conclusion with respect to the bite marks or could have otherwise helped Plaintiff to avoid a conviction.

           b.    Fabricating Evidence

Plaintiff's primary argument as to Detective Parent's fabrication of evidence is that Detective Parent participated in Dr. Sperber's constitutional violations.  Specifically, Detective Parent sent Dr. Sperber distorted photos and allowed him to visit Plaintiff in jail to get molds of Plaintiff's jaws.

As noted previously, Dr. Sperber did not intentionally produce false evidence.  The Court **GRANTS** Detective Parent summary judgment with respect to the bite mark allegations.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:   **CV 5:17-00497-SJO (SPx)**          DATE: September 3, 2019

       4.     Detective Bradford

Plaintiff brings claims against Detective Bradford that are similar to the ones he brings against Detective Parent.  Detective Bradford purportedly failed to investigate certain leads and gather exculpatory evidence.  He also purportedly fabricated evidence with regards to Mr. Gregonis' faulty blood spatter analysis.

       a.     Failure to Preserve Crime Scene and Gather Exculpatory Evidence

For several allegations, Plaintiff combines Detective Bradford with the other Defendants in this action.  For example, it is undisputed that Detective Bradford agreed with Nourse and the other detectives that the coroner should not be called until it was light out.  This amounts to a judgment call that falls well short of a constitutional violation under Section 1983.

The Court reaches the same conclusion with respect to Detective Bradford's other failures to investigate leads.  Specifically, Detective Bradford did not investigate Eugene Price or check his alibi.  Detective Bradford also did not follow up on a piece of blond hair that was found on the victim's fingernail that did not match Plaintiff.  Detective Bradford purportedly did not vet and corroborate evidence of Plaintiff's abuse of his wife nor did he scrape Pamela's fingernails.  According to Plaintiff, all of these are potential leads that may have led investigating officials away from Plaintiff and toward another suspect.  Nevertheless, there is no evidence in the record that Detective Bradford operated in "bad faith" or was negligent.  *See Wilson*, 260 F.3d at 955.  Without this, Plaintiff's allegations amount to speculation and conjecture.

Detective Bradford's actions also did not prejudice Plaintiff.  Neither Detective Bradford's failure to preserve the crime scene nor his failure to investigate other leads led to Plaintiff's conviction, as it was the shoddy bite mark evidence that led to Plaintiff's conviction.  Plaintiff does not show that if Detective Bradford investigated more thoroughly, then evidence could have been found that rebutted Dr. Sperber's bite mark analysis or otherwise exonerated Plaintiff.

The Court **GRANTS** summary judgment to Detective Bradford with respect to his failure to preserve the crime scene and investigate further leads.

///
///
///
///

MINUTES FORM 11
CIVIL GEN
      Initials of Preparer _____
__ : ___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  CV 5:17-00497-SJO (SPx)         DATE: September 3, 2019

b.    Fabrication of Evidence

Plaintiff finally contends that Detective Bradford fabricated evidence in two respects.  First, he created false evidence by administering a polygraph exam to Plaintiff.  Second, he participated in Mr. Gregonis' biased blood spatter experiment.

These allegations fail because Plaintiff is not able to point to evidence that Detective Bradford had a motive to fabricate evidence to implicate Plaintiff.  *See Caldwell*, 889 F.3d at 1112.  Moreover, with respect to the polygraph exam, administering a polygraph in itself is not a constitutional violation.  *See, e.g.*, *United States v. Alvirez*, 831 F.3d 1115, 1124 (9th Cir. 2016) (discussing the use of a polygraph exam in an investigation).  A law enforcement officer may administer a polygraph as part of a broader investigation.  With respect to the blood spatter experiment, the Court has already held that the experiment may have been unreliable but it was not the product of a conscious and intentional effort to implicate Plaintiff.

The Court **GRANTS** Detective Bradford summary judgment with respect to allegations that he fabricated evidence.

5.    Detective Navarro

As with the other detectives involved in the investigation of the murder, Plaintiff argues that Detective Navarro failed to preserve evidence at the crime scene and that he fabricated evidence.

a.    The Same Allegations As Against Other Defendants

To the extent that Plaintiff brings similar allegations against Detective Navarro that he does against the other law enforcement officials, the Court **GRANTS** summary judgment to Detective Navarro.  Detective Navarro is entitled to summary judgment with respect to any allegations that he failed to preserve the crime scene, that he failed to scrape the victim's fingernails, or that he failed to contact the coroner in a timely fashion.

b.    Failure to Preserve Crime Scene and Gather Exculpatory Evidence

Aside from the allegations that are equivalent to the other claims made by Plaintiff against the other Officer Defendants, Plaintiff also argues that Detective Navarro gave permission to the new owner of the mobile home on the property to dispose of the mobile home.  According to Plaintiff, this led to the destruction of exculpatory evidence.

MINUTES FORM 11
CIVIL GEN                          Page 32 of 35                    ___ : ___
                                                                    Initials of Preparer _____

Priority    _____
Send    _____
Enter    _____
Closed    _____
JS-5/JS-6    _____
Scan Only    _____

CASE NO.:   CV 5:17-00497-SJO (SPx)      DATE: September 3, 2019

Unfortunately for Plaintiff, he cannot point to evidence showing that Detective Navarro acted in bad faith to destroy evidence or failed to investigate evidence in the mobile home. In fact, some evidence shows that the Detectives relinquished custody of the motor home, and Plaintiff himself was responsible for having the motor home seized when he faced foreclosure.

In any event, the mobile home likely did not have any evidence in it that would have changed the outcome of this case. Plaintiff points out that the mobile home contained signs of an argument that Eugene Price had with Pamela Although this evidence could have been used to impeach Mr. Price at trial, Mr. Price's testimony was not the reason Plaintiff was convicted. As noted *supra*, "with the exception of the bite mark evidence, the defense had a substantial response to much of the prosecution's evidence against [Plaintiff]." *In re Richards*, 63 Cal. 4th at 315. Even assuming that there was evidence in the motor home that could impeach Mr. Price, it is unclear how this evidence would have challenged the bite mark evidence, which ultimately led to Plaintiff's wrongful conviction.

The Court **GRANTS** summary judgment to Detective Navarro with respect to the failure to preserve evidence in the motor home.

b.    Fabrication of Evidence

The Court next addresses the contention that Detective Navarro deliberately fabricated evidence. Specifically, he wrote a report called a "time and distance test," in which he stated that it took him 41 minutes to drive the 45 miles from Plaintiff's workplace to his residence. Aside from exceeding the speed limit, Detective Navarro also purportedly only drove to the bottom of the hill in front of Plaintiff's residence, thereby not accounting for the time that it took for him to reach the actual crime scene. This permitted Detective Navarro to conclude that Plaintiff could have left his workplace, murdered his wife, and called the police within the timeline that the police had constructed.

The allegations against Detective Navarro are very similar to the allegations against Dr. Sperber and Mr. Gregonis. As with the latter two individuals, the Court refuses to impute bad faith based solely on the fact that the California Supreme Court vacated Plaintiff's conviction. Plaintiff does little to show that Detective Navarro had a motive to fabricate evidence against Plaintiff, which would help Plaintiff show that Detective Navarro fabricated evidence. *See Caldwell*, 889 F.3d at 1112.

Additionally, Plaintiff is not able to show that Detective Navarro's actions caused his harm, his incarceration. Dr. Sperber's bite mark evidence and testimony, not Detective Navarro's

MINUTES FORM 11
CIVIL GEN        Page 33 of 35        Initials of Preparer _____

___ : ___

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**   CV 5:17-00497-SJO (SPx)          **DATE:** September 3, 2019

purportedly shoddy driving experiment, was the primary cause of Plaintiff's incarceration.  Even without Detective Navarro's driving experiment, it is likely that Plaintiff would have been convicted.

The Court **GRANTS** summary judgment to Detective Navarro with respect to the allegations that he fabricated evidence.

### 6.   County of San Bernardino

The Court next addresses Plaintiff's allegations against the County of San Bernardino, the county that prosecuted him for the murder of his wife.  Plaintiff contends that the County failed to prevent the violation of his rights by not having particular policies in place about how to examine victims or crime scenes.  He also alleges that the County does not have customs, policies, or practices in place that prevent *Brady* violations or the manufacturing of false evidence.  Finally, he contends that policies in place at the County led to constitutional violations against him.

Plaintiff's allegations against the County fail because proving liability under *Monell* requires a predicate constitutional violation by a government official.  For example, a local government can only be held liable where an individual violates a plaintiff's constitutional rights pursuant to the "execution of a government's policy or custom."  *See Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978)).   Here, Plaintiff does not show that any of the Defendants violated his constitutional rights.  Accordingly, the Court **GRANTS** summary judgment to the County.

### 7.   Qualified Immunity For Defendants

As a final matter, Defendants contend that they are entitled to qualified immunity because their conduct did not violate a clearly established law.   Defendants are entitled to qualified immunity unless: (1) Defendants violated Plaintiff's constitutional rights, and (2) it was clearly established, at the time, that Defendant's conduct was unconstitutional.  *See Saucier v. Katz*, 533 U.S. 194, 205-06 (2001).

The Court does not need to reach the qualified immunity defense because the Court holds that the undisputed facts show that Defendants did not violate Plaintiff's constitutional rights under the first prong of the *Saucier* test.  Were the Court to reach the second prong, however, Plaintiff does have a clearly-established constitutional rights with respect to: (1) *Brady* obligations of law enforcement, (2) obligations of law enforcement to investigate leads and preserve evidence, and (3) obligations of law enforcement to refrain from fabricating evidence.  *See* Sections B.1-B.4, *supra*.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>CV 5:17-00497-SJO (SPx)</u>        **DATE:** <u>September 3, 2019</u>

Ultimately, the Court does not need to analyze qualified immunity because it **GRANTS** summary judgment to Defendants on other grounds.

III.    <u>RULING</u>

The Court **GRANTS** the Gregonis and Sperber Motion, the Officer Defendants' Motion, and the County's Motion. This case shall close.

IT IS SO ORDERED.

## Marie Bolanos

**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Wednesday, September 4, 2019 10:59 AM
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 5:17-cv-00497-SJO-SP William J. Richards v. County of San Bernardino et al Order on Motion for Summary Judgment

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered on 9/4/2019 at 10:58 AM PDT and filed on 9/3/2019

**Case Name:**      William J. Richards v. County of San Bernardino et al
**Case Number:**    5:17-cv-00497-SJO-SP
**Filer:**
**WARNING: CASE CLOSED on 09/03/2019**
**Document Number:** 138

**Docket Text:**
**MINUTES (IN CHAMBERS) by Judge S. James Otero: ORDER GRANTING DEFENDANTS GREGONIS AND SPERBER'S MOTION FOR SUMMARY JUDGMENT[91]; ORDER GRANTINGDEFENDANTS BRADFORD, NAVARRO, NOURSE, AND PARENT'S MOTION FOR SUMMARYJUDGMENT[93]; ORDER GRANTING COUNTY OF SAN BERNARDINO'S MOTIONFOR SUMMARY JUDGMENT[94].This case shall close. MD JS-6. Case Terminated. (lc)**

**5:17-cv-00497-SJO-SP Notice has been electronically mailed to:**

Marilyn E Bednarski     reception@kmbllaw.com, mbednarski@kmbllaw.com

Caitlin S Weisberg     mbolanos@kmbllaw.com, reception@kmbllaw.com, jwhite@kmbllaw.com, cweisberg@kmbllaw.com

Susan E Coleman     tmehra@bwslaw.com, dwetters@bwslaw.com, scoleman@bwslaw.com, gmoreno@bwslaw.com

Wendy J Koen     wkoen.defender@gmail.com

Kristina Doan Strottman     kstrottman@bwslaw.com, tmehra@bwslaw.com

David S McLane    dmclane@kmbllaw.com

**5:17-cv-00497-SJO-SP Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**